**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| MOMENTA PHARMACEUTICALS, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:11-cv-11681-NMG |
| | ) | |
| AMPHASTAR PHARMACEUTICALS, INC., *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
|  | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' EMERGENCY**
**MOTION TO MODIFY OR DISSOLVE TEMPORARY RESTRAINING ORDER**

Through a series of rushed events, on October 7, 2011, before receiving briefing or written submissions from Defendants, this Court granted Plaintiffs' motion for a TRO prohibiting Defendants from selling or *offering to sell* Amphastar's generic version of the drug enoxaparin until the preliminary injunction hearing on October 20. No written submission was made because the day before the hearing, the Court had advised the parties that the October 7 hearing would be related solely to the motion for preliminary injunction (not the TRO) and that, it appeared, it was *denying* the motion for a TRO:

> Counsel are informed that the hearing scheduled for Friday, October 7, 2011 will be for the purpose of permitting the defendants to respond orally to plaintiffs' motion for a preliminary injunction without prejudice to their filing a written opposition to that motion on or before October 14, 2011 (14 days from the date the motion was filed). *The Court discerns no irreparable harm that is likely to befall plaintiffs before defendants' written response can be filed and a full hearing on plaintiffs' motion is conducted during the week of October 21, 2011.*

Order of October 6, 2011 at Docket No. 35 (emphasis added) (attached as Exhibit A to the Declaration of Isaac A. Hubner, hereinafter "Hubner Decl."). And then, only hours before the hearing, the Court further advised the parties that

> [t]he Court will proceed with a circumscribed hearing this afternoon limited to the issue of whether _Plaintiffs_ will suffer irreparable harm in the next two weeks absent immediate injunctive relief from the Court.

Email from Clerk Patch to Counsel dated October 7, 2011 (emphasis added) (attached as Exhibit B to Hubner Decl.). As a result of those two communications, Defendants' entered the courtroom with a reasonable expectation that they would not be called on to submit their own evidence of immediate irreparable harm, and that they would have an opportunity to submit a written response to Plaintiffs' motion before any injunctive relief would be granted.

As a result, even though the Defendants were present, the hearing was effectively an _ex parte_ TRO procedure, because the Court had the benefit of hearing only one side of the case on October 7 before granting the TRO. Indeed, when the Court then said in its Order that it had further reviewed the submissions, it could only have reviewed Plaintiffs documents. Defendants were neither unwilling nor unable to make submissions, but the Court simply did not request submissions and stated instead that the submissions would be expected the following week in conjunction with the preliminary injunction, "without prejudice."

This unfortunate series of events led to the issuance of a TRO that, in fact, now causes _real_ -- not imaginary or speculative -- harm to Defendants. If Defendants had understood in advance of the October 7 hearing that they were expected to proffer evidence concerning _their_ injury if the TRO were granted, they would have demonstrated two distinct and significant categories of harm, and the result likely would have been different.

Defendants now ask the Court to modify (or dissolve) the TRO to allow them to take two steps during the TRO period to limit significant damage to their business which can not be compensated for should this court deny the preliminary injunction next week.

*First,* Defendants *are* injured because they cannot sell for two weeks enoxaparin inventory which will soon expire. As set forth in the Declaration of Jacob Liawatidewi (filed under seal contemporaneously herewith), one lot of enoxaparin will soon expire and become unusable on December 31, 2011. Due to the shelf life requirement of the wholesalers to which Defendants sell, and the time required for processing and shipping an order, the market requires drugs to have a minimum of 10 weeks' remaining shelf life to be sold. However, as a direct result of the TRO, Amphastar is not able to even *negotiate* to sell any of this inventory, and when the TRO expires, it will be too close to the lot's expiration date to sell for full price. This TRO, even if vacated late next week, will cause Amphastar to suffer a loss of *millions* of dollars. (Again, the details are in the confidential Declaration of Jacob Liawatidewi filed under seal herewith).

*Second,* Defendants *will* suffer significant harm due to lost opportunities with Group Purchasing Organizations ("GPO") who are bid submission deadlines in the next two weeks. The bulk of generic enoxaparin sales are through GPOs, and GPO contracts usually have a 3-5 year duration. Once a contract is awarded, the opportunity for a new supplier to enter into a contract with a GPO is significantly reduced.

