**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____
)
MOMENTA PHARMACEUTICALS, INC., *et al.*,    )
)
Plaintiffs,    )
)
v.    )      C.A. No. 1:11-cv-11681-NMG
)
AMPHASTAR PHARMACEUTICALS, INC*., et al.*    )      Leave to File Granted
)      on October 20, 2011
Defendants.    )
)
_____)

**DEFENDANTS' SUR-REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANTS'**
**OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Anthony T. Pierce (admitted *pro hac vice*)
apierce@akingump.com
Mark Mansour (admitted *pro hac vice*)
mmansour@akingump.com
Jonathan P. Robell (admitted *pro hac vice*)
jrobell@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue NW
Washington, DC  20036
Telephone:  202.887.4000
Facsimile:  202.887.4288

Steven M. Bauer (BBO No. 542531)
sbauer@proskauer.com
Isaac A. Hubner (BBO No. 677719)
ihubner@proskauer.com
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110
Telephone:  617.526.9600
Facsimile:  617.526.9899

Herman L. Goldsmith (admitted *pro hac vice*)
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036-8299
hgoldsmith@proskauer.com

Jan P. Weir (admitted *pro hac vice*)
jweir@sycr.com
STRADLING YOCCA CARLSON & RAUTH
660 Newport Center Drive, Suite 1600
Newport Beach, CA  92660
Telephone:  949.725.4000
Facsimile:  949.725.4100

*Counsel for Defendants Amphastar Pharmaceuticals, Inc., International Medication Systems,
Ltd., and Watson Pharmaceuticals, Inc.*

Plaintiffs make new arguments and present new evidence by way of an additional expert declaration in support of Plaintiffs' Memorandum of Law In Response To Defendants' Opposition To Plaintiffs' Motion For A Preliminary Injunction.  As demonstrated below, Plaintiffs' new arguments and evidence are without merit.

## I.    The '886 Patent

### A.    The '886 Patent Is Not Infringed

Plaintiffs contend that the "separation" step of claims 6, 15 and 53 covers the use of HPLC or CE to determine the presence of the non-naturally occurring sugar associated with peak 9 of FIG. 1 of the '886 patent.  It is undisputed that peak 9 of FIG. 1 was obtained by CE.  It is also undisputed that HPLC would not yield FIG. 1 and thus would not yield peak 9.  Further, Plaintiffs do not dispute that if claims 6, 15 and 53 do not cover HPLC as the separation step then there would be no infringement of the '886 patent by Defendants.

### 1.  The language of the '886 patent's Claims requires Peak 9 of FIG.1 from the use of a CE method.

Plaintiffs' Response at page 2 lines 25-26, contends that *"[T]he claim requires the use of `a separation method,' without further limitation or qualification*."  This is not true.  The '886 patent clearly requires that the "***separation method***" in each of Claims 6, 15 and 53 is **"*to determine …[the]  presence of a structural signature associated with the non-naturally occurring sugar associated with peak 9 of FIG. 1*".  One can only determine the presence of peak 9 of FIG. 1 using CE.**    As there is no other identification of what the sugar is at peak 9, one must perform the CE that resulted in FIG. 1 to determine the presence of the sugar associated with peak 9.  (Azadi Supp. Decl., ¶ 4.)

Plaintiffs argue that a person of skill in the art using a separation method different than CE "might" find the sugar associated with peak 9 of FIG. 1 under a different peak depending on the method of separation conditions used.  (Resp. p. 8.)  Yet, Plaintiffs do not explain how a person of skill in the art would be able to determine that what he/she found under a different peak is the same sugar under peak 9 of FIG. 1.  (Azadi Supp. Decl., ¶ 4.)  It is well known by