Prior to the TRO, Amphastar was in active talks and preparations to make time-sensitive bids on significant GPO enoxaparin contracts. The deadlines for two such bids fall within the TRO period. (The details are again provided in the Liawatidewi declaration, filed under seal herewith.) In particular, these GPOs have solicited bids for enoxaparin that are due on October 11 and October 14, respectively. The contracts have a term of three years each and estimated annual sales of tens of millions of dollars. Based on prior successful bids using Amphastar's

pricing strategy, Amphastar had a high chance of being awarded the contracts. If Amphastar loses these contracts because its bid is untimely, there is no way to make that loss up.

Permitting Amphastar to sell its expiring lot, and to make two bids to GPOs, will not harm the Plaintiffs. If the Court enters the preliminary injunction Plaintiffs seek -- which is highly unlikely -- Amphastar will have to withdraw its bids with the GPO and will not be able to ship its expiring drug, and there will be no harm to Plaintiffs. If, however, the Court does not allow Amphastar to at least take the appropriate steps to protect these sales, it will be locked out of these opportunities forever, giving Plaintiffs an unwarranted two week monopoly extension which will *never* be corrected by the legal process.

As demonstrated below, Defendants will suffer real, significant harm if they are not allowed to do *any* business until October 21. Therefore, pursuant to Fed. R. Civ. P. 65(b), Defendants respectfully request that the Court dissolve the TRO or, at the very least, modify it in two important respects.

## BACKGROUND

### A.    Procedural History

On September 30, Plaintiffs filed a motion for a TRO and Preliminary Injunction to prohibit Defendants from selling or offering to sell their generic version of enoxaparin. The Court scheduled a hearing on the TRO to occur on October 7. In the meantime, counsel for the parties agreed that Defendants' written oppositions to the pending motions would be served and filed on October 14, fourteen days from service. In the 48 hours preceding the hearing on October 7, however, there was a series of communications between the Court and the parties about the scope of the hearing and the matters that the Court wanted addressed, and led ultimately to the granting of a TRO.

Specifically, as noted above, on October 6 the Court advised the parties in a written order as follows:

> Counsel are informed that the hearing scheduled for Friday, October 7, 2011 will be for the purpose of permitting the defendants to respond orally to plaintiffs' motion for a preliminary injunction without prejudice to their filing a written opposition to that motion on or before October 14, 2011 (14 days from the date the motion was filed). The Court discerns no irreparable harm that is likely to befall plaintiffs before defendants' written response can be filed and a full hearing on plaintiffs' motion is conducted during the week of October 21, 2011.

On the basis of that seemingly plain order, Defendants understood that the only purpose of the hearing was to give them an advance opportunity to address Plaintiffs' motion for a preliminary injunction, and believed that it was neither necessary nor expected of them to make a written submission with regard to the motion for TRO, which the Court had already said was not supported by any discernible harm on the record before it.

The expectation that the hearing would be narrow in scope was reinforced by a series of emails later that day between the Court's deputy and counsel for the parties.  At 3:45 p.m., the deputy wrote to all counsel, stating:

> …as Defendants have not yet filed their response, in writing, to the Motion for the TRO/PI, the Judge is inclined to move the hearing to a later date (next week) to allow Defendants time to respond in writing, UNLESS plaintiffs can prove that they will suffer irreparable harm in delaying the matter.  Please advise if counsel can stipulate to allow the defendant ample time to respond in writing and let me know as soon as possible.

Email from Clerk Patch to Counsel dated October 6, 2011 (attached as Exhibit C to Hubner Decl.). Plaintiffs, however, refused to enter such a stipulation, nor did they submit additional proof of irreparable harm over the next two weeks, as the Court invited them to do.  Accordingly, on the morning of October 7, only hours before the hearing, the Court advised the parties that "[t]he Court will proceed with a circumscribed hearing this afternoon limited to the issue of

whether plaintiffs will suffer irreparable harm in the next two weeks absent immediate injunctive relief from the Court."  (*See* Exhibit B).

Guided by the Court's instruction, Defendants came to the hearing prepared to address only Plaintiffs' alleged irreparable injury over the next two weeks, and none of the other factors relevant to the TRO decision, such as the severe irreparable injury that Defendants themselves would suffer if the TRO were granted; Plaintiffs' likelihood of success on the merits; the balance of equities; and the public interest.  Had they realized that the Court might actually decide the motion for the TRO and find irreparable harm where it had discerned none before, Defendants would have proffered additional information about those factors—as presented here—at the hearing itself.  Instead, Defendants came armed without even a written response to Plaintiffs' motion, in compliance with the communications as they understood them from the Court.