those skilled in the art that even when the same separation instrument, such as CE, is used, if the control parameters (e.g., type of column, working conditions, etc.) are changed, then the peak profile will be totally different.  Not to mention, HPLC and CE are two completely different separation technologies. Plaintiffs' argument that as long as the conditions of the separation method contain a parallel analysis the person of skill in the art "would find at least one unique peak that would necessarily correspond to the non-naturally occurring sugar" does not answer the question of how he/she would know that the one unique peak was the same as the sugar at peak 9 of FIG. 1.  Without any description as to how one skilled in the art could determine which peak generated by a non-CE separation method corresponds to peak 9 of FIG. 1, claims 6, 15 and 53 would be non-enabled if read on HPLC.  *See e.g.*, *AK Steel Corp. v. Sollac and Ugine*, 344 F.3d 1234, 1244 (Fed. Cir. 2003) ("as part of the quid pro quo of the patent bargain, the applicant's specification must enable one of ordinary skill in the art to practice the full scope of the claimed invention."); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1380 (Fed. Cir. 2007) ("the asserted claims read on, and the full scope of the claimed invention includes, an injector system with and without a pressure jacket. There must be 'reasonable enablement of the scope of the range' which, in this case, includes both injector systems with and without a pressure jacket.")

Plaintiffs contend that claim 54 of the '886 patent "expressly identifies HPLC as a type of separation method" (Resp. 3:9-10).  Plaintiffs misconstrue the language of claim 54.  Claim 54 provides:

> 54.     The method of claims 1, 3, 6, 7, 8, 10, 11, 14, 20 or 43, wherein the **structural signature** is **determined using** high performance liquid chromatography (**HPLC**).

(Schou Decl., Exh. B, Col. 70:30-32. Emphasis added.)  Plaintiffs contend that claim 54 is directed to a separation method using HPLC.   Claim 54 does not contain the phrase "the separation method" with HPLC.  Claim 54, states instead a method of "**determining**" "the

structural signature" of the sugar associated with peak 9 of FIG. 1 (*See* Schou Decl., Exh. B, Cols. 6:57-7:60.), which can only occur after the "separation".

The fact that the dependent claim 54's "determining" step is a different additional step from the independent claim 6's separation step is apparent from related dependent claims 55, 57, 58, 59 and 60.  Dependant claims 55, 57, 58, 59 and 60 contain the exact same language as claim 54 with the exception that the particular method for "determining" the structural signature is changed—NMR for claim 55, MALID-MS claim 57, ESI-MS claim 58, and ELISA claim 60. Importantly, neither NMR or MALID-MS, ESI-MS ELISA are separation techniques.  (Azadi Supp. Decl., ¶ 11.)  Further, Example 1 of the '886 patent provides that after separation, individual peak "was collected", then "their mass was measured by offline MALDI Mass Spectrometer" (Col 48:65 –Col. 49:2).  Using a non-separated sample in any one of these systems, one would not provide a meaningful result for a mixture of oligosaccharide like this case.  (*Id.*)  Since NMR or MALID-MS, ESI-MS, or ELISA are not separation methods, the step of "determining" the structural signature is a different step than the separating step.  Thus, as all of claims 54-60 are identical except for use as the particular method of determining, claims 54 and 56 cannot be construed differently and thus are not separation steps.

2.  The Specification Supports Defendants' Claim Construction

Plaintiffs make the same mistake of conflating the step of determining the actual structural signature from the separation step in their citation to the Specification. (Resp. 3-4.) Plaintiffs quote a portion of the Specification refers to "determining" the structural signature, not separating out a particular sugar component.  The portion of the specification was cited in Defendants' opposition, however, the `886 patent describes the separation step and **states that HPLC is not sufficient whereas CE is the method of the invention** Col. 47:54-Col.48:1.

The '886 patent repeatedly distinguishes and differentiates its invention as being different from the HPLC separation method, especially from SAX-HPLC separation.  "**SAX-HPLC** … is often **insufficiently sensitive** for detecting small amount of structurally important heparin-

derived oligosaccharide" (Col. 4:40-44, emphasis added); and "**CE is superior to SAX HPLC in oligosaccharide analysis …**" (Col. 33:55-56, emphasis added).

It should be noted that the '886 patent acknowledges that SAX-HPLC is prior art technology "**HPLC (SAX**) have **previously been used** for the qualitative and quantitative analysis of heparin preparations" (Col. 47:42-44, emphasis added).  However, in contrast to the claims of '886 patent regarding the inferiority of SAX-HPLC, both the USP method <207> and Amphastar's release testing for 1,6-anhydro ring are conducted with the SAX-HPLC method.