To Defendants' surprise, at the conclusion of the hearing, the Court granted the TRO.  In a Memorandum and Order filed later that day, and based on no more evidence than it had before it on October 6, the Court found that there could be "significant risk of price erosion, loss of market share, and reputational harm" to Plaintiffs over the next two weeks if Defendants were allowed to "launch" their product.[1]  Order of October 7, 2011 at Docket No. 39, at page 2 (attached as Exhibit D to Huebner Decl.).  At the same time, the Court found that Defendants faced "little, if any, prospective harm that could not be fully protected by a bond."  Defendants, however, had not yet had the opportunity to make a submission detailing their own irreparable injury.  The Court ordered Defendants not to advertise, sell, or offer for sale any generic

---

[1] As discussed below, the Court may have been misled by Plaintiffs' submissions into believing that some sort of "launch" of Defendants' product was imminent.  In fact, Defendants had already received FDA approval to sell their drug, and had been selling their product for several weeks before Plaintiffs brought their motion for the TRO.

enoxaparin product until the close of business on October 21, and ordered Plaintiffs to post a $50,000 bond to secure any costs and damages incurred by Defendants.

## ARGUMENT

### I.     PLAINTIFFS DO NOT MEET THE STANDARD FOR ISSUANCE OF A TRO

The standard for granting a TRO is the same as for a preliminary injunction: the plaintiff must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Holmes Prods. Corp. v. Catalina Lighting, Inc.*, 67 F. Supp. 2d 10, 11-12 (D. Mass. 1999) (Gorton, J.) (same); *Quincy Cablesystems, Inc. v. Sully's Bar, Inc.*, 640 F. Supp. 1159, 1160 (D. Mass. 1986) (standard for preliminary injunction and TRO equivalent).  Here, consideration of all the submitted facts that would have been before the Court, if the Court had asked for them, makes clear that the balance of equities tips heavily in favor of Defendants, not Plaintiffs, because the former will suffer far more from the imposition of the TRO than the latter will suffer from its modification or dissolution.  Furthermore, as will be discussed more fully in Defendants' Opposition to the Motion for Preliminary Injunction, Plaintiffs have not met their burden of showing a reasonable likelihood of success on the merits.

### A.     Defendants Will Suffer Far Greater Irreparable Injury If The TRO Remains In Effect Than Plaintiffs Will Suffer If It Is Dissolved

None of the "injury" proffered by the Plaintiffs at the TRO hearing -- *all speculative* -- is the kind of injury which would justify barring Defendants from selling their product for two weeks, resulting in lost opportunity which can never be regained.  Each of the categories of harm

alleged by Plaintiffs -- economic losses, reputational damage, loss of ability to invest in research and development, and loss of ability to hire and retain talent -- *has nothing to do with what might occur over the next two weeks.*  Defendants' injuries, on the other hand, are truly irreparable, because Defendants are new entrants in the market for generic enoxaparin.  If Defendants are prevented from competing at this early stage of their manufacturing and production process, they simply will not have the opportunity later to establish their business.  (The details are provided in the Liawatidewi declaration, filed under seal.)

Defendants have already suffered and will continue to suffer harm of comparable or greater magnitude than any alleged by Plaintiffs.  Defendants have millions of dollars in pharmaceutical products that are growing staler by the day.  They are losing the opportunity to bid on multi-year supply contracts encompassing a significant portion of the overall market.  The $50,000 security bond required by the Court does not begin to cover the damages Defendants are likely to incur over this period.

Finally, the TRO is directly opposed to the public interest as embodied in the FDA's generic drug regulatory scheme and the Hatch-Waxman Act, which oppose undeserved monopolies in the generic drug market and the artificial elevation of drug prices.

**B.      Plaintiffs Cannot Show A Reasonable Likelihood of Success On The Merits**

When the Court found that Plaintiffs had demonstrated a reasonable likelihood of success on the merits, it did not have the benefit of Defendants' views on that subject.  Defendants had not been advised of the need to address that factor at the October 7 hearing, and in fact it was hardly addressed by the Court or by counsel in their oral remarks. To the extent the TRO recites that the Court has considered the "pleadings," moreover, only Plaintiffs had made such submissions at that time.

What the Court did not know at the October 7 hearing is that Plaintiffs' patents do not even cover a drug product; Plaintiffs have not presented *any* evidence that Defendants are infringing; and even if Defendants were found to be using the claimed methods, Plaintiffs' infringement claims would be barred by the safe harbor provisions of the Hatch-Waxman Act, 35 U.S.C. § 271(e)(1).  These arguments will be presented in much greater detail in Defendants' Opposition to the Motion for a Preliminary Injunction, to be filed forthwith, and for the sake of economy are not duplicated here.