   3.  The Prosecution History Supports Plaintiffs' Claim Construction

It is beyond dispute that Plaintiffs then amended the pending claims to add the peak 9 of FIG. 1 limitation.  It is also undisputed that the Examiner initially rejected claim 331 (the basis of claims 6, 15, and 53) as anticipated by Desai et al. and Linhardt et al**.**  Plaintiffs contend that in addition of the "peak 9 of FIG 1" limitation does not create an estoppel because Momenta added the "exhaustively digested" limitation at the same time.  The fact that the patentee made more than one amendment does not mean that there is no prosecution history estoppel.

Plaintiffs also contend that for prosecution history estoppel to apply, Momenta had to make a "clear and unmistakable" disclaimer of HPLC.  (P's. Resp. p. 5, lines 1-2, citing *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1377 (Fed. Cir. 2009).)  *Martek* is a prosecution disclaimer case.  Prosecution disclaimer cases arise where there is no corresponding amendment to a patent's claims.  When there is no amendment, the courts require a "clear and unmistakable disclaimer." *Id*.  However, when there is an amendment to the claims, as in this case, there is no requirement for a "clear and unmistakable" disclaimer.  Rather, in the case of an amendment the courts place the burden on the patentee to show that there was no waiver/disclaimer of all the subject matter removed by the amendment.  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co*., Ltd. 535 U.S. 722, 739-40 (2002) (citing *Warner-Jenkinson v. Hilton Davis Chemical Co.*, 520 U.S. 17, 33 (1997)):

When the patentee is unable to explain the reason for amendment, estoppel not only applies but also "bars the application of the doctrine of equivalents as to that element." *Ibid.* These words do not mandate a complete bar; they are limited to the circumstance where "no explanation is established." They do provide, however, that when the court is unable to determine the purpose underlying a narrowing amendment—and hence a rationale for limiting the estoppel to the surrender of particular equivalents—the court should presume that the patentee surrendered all subject matter between the broader and the narrower language.

*Id.* at 740.

The Federal Circuit has recently affirmed this doctrine. *See, e.g., Duramed Pharms., Inc. v. Paddock Labs., Inc.*, 644 F.3d 1376, 1380 (Fed. Cir. 2011)  (holding that "[b]ecause during prosecution [the patentee] narrowed the scope of the [its] patent's claims in response to a prior art rejection, a presumption of prosecution history estoppel applies.")

The direction that the prosecution moves in after an amendment is made is irrelevant to whether that amendment supports a finding of prosecution history estoppel. *See Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003) (quoting *Desper Products, Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1336 (Fed. Cir. 1998)) (stating that "when the applicant amended the claims and made accompanying remarks to overcome a rejection based on another patent, we stated [in the *Desper Products* case] that the fact that 'the prosecution shifted to a difference focus does not blunt the impact of those remarks made to overcome prior rejections.'").  Where, as in this case, the patentee was faced with a rejection, amended its claims and made new arguments, and then the examiner withdrew its rejection, the reliance by the patent office is clear. *Lifestream Diagnostics, Inc. v. Polymer Tech. Sys., Inc.*, 109 Fed. Appx. 411, 413-415 (Fed. Cir. 2004) ("A patentee may not state during prosecution that the claims do not cover a particular device and then change position and later sue a party who makes that same device for infringement.").

Thus, the '886 patent's written description which states that HPLC is not good enough for separation (Col. 4:40-44; Col. 33:55-56, Col. 47:49-53), the patent's claims that refer to the peak of a CE derived FIG. 1 and the prosecution history in which Momenta added the peak 9

limitation to overcome the prior art are all consistent and do not support a reading of claims 6, 15 and 53 as using HPLC for the separation step.