**II.    THE COURT SHOULD DISSOLVE THE TRO IN LIGHT OF THE SIGNIFICANT IRREPARABLE INJURY THAT DEFENDANTS HAVE ALREADY SUFFERED AND WILL CONTINUE TO SUFFER; OR, AT LEAST, ALLOW DEFENDANTS TO BID ON SUPPLY CONTRACTS WITH DEADLINES BEFORE OCTOBER 21**

For the reasons established above, the Court did not have before it a complete record on October 7 when it decided the motion for the TRO.  Defendants have already suffered, and will continue to suffer, substantial injury if the TRO is allowed to remain in effect.  Moreover, Plaintiffs' allegations concerning their own expected injury are exaggerated and not credible. Accordingly, it is appropriate for this Court to dissolve the TRO pending the full preliminary injunction hearing on October 20.  *See Granny Goose Foods v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 440-442 (1974) (affected party may challenge the propriety, breadth or vagueness of a TRO even before hearing on the application for preliminary injunction.); Fed. R. Civ. P. 65(b)(4) (allowing for motion to dissolve TRO order with two days' notice to opposing side).

In the alternative, the Court could largely allay Defendants' injuries if it modified the TRO to provide that Defendants are permitted to complete their bids for GPO supply contracts

that have deadlines before October 21 and enter into contracts to sell lots with an expiration date before January 1, 2012.

The GPO contracts are not expected to be awarded until after the October 20 preliminary injunction hearing, and Defendants would agree not to ship the expiring lots until after the October 20 hearing.  Accordingly, if Defendants submitted their bids during the next two weeks, and the Court decided on October 20 that preliminary injunctive relief should be granted, Defendants could still withdraw their bids before the awards are made.  There is no credible basis to believe that the mere act of submitting a bid will cause some irreparable injury to Plaintiffs.  Further, the equitable relief, if any, "should be narrowly tailored to fit the specific legal violations."  *See Gemveto Jewelry Co., Inc. v. Jeff Cooper Inc.*, 800 F.2d 256, 259 (Fed. Cir. 1986).

## <u>CONCLUSION</u>

For the reasons above, the TRO should be dissolved or modified to allow Defendants to bid on supply contracts with deadlines before October 21, and sell expiring lots.

Dated:  October 12, 2011                          Respectfully submitted,

                                                  /s/ Steven M. Bauer
                                                  Steven M. Bauer (BBO #542531)
                                                  Isaac A. Hubner (BBO # 677719)
                                                  Proskauer Rose LLP
                                                  One International Place
                                                  Boston, MA  02110-2600
                                                  Telephone:  617.526.9600
                                                  Facsimile:  617.526.9899
                                                  sbauer@proskauer.com
                                                  ihubner@proskauer.com

Anthony T. Pierce (admitted *pro hac vice*)
apierce@akingump.com
Mark Mansour (admitted *pro hac vice*)
mmansour@akingump.com
Jonathan P. Robell (admitted *pro hac vice*)
jrobell@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue NW
Washington, DC  20036
Telephone:  202.887.4000
Facsimile:  202.887.4288

Jan P. Weir (admitted *pro hac vice*)
jweir@sycr.com
STRADLING YOCCA CARLSON & RAUTH
660 Newport Center Drive, Suite 1600
Newport Beach, CA  92660
Telephone:  949.725.4000
Facsimile:  949.725.4100

*Counsel for Defendants Amphastar Pharmaceuticals, Inc., International Medication Systems, Ltd., and Watson Pharmaceuticals, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of October, 2011, I caused a copy of the foregoing document to be electronically filed using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Courtney M. Schou
Eric J. Marandett
Jessica Gan Lee
Robert S. Frank , Jr.
CHOATE, HALL & STEWART LLP
Two International Place
100-150 Oliver Street
Boston, MA  02110
Telephone:  617.238.4849
Facsimile:  617.248.4000

*Counsel for Plaintiffs Momenta
Pharmaceuticals, Inc. and Sandoz, Inc.*

Melissa Nott Davis
Sarah Chapin Columbia
Thomas P. Steindler
MCDERMOTT, WILL & EMERY LLP
28 State Street
Boston, MA  02109
Telephone:  617.535.4074
Fax:  617.535.3800

*Counsel for Plaintiff Sandoz, Inc.*

/s/ Steven M. Bauer
Steven M. Bauer