       **B.**      **The Asserted Claims Of The '886 Patent Are Invalid**

       <u>1.  Claims 6, 15 and 53 Claim An Obvious Use Of A Known Method</u>

Plaintiffs incorrectly suggest that Defendants bear the burden of proving invalidity on this motion. The burden of establishing a likelihood of success on the merits is on Plaintiffs and that burden includes the burden of showing that the patent will withstand a validity challenge.

Plaintiffs' argument that Defendants' invalidity position is based on nothing but lawyer argument is incorrect. Defendants presented undisputable evidence of the invalidity of the '886 patent from the prosecution history for the '886 patent. There can be no dispute that original claim 331 was rejected in its entirety as anticipated by Desai et al. (Hubner Decl., Exh. F. p. 12.) The Examiner rejected every one of Momenta's arguments including the declaration of Dr. Shriver. (*Id*., at 3.) Momenta acquiesced and abandoned the prosecution of claim 331. This is strong, clear and convincing, impartial evidence upon which this Court and a trier of fact can rely that the fundamental steps in claims 6, 15 and 53 of providing, separating and making a determination were known in the art and not an invention of Momenta. The only reason that claims 6, 15 and 53 were allowed was because of the inclusion of added limitations of using the otherwise anticipated test of claim 331 to determine the "quality" of the sample (claim 6), determine the level of one or more structural signatures (claim 15) and to select a batch base upon use of the otherwise anticipated test (claim 53.) Thus, the test was known and the claims allowed because of how the known test is used. Drawing a conclusion as to the quality of a test sample based upon a comparison with a reference standard is a well known quality control procedure. Further, selecting a batch based upon a quality control test involving the comparison of a test sample to a reference standard is a basic known FDA procedure. Lastly, determining the level of the structural signature is inherent in the anticipated test. (Azadi Supp. Decl., ¶¶ 13-15)

Finally, Plaintiffs contend that the PTO Examiner allowed claim 331 and that Defendant's evidence to the contrary is misleading. As evidence, Plaintiffs cite the Court to claim 1 of the

'886 patent which Plaintiffs contend is claim 331 "with only minor amendment." (Ps. Resp. at 7.) However, like asserted claims 6, 15, and 53, claim 1 of the '886 patent contains an additional limitation beyond the original limitations of claim 331. Claim 1 has the added limitation of: "determining the presence of the structural signature associated with the non naturally occurring sugar associated with peak 9 of FIG. 1 **in a second batch of enoxaparin**". (Schou Decl., Exh. B, Col. 64:3-5, emphasis added.) Plaintiffs are right this is a minor amendment. As such, claim 331 was never allowed without further amendment.

    2. Claims 6, 15 and 53 Are Indefinite

    Dr. Shriver contends in his declaration that claims 6, 15 and 53 are sufficiently definite because they reference a non-naturally occurring sugar. However, enoxaparin is entirely made up of non-naturally occurring sugars because their chains are cut from a naturally occurring sugar, which is heparin. The depolymerization of heparin by use of "alkaline depolymerization of heparin benzyl ester" (USP monograph of Enoxaparin Sodium) does not occur in nature and thus all of the depolymerized sugar sequences of enoxaparin are non-naturally occurring. Further, enoxaparin has several types of special signature structures of non-naturally occurring sugars, including sugars that do not have the 1,6-anhydro ring structure, such as odd oligiosaccharides. Thus, merely stating that the claimed test is looking for a non-naturally occurring sugar provides no information regarding which of many are the subject of the claim. Likewise, merely stating that the sugar results from the method of making enoxaparin does not distinguish between the many possible sugars.

    Dr. Shriver further contends that while the sugar that is being tested for in claims 6, 15 and 53 "bears a relationship to peak 9 of FIG. 1" one of skill in the art "**might**" find the same sugar under a different peak, depending on the separation method and the conditions used." Shriver Decl., ¶ 30. The argument proves Defendants' point. The fact that someone skilled in the art "might" find the same sugar under a different peak means that they might not and without direction from the patent as to how, the patent is not enabled and indefinite. Dr. Shriver does not explain how someone skilled in the art would even know he/she found the same sugar without

any identification of the sugar other than the reference to peak 9 in the CE derived FIG. 1. There is, for example, no mention whatsoever in the ’886 patent that peak 9 relates to a sugar that has a 1, 6 anhydro ring structure. (Azadi Supp. Decl., ¶ 3.) Indeed there is no mention of a 1, 6 anhydro ring structure in the `886 patent at all. (*Id.*)

Dr. Shriver further contends that the ’886 patent provides a sufficient disclosure to enable one skilled in the art to perform specific CE test that resulted in FIG. 1. Dr. Shriver contends that the CE analysis that resulted in FIG. 1 came from the Rhomberg et al. publication, cited at Col. 33:9-17 of the ’886 patent. The Rhomberg publications are cited for determining the molecular weight of polysaccharide fragments. There is no statement in the patent that the CE process disclosed in Rhomberg is the same process disclosed in Example 1. Dr. Shriver does not say that Rhomberg discloses the CE conditions used to generate FIG. 1. Dr. Shriver further contends that the ’886 patent’s specification discloses “most” of the key parameters of the Rhomber procedure. Dr. Shriver cites to Col. 27, lines 26-31 which is merely a summary description of the Figures. No information is provided about the CE conditions, such as temperature, pressure, type and length of column, pH, voltage, etc. Dr. Shriver cites Col. 47:54-65. Again there is no statement relating to the CE conditions of Example 1. Cols. 48:56-49:20 relate to Example 1, but the cited text merely describes the use of CE and not the CE conditions that generated FIG. 1. Cols. 48:56-49:20 describe the heparinase step, but provide none of the conditions for the CE. Lastly, Col. 62:47-60 relates to an entirely different example and FIG 10, not FIG 1. Thus, Dr. Shriver was unable to point to any disclosure in the ’886 patent of the CE conditions that generated FIG. 1. (Azadi Supp. Decl., ¶¶ 6-9.)

Since one of skill in the art cannot reproduce FIG. 1 one cannot determine what non-naturally occurring is allegedly present at peak 9 from the information provided in the patent claims 6, 15 and 53 are invalid for indefiniteness. *Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*, 401 F.3d 1367, 1371 (Fed. Cir. 2005) (“The perspective of a person of ordinary skill in the art at the time of the patent application governs the definiteness analysis.”); *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003) (“A claim is

indefinite if its legal scope is not clear enough that a person of ordinary skill in the art could determine whether a particular composition infringes or not.")  Further, each of all thirteen (13) independent claims of the '886 patent contains the associated with peak 9 of CE obtained FIG. 1 limitation,  Patent '886 termed peak 9 as an unknown substance, "a non naturally occurring sugar" not a sugar having a 1,6-anhydro ring structure.  USP's drug standards are required by the FDA and therefore are the industry standard for the pharmaceutical field.  All USP standard methods were carefully developed and validated by USP experts.  Before a USP standard method becomes effective, it must be published for comments from the public.

USP standard Method <207> is the "test for 1,6-anhydro derivative for enoxaparin sodium" (USP method <207>)  It utilizes a SAX-HPLC methodology.  USP Method <207> observes four (4) types of 1,6-anhydro structures.  However, Plaintiffs are contending that peak 9 contains the 1,6-anhydro structure which means that peak 9 did not separate out the four sugars and thus does not represent "a" sugar.   Thus, the '886 CE method is not capable of distinguishing these 4 types; it reported only one peak, "peak 9 in FIG. 1".  Therefore, the conclusion that peak 9 or the "non naturally occurring sugar" is the 1,6-anhydro ring structure is scientifically unsupported when compared to the USP standard method <207>.

## II.     Defendants Do Not Infringe The '466 Patent And It Is Invalid

### A.     Plaintiffs Have No Evidence Of Infringement

In spite of having moved for a TRO/preliminary injunction on the ground that Defendants are infringing the '466 patent, Plaintiffs have not responded at all to Defendants arguments and evidence that there is no infringement of the '466 patent based on a fundamental fact that the FDA never asked Amphastar to perform any release testing for sequencing of tetrasaccharides. Significantly, Plaintiffs have not responded to Defendants' point that Plaintiffs have not presented evidence that there is an actual FDA requirement for tetrasaccharide sequencing.

### B.     The '466 Patent Is Invalid

Dr. Shriver contends that the prior art Sasisekharan '642 patent did not disclose (a) analyzing an isolated tetrasaccharide fraction from a size fraction enoxaparin preparation," and

10

(b) the requirement that a particular tetrasaccharide sequence be present in a defined relative amount.  Dr. Shriver's arguments illustrate just how little alleged innovation there was to the '466 patent.  As Dr. Shriver acknowledges claim 1 was allowed over Sasisekharan because of the step of first "isolating" the tetrasaccharides and claim 8 was allowed because of the added step of determining the "amount" of the tetrasaccharide.  Both steps were, however, disclosed in the prior art patent to Linhardt et al., United States Patent No. 4,847,338 ('338 patent).  At Col. 4:10-30, Linhardt discloses the isolation of fragments for heparinase digested "depolymerized heparin" (Claim 1 of `338 patent), including the isolation of "tetrasaccharides," before further processing the tetrasaccharides with "SAX-HPLC" to obtain "individual components" (Example II of '338 patent), just as claimed in claim 1 of the '466 patent.

> The fragments thus obtained are redissolved in a suitable aqueous solution . . . and applied to a gel column . . .
>
> The column effects separation of the fragments on the basis of size. . . .Further fractionation of the sized fragment mixtures is accomplished on the basis of charge using an anion exchanger, such as by high performance liquid chromatography on a column packed with strong anion exchanger.

(See also, Example II, Col. 5:54-59 of '338 patent: "Six distinct peaks were observed representing, from last to first eluted, disaccharide, mixed tetrasaccharide fragments, missed hexasaccharide fragments, mixed octasaccharide fragments, mixed decasaccharide fragments."  Thus, Linhardt teaches the step of first isolating tetrasaccharides prior to further sequencing.  (Azadi Supp. Decl., ¶ 16.)

Linhardt then sequenced the isolated tetrasaccharides as described in Example II.  (Col. 6:29-41.  The Figure 2A represents the results of the further separation of the tetrasaccharides.  One of ordinary skill in the art would know that the area under the curve represents the amount of the tetrasaccharide represented by the peaks in Figure 2A.  (Azadi Supp. Decl., ¶ 17.)  Thus, Linhardt disclosed the only alleged points of novelty for claims 1 and 8, the only two independent claims of the '466 patent.  It would have been obvious to any one skilled in the art

to combine the teachings of Sasisekharan '642 and Linhardt '338 and thus, claims 1 and 8 of the '466 patent are invalid.

### III.     The Safe Harbor Provision Of The Hatch-Waxman Act Applies In This Case

The Hatch-Waxman Act's safe harbor provision plainly applies to the methods of testing allegedly covered by the Plaintiffs' patents.  Plaintiffs' argument to the contrary is out of step with the text of the statute and Supreme Court precedent.

Section 271(e)(1) itself says nothing about pre- or post-FDA approval activities.  Instead, the statute simply states that "[i]t shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention . . . solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs . . . ."  35 U.S.C. § 271(e)(1).  Although the Federal Circuit's *Classen* decision,[1] cited by Plaintiffs, plumbed the depths of Section 271(e)(1)'s legislative history to divine the purpose of the statute, the plain language speaks for itself.  This Court need go no further.

The Supreme Court has squarely addressed the breadth of Section 271(e)(1)'s plain terms.  In *Merck KGaA v. Integra Lifesciences I, Ltd.*, 545 U.S. 193, 193, 202 (2005), the Court held that the statutory language "makes clear" that Section 271(e)(1) "provides a wide berth for the use of patented drugs in activities related to the federal regulatory process. . . . [I]t is apparent from the statutory text that § 271(e)(1)'s exemption from infringement extends to all uses of patented inventions that are reasonably related to the development and submission of any information under the FDCA."  *Id.* at 202.  The Court continued, "[Congress] exempted from infringement *all* uses of patented compounds 'reasonably related' to the process of developing information for submission under *any* federal law regulating the manufacture, use, or distribution of drugs."  *Id.* at 206 (emphasis in original) (citation omitted).  There is "simply no room in the statute," the Court wrote, "for excluding certain information from the exemption on the basis of

---

[1] *Classen Immunotherapies, Inc. v. Biogen IDEC*, No. 2006-1634, 1649, 2011 U.S. App. LEXIS 18126 (Fed. Cir. Aug. 31, 2011).

the phase of research in which it is developed or the particular submission in which it could be included the ground that the allegedly infringing acts occurred." *Id.* at 202.

The broad language of the statute and Supreme Court precedent should doom Plaintiffs' attempt to limit Section 271(e)(1)'s safe harbor only to pre-approval testing. The dispute in *Classen* involved the administration of drugs and vaccines and FDA reporting ancillary to that administration. The *Classen* majority did not decide whether FDA-required testing constitutes infringement if done after FDA approval. Indeed, the majority noted "[t]here is no issue in this case of submissions for regulatory approval of generic products or like policy considerations." *Classen*, 2011 U.S. App. LEXIS 18126, at *36. The dissent disagreed with the majority and concluded that "the safe harbor extends to all uses that are reasonably related to submitting any information under the FDCA, including information regarding post-approval uses. *Id.* at 74. Here, there is no reason to conduct the allegedly patented tests except to report the results to the FDA. Any such testing therefore falls squarely within the ambit of Section 271(e)(1)'s safe harbor.

## CONCLUSION

Plaintiffs have not met their burden of establishing a likelihood of success on the merits, irreparable harm or any public interest. Accordingly, Plaintiffs' motion for preliminary injunction should be denied.

Dated:  October 20, 2011                                    Respectfully submitted,

                                                            /s/ Steven M. Bauer
                                                            Steven M. Bauer (BBO No. 542531)
                                                            sbauer@proskauer.com
                                                            Isaac A. Hubner (BBO No. 677719)
                                                            ihubner@proskauer.com
                                                            PROSKAUER ROSE LLP
                                                            One International Place
                                                            Boston, MA 02110
                                                            Telephone:  617.526.9600
                                                            Facsimile:  617.526.9899

Herman L. Goldsmith (admitted *pro hac vice*)
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036-8299
hgoldsmith@proskauer.com

Jan P. Weir (admitted *pro hac vice*)
jweir@sycr.com
STRADLING YOCCA CARLSON & RAUTH
660 Newport Center Drive, Suite 1600
Newport Beach, CA 92660
Telephone: 949.725.4000
Facsimile: 949.725.4100

Anthony T. Pierce (admitted *pro hac vice*)
apierce@akingump.com
Mark Mansour (admitted *pro hac vice*)
mmansour@akingump.com
Jonathan P. Robell (admitted *pro hac vice*)
jrobell@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue NW
Washington, DC 20036
Telephone: 202.887.4000
Facsimile: 202.887.4288

*Counsel for Defendants Amphastar Pharmaceuticals, Inc., International Medication Systems, Ltd., and Watson Pharmaceuticals, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of October, 2011, I caused a copy of the foregoing

Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction

to be electronically filed using the CM/ECF system, which will then send a notification of such

filing (NEF) to the following:

Courtney M. Schou
Eric J. Marandett
Jessica Gan Lee
Robert S. Frank, Jr.
CHOATE, HALL & STEWART LLP
Two International Place
100-150 Oliver Street
Boston, MA 02110
Telephone:  617.238.4849
Facsimile:  617.248.4000

*Counsel for Plaintiffs Momenta*
*Pharmaceuticals, Inc. and Sandoz, Inc.*

Melissa Nott Davis
Sarah Chapin Columbia
Thomas P. Steindler
MCDERMOTT, WILL & EMERY LLP
28 State Street
Boston, MA 02109
Telephone:  617.535.4074
Fax:  617.535.3800

*Counsel for Plaintiff Sandoz, Inc.*

/s/ Steven M. Bauer
Steven M. Bauer (BBO No. 542531)
sbauer@proskauer.com
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110
Telephone:  617.526.9600
Facsimile:  617.526.9899