1                IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF MASSACHUSETTS

3
   * * * * * * * * * * *    *
4  MOMENTA PHARMACEUTICALS,  *   11CV11681-NMG
   INC., and SANDOZ, INC.    *
5                            *
   VS.                       *   July 11, 2017
6                            *   9:15 a.m.
   AMPHASTAR PHARMACEUTICALS, *
7  INC., and INTERNATIONAL   *
   MEDICATION SYSTEMS LTD.    *
8                            *   BOSTON, MA
   * * * * * * * * * * *     *
9                            *

10           BEFORE THE HONORABLE NATHANIEL M. GORTON

11                         DISTRICT JUDGE

12                         (JURY TRIAL)

13   **APPEARANCES**:

14  FOR THE PLAINTIFF,
    MOMENTA PHARMACEUTICALS,
15  INC.:                    ROBERT S. FRANK, JR., ESQ.
                             DANIEL C. WINSTON, ESQ.
16                           SOPHIE F. WANG, ESQ.
                             ERIC J. MARANDETT, ESQ.
17                           ROBERT M. BUCHANAN, JR., ESQ.
                             Choate, Hall & Stewart
18                           100-150 Oliver Street
                             Boston, MA 02110
19

20  FOR THE PLAINTIFF,       ERIK J. OLSON, ESQ.
    SANDOZ, INC.:            Morrison & Foerster LLP
21                           755 Page Mill Road
                             Palo Alto, CA  94304
22

23

24

25

1   **APPEARANCES** (CONT'D):

2   FOR THE DEFENDANTS:        DOUGLAS H. CARSTEN, ESQ.
                              JOSHUA MACK, ESQ.
3                             NATALIE J. MORGAN, ESQ.
                              Wilson Sonsini Goodrich & Rosati
4                             12235 El Camino Real
                              Suite 200
5                             San Diego, CA  92130

6                             MICHAEL S. SOMMER, ESQ.
                              Wilson Sonsini Goodrich & Rosati
7                             1301 Avenue of the Americas
                              40th Floor
8                             New York, NY  10019

9   Court Reporters:
                              Debra D. Lajoie, RPR-FCRR-CRI-RMR
10                            Cheryl Dahlstrom, RMR, CRR
                              One Courthouse Way
11                            Boston, MA  02210

12

13              Proceeding reported and produced
                 by computer-aided stenography

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

Opening Statement                                          Page

  By Ms. Wang                                               4

  By Mr. Carsten                                            24


Testimony of:              Direct  Cross  Redirect  Recross


GANESH KAUNDINYA
  By Mr. Frank             45
  By Mr. Mack                     114
  By Mr. Frank                           130

ZACHARY SHRIVER
By Mr. Frank              134
By Mr. Sommer                    157



E X H I B I T S

No.      Description                                 In Evd.

1-2617                                                45

1                    P R O C E E D I N G S

2          THE COURT:  Good morning, jurors.  As I told you

3     yesterday, we're going to start the trial now; and when we

4     start, each side gets to make an opening statement.  So for the

5     plaintiffs, I'll invite Mr. Frank to make the opening

6     statement.

7          MR. FRANK:  Good morning, your Honor.  With your

8     permission, Sophie Wang will open for the plaintiffs.

9          THE COURT:  All right.  Ms. Wang.

10         MS. WANG:  Good morning, your Honor.  Thank you.

11         Good morning, ladies and gentlemen of the jury.  My

12    name is Sophie Wang, and I, along with my team -- Bob Frank,

13    Erik Olson, Dan Winston, Eric Marandett, and Bob Buchanan --

14    together represent the plaintiffs in this case, Momenta

15    Pharmaceuticals, a small biotech company located here in

16    Massachusetts, and its partner, Sandoz, Inc., a pharmaceutical

17    company located in New Jersey.

18         As you heard yesterday, this case is going to be about

19    a patent infringement lawsuit that Momenta and Sandoz has

20    brought against a California company named Amphastar.  And as

21    you'll hear throughout the trial, like all patent cases, it's

22    going to be about two main things:  innovation and choice.

23    Momenta innovated, and as a reward for its innovation, the

24    United States Patent Office awarded Momenta a patent.

25    Amphastar chose not to innovate and instead, as you will hear

1   through this trial, Amphastar chose to use Momenta's invention

2   without permission, and they've made hundreds of millions of

3   dollars doing so.  Amphastar's choices are why we're here

4   today.

5          This case actually begins long before Amphastar ever

6   entered the picture because the patent in this case is the

7   product of about two decades of hard work and dedication by a

8   scientist named Dr. Ganesh Venkataraman Kaundinya, who's

9   sitting right over here at this table.  Ganesh, as he's allowed

10   me to call him, is the founder of Momenta.  And the story of

11   Momenta is really the story of how Ganesh's research led to a

12   groundbreaking discovery and an invention that allowed a

13   company to sell the generic version of a drug called

14   enoxaparin.

15          Now, the funny thing about Ganesh, as he'll tell you

16   later today, is that he never intended Momenta to be a generic

17   drug company because he founded the company while he was doing

18   research at MIT, and he was focused on studying something

19   called complex sugar molecules because he thought that if you

20   learned as much as you could about these types of complicated

21   molecules you would come up with new ways of curing diseases

22   like diabetes and cancer.

23          So how does he end up making a generic version of

24   enoxaparin?  As you'll learn throughout this case, enoxaparin

25   is actually made from the same type of complex sugar molecule

1    that Ganesh was studying back at MIT.  You'll hear that

2    scientists at the time actually thought these types of

3    molecules were too difficult to understand and had actually

4    given up on trying.  And enoxaparin is a very good example of

5    this because enoxaparin was first approved by the FDA for sale

6    in 1993 by a company called Sanofi-Aventis.  It was sold under

7    the name of Lovenox.  Sanofi-Aventis sold this drug for ten

8    years to patients and in 2003 admitted that they didn't know

9    fully what this drug was made of and how it worked.  It may be

10   a little scary to hear that the FDA would allow this to happen,

11   but you're going to learn throughout the course of this trial

12   that the FDA, which is concerned about the safety and

13   regulation of drugs, in fact, made Sanofi-Aventis go through

14   lots of testing to demonstrate that their drug was safe and

15   effective for use.

16          Now, back in the 1990s when Ganesh was at MIT, he

17   wasn't thinking about the FDA or about a generic drug.  He was

18   focused on complex sugars.  And, specifically, he was looking

19   at one kind of complex sugar called heparin.  You're going to

20   hear a lot about that throughout this case.  Now, heparin was

21   actually discovered about a century ago, before World War I,

22   and it was widely used as an anticoagulant, a blood thinner, to

23   treat blood clots.  The reason that this was so important is

24   because blood clots are incredibly dangerous.  They can block

25   the flow of blood to your heart or your lungs or your brain and

1    can be deadly.  And heparin was widely used for decades to

2    treat blood clots, but scientists did not know fully what

3    heparin was made of.

4         And, in fact, what you'll hear in this case is it's

5    because it's a very complicated sugar.  What do I mean by that?

6    Table sugar, the stuff that you and I might put into our

7    coffee, is considered a simple sugar by scientists because it's

8    made up of only two sugar molecules that are linked together on

9    a chain.  Heparin is made up of long chains of sugar units,

10   anywhere between 40 to 70 individual units on a chain.  And

11   even more, heparin is not just one single chain.  It's a

12   mixture of long chains of varying lengths, with varying sugars

13   on them.

14        So you'll hear about heparin, because of how long it

15   was, there were actually a lot of bad side effects.  So by the

16   1980s, scientists had figured out a way of cutting these long

17   sugar chains into shorter ones.  The problem still was that

18   they didn't know fully what the shorter chains were made of.

19   That's where Ganesh got started.  He started looking at

20   heparin, and he started analyzing the chains to figure out sort

21   of what information he could discover.

22        You'll hear that most scientists at this time were

23   focused on these long chains because they thought that's where

24   the complicated information was.  Ganesh had the opposite idea.

25   He thought it might make more sense to cut these long chains

1    into tiny, little pieces, the smallest pieces he could get to,

2    because he thought maybe he could learn something new by

3    looking at them this way.  You'll hear that he had to actually

4    develop his own tools to do so because science at the time was

5    not sophisticated enough to get him there.

6          The problem was, in order to do anything more, Ganesh

7    needed money.  At the time, he needed a lab; he needed

8    equipment; he needed people to help him with his work.  And so

9    you'll hear that -- he's going to tell you that for five long

10   years he had no money and no interest from anyone because none

11   of the investors were interested in these sugar molecules at

12   the time.

13         So, finally, after five years, in 2001, he got one

14   investor to give him a tiny bit of money to start his company

15   here in Massachusetts which he called Momenta.  With that small

16   amount of money, he hired a small team of scientists all from

17   MIT, including a scientist by the name of Zach Shriver, who

18   you'll also hear from in this trial.  Together, Ganesh and Zach

19   continued working on studying complex sugars.

20         But the problem with only having one investor, as you

21   can imagine, is that the money runs out quickly.  Ganesh needed

22   to come up with another plan to get some funding in the door so

23   he could continue his work.  That's actually how he started

24   studying enoxaparin, because, as I mentioned earlier,

25   enoxaparin is made from the same sugar molecule, heparin, that

1     Ganesh had been studying at MIT.  It's actually made by using a

2     special chemical process to break the long chains of heparin

3     into shorter ones.  Ganesh thought, if he could apply his

4     technology and understand more about enoxaparin, he might be

5     able to get some interest from the name-brand company,

6     Sanofi-Aventis, who made this product because everyone knew

7     that Sanofi-Aventis didn't actually know fully what its own

8     drug was made of.

9          So Ganesh and his team got to work and started

10    studying enoxaparin.  While they expected to learn new things,

11    what they did not expect was to make a groundbreaking discovery

12    because, as it turns out, when they broke enoxaparin down into

13    its smallest pieces, which nobody else had done before, they

14    discovered something that wasn't supposed to be there.  They

15    discovered a sugar that did not exist in the original heparin

16    chain.  And the reason that this was so important was because

17    everyone assumed that if you take long chains of sugars and you

18    cut them into shorter chains, what's in the shorter chains is

19    going to be exactly the same as the stuff you began with.

20         Ganesh and his team realized, after studying

21    enoxaparin, that this was not the case.  Instead, as a result

22    of the chemical process used to make enoxaparin, you actually

23    change some of the sugars on the chain.  It's like, if you had

24    a thick rope and you're using a saw to saw it into pieces.  As

25    a result of that process, some of the ends get a little frayed,

1    and those frayed pieces don't exist in the original rope.  So

2    Ganesh and his team realized that this was a signature of

3    enoxaparin.  It did not exist in heparin.  And as it turned

4    out, it does not exist in any other kind of sugar molecule that

5    comes from heparin.

6            So what did they do with this?  Ganesh realized that

7    could you use this signature as part of a manufacturing process

8    for heparin -- or for enoxaparin in order to control every

9    single batch to make sure that what you're making actually is

10   enoxaparin, that it has the signature component.  And,

11   remember, this was important because enoxaparin is so

12   complicated.  Nobody knew actually fully what it was, that you

13   have to make sure that every batch that you make is actually

14   safe and effective for use because, otherwise, people could

15   die.

16           So Ganesh came up with this method, and this is the

17   method you're going to hear a lot about in this trial.  It

18   involves four steps.  The first step is to break enoxaparin

19   into these smallest pieces.  The second step is to separate out

20   those pieces so that you can find the signature of enoxaparin.

21   The third step is to compare your results to a reference, in

22   this case, what the drug is supposed to look like.  And,

23   finally, you select a batch of enoxaparin based upon that

24   comparison for finished products that you can sell it to

25   consumers.

1          And so Ganesh took his ideas and he took his method,

2     and in May of 2002 he went to Sanofi-Aventis, the name-brand

3     company who was selling enoxaparin.  He told them, I found this

4     signature.  I have this method of finding it.  I think I can

5     help you learn more about your product.  Now, Ganesh will tell

6     you today that, in retrospect, he was being a little naive, and

7     here's why:  Sanofi-Aventis was making $2 billion a year at the

8     time selling its drug.  A large reason for that is because

9     there were no generic versions on the market, and here's why:

10    When you have a name-brand drug, in order to make a generic

11    version of it, like Advil or ibuprofen, the FDA just says you

12    have to take the name-brand drug and prove that what you've

13    made is the same.  And this is what the chemical molecule of

14    ibuprofen looks like.  All a company has to do is to copy that.

15         This is what enoxaparin looks like.  This is why it's

16    so complicated.  And so for years no generic company was able

17    to demonstrate to the FDA that what they had made was the same

18    as what the brand was.  In retrospect, what Ganesh had done is

19    go to a company making billions of dollars with no competition

20    and tell them that not only had he found the key to their

21    product, but he had come up with a way to prove to the FDA that

22    what he had made was the same as that product.  As you'll hear

23    from Ganesh, Sanofi-Aventis was greatly interested for a short

24    period of time.  They came and took a look at his lab and

25    looked at his data, and a couple of months later, they cut off

 1   all communications.

 2        Now, Ganesh may have been naive enough to go and show

 3   Sanofi all of his research, but he did have the sense to do

 4   something to try to protect his invention before he did so, and

 5   that's -- right before he went to Sanofi-Aventis, he filed a

 6   patent application with the United States Patent Office.

 7        You heard yesterday a little bit about the Patent

 8   Office and what it does.  Its job is to review and grant

 9   patents as rewards for inventors for their innovation.  And a

10   patent, as you heard yesterday, is like property; it's like a

11   deed.  It gives you the right, the legal right from the

12   government, to prevent other people from using your invention

13   without your permission.

14        As you heard yesterday as well, a patent can be

15   granted on lots of types of things.  It can be granted on a new

16   device, like a cellphone, or in the case of Ganesh's patent, it

17   can be granted on a method, a new and useful way of doing

18   something that nobody else had done before.  And as you also

19   heard yesterday, once you file a patent application, it takes

20   awhile before the Patent Office actually makes a decision

21   because they have to review it carefully.

22        So after Ganesh filed his patent application in May of

23   2002, a couple of other things happened.  Two months after

24   Sanofi-Aventis rejected Momenta and Ganesh, they went to the

25   FDA, and they made a formal request with the FDA.  And what

1    they told the FDA was this:  We found a signature of

2    enoxaparin.  We're going to give it a name.  It's called the

3    1,6 anhydro ring structure.  And more than this, you, FDA,

4    should reject any attempt by a generic manufacturer to make a

5    copy of our drug unless they used our own manufacturing process

6    because that's the only way you can prove that you have the

7    signature.

8          When Ganesh heard about this, he was very upset, and

9    he'll tell you it's because he told Sanofi-Aventis the exact

10   opposite.  He had come up with a method that you use to test

11   enoxaparin to show that it was actually the same as the brand

12   drug without having to use their manufacturing process.

13         What did Ganesh do?  He returned to science, to

14   research, and he began trying to figure out how he could prove

15   Sanofi-Aventis wrong, by making a generic version of enoxaparin

16   himself without using their method.  You're going to hear that

17   he finally found a partner who was willing to believe in his

18   idea, Sandoz, the other plaintiff in this case.  Together,

19   Momenta and Sandoz, in 2005, filed an application with the FDA

20   for a generic enoxaparin.

21         As you'll hear in this case, that was also not the end

22   of the story.  There was a lot of back-and-forth with the FDA.

23   Throughout all of this, Ganesh and his team continued to

24   develop their methods.  They actually created an even better

25   method, a new method, that's different from the one that Ganesh

1    had patented back in 2002.

2         Now Ganesh's hard work paid off in two ways.  In 2009,

3    finally, the United States Patent Office granted him his

4    patent.  You've seen the patent yesterday.  This is the '886

5    patent in this case.  With this grant, the United States Patent

6    Office told Ganesh that his invention was new and useful and

7    that it deserved protection.

8         The second reward for his hard work came in 2010

9    because on July 23 of 2010, Momenta and Sandoz became the first

10   to get a generic enoxaparin approved for sale.  After 17 years

11   of Sanofi-Aventis selling this drug without a generic on the

12   market, they were the first to get approval.  And it was a huge

13   victory.  Ganesh will tell you today that he thought it was a

14   validation of the 20 or so years that he had spent studying

15   these sugars that most people had not been concerned with.

16        For the company, it was the very first product that

17   Momenta got onto the market after almost a decade of work.  And

18   for patients across the United States, Momenta and Sandoz

19   charged a price that was a third less than Sanofi-Aventis and

20   so saved patients about $400 million in the first year alone on

21   the purchase of enoxaparin.

22        You're going to hear from Ganesh that even with that

23   discount he finally made enough money that he could hire more

24   people at his company and grow his company the way that he

25   wanted.  And so today, instead of about ten scientists from MIT

1    working out of a lab, they have about 300 employees here in

2    Massachusetts working on a pipeline of ten new, more

3    affordable, drugs, all based on the same core technology that

4    Ganesh developed back at MIT and all made possible by the

5    success of their generic enoxaparin product.

6          Now, Momenta's success this day was actually a success

7    for one other group, and that's other generic manufacturers of

8    enoxaparin.  And the reason for this is because, on the same

9    day that the FDA granted Momenta approval, the FDA finally

10   responded to Sanofi-Aventis' request back in 2003.  And they

11   told Sanofi-Aventis, we disagree with you.  We do not believe

12   that a company has to use your process in order to get approved

13   for a generic enoxaparin.  And so the FDA affirmed what Ganesh

14   has always believed, which is, that if you do the work, you

15   innovate, you can get approved without using someone else's

16   process.

17         And that's what leads us to this case and Amphastar.

18   Now, Amphastar, you're going to hear, is a California company

19   that's in the business of making copies of other people's

20   drugs.  They have about 20 drugs on the market.  And you're

21   going to hear that Amphastar was never concerned about

22   investing in learning more about complicated sugars the way

23   Momenta was.  They were in the business of making generic

24   drugs.

25         And you're going to hear that back in the early 2000s,

1    when Ganesh was still struggling to find the funding to start

2    Momenta, Amphastar really wanted to make generic enoxaparin

3    because, as everybody knew, others were making billions freely

4    with no competition on the market.  Amphastar will tell you

5    that they were the first to file an application with the FDA to

6    try to get approval for a generic.  They did not get approved

7    until a year after Momenta, in September of 2011.

8         Amphastar may tell you that they came up with their

9    own testing methods on their own, but the evidence is going to

10   show that Momenta's patent application was published by the

11   Patent Office as early as 2003.  And the evidence is also going

12   to show that Amphastar absolutely knew about Momenta's patent

13   application because they even cited to it in their own

14   application to the FDA to make generic enoxaparin drugs.

15        Now, Momenta is going to show you evidence in this

16   case of exactly how Amphastar infringes their patent.  And

17   you're going to hear from an expert, Dr. Jian Liu, who's been

18   working in the field of heparin and sugars for about 25 years.

19   What he's going to do is show you exactly what Momenta's patent

20   says and show you all the documents from Amphastar that show

21   what they do.

22        And if you look at your screens, this is what a claim

23   of this patent looks like.  You heard about this a little bit

24   yesterday.  This actually sets out Momenta's method in a series

25   of steps.  What Dr. Liu is going to do is he's going to walk

1    you through every single one of these steps and show you why

2    Amphastar performs each step.  For Step 1, for example, he's

3    going to show you documents from Amphastar that actually used

4    the exact words from the Momenta patent:  "exhaustive digestion

5    of enoxaparin."  That's Step 1, breaking down enoxaparin into

6    those small pieces.

7           For Step 2, he's going to show you how Amphastar uses

8    a separation method to separate out those small pieces and that

9    the method they used is something called HPLC, which he'll

10   explain.

11          For Step 3, he's going to show you how Amphastar then

12   takes these results and makes a determination about their

13   enoxaparin by comparing it to a reference, the brand drug.

14          For Step 4, he's going to show you how Amphastar

15   selects a batch of their enoxaparin for further processing

16   based upon these results, and they do this for every single

17   batch of enoxaparin that they are currently selling to

18   patients.

19          And if you believe Dr. Liu, that, in fact, all of the

20   evidence shows that every single step is met, you're going to

21   be asked to decide how badly Momenta was hurt by Amphastar.

22   And the evidence is going to show that Momenta suffered a 98

23   percent loss over the course of three years as a result of

24   Amphastar's use of their method.

25          Now, what's Amphastar going to say about this?

1    Amphastar's counsel is going to be able to come up here

2    afterward and talk to you.  He's going to probably raise a

3    couple of things that I want to get in your mind.  The first is

4    they're going to say that they don't infringe and they don't

5    use our method because they looked for something called 1,6

6    anhydro ring structures.  Momenta's patent does not include the

7    words "1,6 anhydro ring structure" in the patent.  And that's

8    true.  We don't have the words "1,6 anhydro ring structure" in

9    the patent.

10          The evidence is going to show that the signature that

11   Ganesh found, the signature of enoxaparin that he put into this

12   patent and into this method, is the 1,6 anhydro ring structure.

13   They're the same thing.  It's just a different chemical name.

14   And so the evidence is going to show that Amphastar, in fact,

15   does do this method.

16          Now, what Amphastar may try to say next is that,

17   without knowing the chemical name of this particular structure,

18   this patent is invalid, and you heard about that a little bit

19   yesterday.  Now, patents are presumed valid, right, because we

20   believe that the Patent Office did its job right in the first

21   instance.  But Amphastar does have the opportunity to try to

22   convince you otherwise.  And what they'll say is that, without

23   knowing the chemical name of this particular structure, a

24   scientist would not know what this patent is about, and they

25   wouldn't know how to use this method.

1          You're going to hear from another expert in this case,

2    Dr. Jeremy Turnbull.  He's also been working in this field for

3    about 30 years.  He'll tell you how he took Momenta's patent to

4    a lab and, in two days' time, followed the steps of the method

5    and recreated the results exactly as stated in the patent

6    without ever knowing the exact chemical name of the signature

7    that Ganesh had found.

8          And if you look on your screen, what you'll see in the

9    top panel is actually directly from Momenta's patent, and these

10   are the results of the method that Ganesh had used.  What's

11   highlighted at 9 and 10 are, in fact, the peaks that represent

12   exactly where the signature of enoxaparin is.  And as you can

13   see in the bottom figure, these are the results of Professor

14   Turnbull's experiment.  And he was able to recreate exactly

15   what's shown in the patent and find exactly those two

16   signatures right there in two days' time.

17        So what Momenta -- what Amphastar is going to be left

18   with is they're also going to try to argue to you the patent is

19   invalid for another reason.  And this reason is that they

20   believe somebody else did this first or that it would have been

21   obvious to people to do this.  What they're going to rely on

22   are a couple of older articles that came out before Ganesh

23   submitted his application.  I won't get into the details of it

24   because I'm sure Amphastar's counsel will.  But when you listen

25   to that evidence, I want you to keep in mind two things:  One,

1    one of the authors of those articles is actually going to

2    testify for Momenta in this trial.  His name is Dr. Umesh

3    Desai.  He's going to tell you that when he wrote that article

4    he had no idea there was even a signature of enoxaparin, let

5    alone a method of finding one, because it was not obvious, and

6    it was not done by anyone else before.

7         Second, you should know that every single article or

8    patent that Amphastar relies on was expressly considered by the

9    Patent Office when they were reviewing Momenta's application,

10   and they decided, the Patent Office decided, that those

11   articles did not make Momenta's patent invalid.

12        The final two things you might hear from Amphastar are

13   defenses that they're going to try to use in case you find that

14   this patent is infringed and that it's valid.  The first is

15   that they say they could have moved this testing method to

16   another country.  Why does that matter?  In the United States,

17   if you have a patent on the method, if you performed the method

18   in the U.S., you infringe.  If you perform it outside of the

19   U.S., you don't infringe because the U.S. patent can't reach

20   you.

21        So what Amphastar is going to try to tell you is that

22   they could have easily moved their method to Canada, from

23   California to Canada, in about a month's time, at no cost and

24   with the FDA's blessing.  The evidence is going to show that

25   for six years they never did.  They never even tried.  And, in

1     fact, the evidence will show you partially why the FDA would

2     have actually made this quite difficult for them, because the

3     FDA expressly told Amphastar that they were looking at their

4     enoxaparin product with close scrutiny because of two reasons:

5     there was an identification of contaminated lots from

6     Amphastar's product and because Amphastar had made untrue

7     statements of material fact to the FDA.  So you decide for

8     yourselves whether or not the FDA would have let them move so

9     easily.

10          Amphastar's last defense is that they're going to

11    claim that they were trapped into using Momenta's patent and

12    that as a result Momenta should have to give up its rights, it

13    waived its rights, to the patent.  You heard a little bit about

14    that defense yesterday.  How are they going to argue this?

15    They now claim they used a method called USP 207.  And that's a

16    method that was published by an organization call the USP, the

17    United States Pharmacopeia, back in 2009.  You're going to hear

18    a lot about this today and through the rest of the trial.

19          The United States Pharmacopeia, you should keep in

20    mind, is not a part of the federal government.  It's not part

21    of the Patent Office or the FDA.  Instead, it's an independent

22    organization that sets guides or standards for the drug

23    industry.  What Amphastar will try to tell you is that, when

24    the USP decided to adopt method 207 to publish it in 2009,

25    Momenta did not tell the USP about its patent application and

1    that its application could cover this method.  And so Amphastar

2    will say that they were trapped.

3          But the evidence is going to show that Momenta's

4    patent application was public in 2003.  It was published by the

5    Patent Office.  Amphastar chose its infringing methods as early

6    as 2004.  And, in fact, that was five years before method 207

7    even existed.  Furthermore, Amphastar absolutely knew about

8    Momenta's patent application because they cited to it in their

9    own application to the FDA.

10         You're also going to hear that Momenta actually didn't

11   even propose method 207.  It was proposed by the brand-name

12   company Sanofi-Aventis because, as you'll hear in this trial,

13   Momenta actually vehemently opposed the adoption of this method

14   because it goes against everything that Ganesh had always

15   believed in, which is, if you do the work yourself, you should

16   be able to get approval and do your own methods without relying

17   on someone else's process and without being forced to use

18   someone else's process.  So you'll hear testimony through this

19   trial that, as a result of Momenta's efforts, the USP actually

20   adopted this method as optional.  Amphastar did not start

21   saying that they were using this method until 2011, after they

22   were sued.

23         Now, starting today and through the rest of this

24   trial, you're going to hear a lot of testimony and a lot of

25   evidence.  There are a couple of questions you may want to keep

1    in mind which will inform your decisions at the end of the

2    trial.  First, what is Momenta's patent about?  The evidence is

3    going to show it's about a method that has four steps, about

4    finding the signature of enoxaparin.

5         Second, does Amphastar use Momenta's patented method?

6    And you're going to see evidence that there are, in fact, three

7    Amphastar testing methods that all use this method, and all of

8    them look for a 1,6 anhydro ring structure, which is the same

9    signature that's described in the patent.

10        Is Momenta's patent valid?  You're going to hear

11   evidence that it is, that, in fact, nobody else had done this

12   before.  It would not have been obvious for someone to do it.

13   And there was no need to name this chemical structure because,

14   as Professor Turnbull demonstrated, you could use this method

15   and know exactly what it covered in two days' time without

16   knowing that name.

17        You're also going to be asked to decide whether or not

18   Amphastar harmed Momenta.  You will see the evidence of the 98

19   percent loss that I talked about.

20        And, finally, you're going to be asked to decide

21   whether you believe Amphastar's defenses.  First, could they

22   have easily moved this testing to Canada?  You're going to hear

23   evidence they never tried, they never did, and, in fact, the

24   FDA would have made it hard for them because of the untrue

25   statements they made to the FDA about their drug.

1          Finally, you're going to have to decide was Amphastar

2     actually trapped into using this method?  And the evidence is

3     going to show that they always had a choice.

4          As I said at the beginning of this, it's all going to

5     come back down to choice.  Momenta chose to innovate, and it

6     was awarded a patent for its innovation.  Amphastar chose not

7     to innovate and instead used someone else's invention to make

8     hundreds of million of dollars.

9          That's why, at the end of this trial, we're going to

10    ask that you find in favor of the plaintiffs in this case,

11    Momenta and Sandoz.  Thank you.

12         THE COURT:  All right.  For the defendants, Mr.

13    Carsten.

14         MR. CARSTEN:  Thank you, your Honor.  Good morning.

15    My name is Doug Carsten, and it's my honor, along with my

16    team -- Michael Sommer, Natalie Morgan, Joshua Mack, and Robert

17    Delafield -- to represent Amphastar and International

18    Medication Systems in this matter.  I'm going to call them

19    Amphastar for short.

20         So who is Amphastar?  Amphastar is an American drug

21    company based in Rancho Cucamonga, California.  Amphastar has a

22    wholly owned subsidiary about a half an hour from here, in

23    Canton.  They make Primatene Mist.  You might have heard of

24    that.  Amphastar stands for American Pharmaceutical Star,

25    Amphastar.  Amphastar prides itself on being a company that

1    develops, tests, and produces its products here in the United

2    States.  It employs over a thousand people in the U.S.  It's

3    also proud to be part of the generic drug industry.  Amphastar

4    makes safe and affordable drug products.  And the generic drug

5    industry has saved American healthcare consumers billions of

6    dollars.

7         You'll hear in this case that Amphastar was founded

8    upon bedrock principles that we all share, helping people by

9    making affordable drugs.  Hard work.  Sticking to your guns and

10   not backing down from a fight when you know you're right.

11        You'll hear about Amphastar, who they are and what

12   they stand for, from Bill Peters, Amphastar's chief financial

13   officer and IMS' president, and he will be with us every day

14   during this trial.

15        Now, there was some suggestion by Ms. Wang's opening

16   that Amphastar made material misstatements of fact to the FDA.

17   I want to address that right off the bat.  The evidence is

18   going to show those were not Amphastar's statements.  They were

19   the statements of a third-party supplier whose materials were

20   used and referenced in Amphastar's drug approval package.

21   Amphastar learned that this third-party, foreign supplier had

22   been outsourcing preparation of material.  Amphastar

23   voluntarily disclosed that to the FDA.  We tested every batch

24   to make sure that stuff was good, and we found a new supplier

25   to ensure that would never happen again.  That's what we want

1   good companies to do:  voluntarily disclose and not hide

2   things.

3       So why is Amphastar here in court?  Well, Amphastar,

4   as you've heard, sells a generic version of a drug called

5   enoxaparin.  And as you heard, the plaintiffs say you infringe

6   our patent.  Now, it's important to remember, the plaintiffs

7   here they don't have a patent that covers enoxaparin.  The

8   plaintiffs aren't the ones who invented the drug.  The

9   plaintiffs aren't the ones who first made enoxaparin.  And the

10  plaintiffs aren't the first one to figure out a use for

11  enoxaparin.  That was a different company, a company that's not

12  here today.  That's Sanofi-Aventis.

13      The plaintiffs, generic companies themselves, weren't

14  even the first ones to try to get approval for a generic

15  version of enoxaparin.  That was Amphastar.  It was Amphastar

16  that was the first company to try to get FDA approval of a

17  generic, lower-cost version of enoxaparin.  You'll hear that

18  Amphastar filed that application in 2003.

19      Plaintiffs, on the other hand, their application to

20  get approval for that product came later, much later, two and a

21  half years later.  And they weren't even the second one to

22  file.  They were third in line.  There was another generic

23  company called Teva Pharmaceuticals that filed in between the

24  two of them.

25      Now, remember what I said about not backing down from

1    a fight when you know you're right?  You'll hear that, as the

2    first filer of a generic application for enoxaparin,

3    Sanofi-Aventis tried to stop Amphastar from getting that

4    approved.  Sanofi-Aventis sued Amphastar over its patent on the

5    drug.

6         But you'll hear that Amphastar knows how to spot bad

7    patents.  And Amphastar successfully proved, after years of

8    fighting in court, that Sanofi-Aventis hadn't been forthright

9    with the Patent Office, and that patent was found

10   unenforceable.  Amphastar was vindicated.

11        And Amphastar believed that it had successfully paved

12   the way to bring its generic, lower-cost version of enoxaparin

13   to market and recognized also that it helped all generic

14   companies by clearing that bad Sanofi-Aventis patent out,

15   including plaintiffs.

16        And eight years after filing its application,

17   Amphastar finally did secure approval.  The FDA agreed that

18   enoxaparin, by Amphastar, could be sold throughout the United

19   States.

20        But just two days after securing that hard-fought

21   approval, plaintiffs sued Amphastar.  You'll hear why it was

22   important for plaintiffs to sue Amphastar.  You'll hear that,

23   even though plaintiffs were the third to file a generic drug

24   application for enoxaparin, plaintiffs secured their approval

25   first.  And you'll hear there's good money in preventing blood

1    clots.  Enoxaparin is also known by its brand name, Lovenox,

2    and Lovenox was a very profitable drug.  It was a blockbuster.

3    And generic drug prices depend heavily upon the number of

4    generic companies that sell the product.  The more generic

5    companies in the market, typically, the lower the prices go.

6    And you'll hear that a generic drug company with a product on

7    the market has a real keen interest in keeping other generics

8    out of that market to preserve a generic monopoly.

9          Now, plaintiffs' efforts to establish a generic

10   monopoly in this case actually started years before they sued

11   Amphastar.  You'll hear that, while both parties' enoxaparin

12   applications were pending in the FDA, Momenta started

13   participating in an organization called the U.S. Pharmacopeia,

14   USP for short.  Now, USP is an independent, nonprofit

15   organization whose purpose is to set standards for the

16   pharmaceutical industry that the pharmaceutical industry should

17   follow so that the drugs that we keep -- that we take every day

18   to keep and maintain our health are safe for us.  The USP sets

19   these standards for the pharmaceutical industry, and the

20   industry is supposed to be able to use and rely on them.

21          In 2008, three years before this lawsuit began, you'll

22   hear that Dr. Shriver, an employee of Momenta, and a named

23   inventor on the '886 patent, became a member of the USP panel

24   that was developing and setting standards to assure the quality

25   and safety of enoxaparin.  This USP panel developed and adopted

1     as a standard a test called USP 207.  Amphastar is required by

2     the FDA to perform this test.

3           You may hear Amphastar's test referred to the 1,6

4     anhydro test or 15 to 25 percent test.  Plaintiffs are going to

5     tell you that our version of the test is very different from

6     USP 207.  But you'll hear from our expert, Professor Robert

7     Linhardt, that these tests are the same; and as a result,

8     you'll hear that Momenta is using its patent to try to prevent

9     Amphastar from practicing the standard that their employee

10    participated in setting at USP.

11          Now, let's be clear.  This USP 207 test, it's not

12    about how to make or use enoxaparin.  It's a test that allows

13    scientists, at the end of the day, to know that what it is that

14    they've made actually is enoxaparin.  It's a quality control

15    test that the FDA requires Amphastar to run on every batch of

16    its enoxaparin before it can be made into a drug product that

17    people can take and use.

18          Now, the USP, it relies upon pharmaceutical industry

19    volunteers.  Why?  These are people with boots on the ground.

20    They know how pharmaceutical company laboratories work.  You'll

21    hear from Amphastar's expert, John Clark, who has years of

22    experience with both the FDA and the USP.  In fact, he worked

23    for each organization in differing roles for years.  He'll

24    explain that, from his experience and expertise, the USP has

25    rules, very specific conflict of interest rules, that require

1     participants to disclose actual or potential conflicts of

2     interest in order to avoid situations where a volunteer uses

3     participation in that process to benefit himself or his

4     employer.

5            Mr. Clark will explain that the rules require each

6     member to submit to USP a statement of interest that relates

7     either directly or indirectly to his or her duties and

8     responsibilities.  And it goes further to say an employee's

9     interest shall be presumed to coincide with that of his or her

10    employer.

11           There's a conflicts of interest form that participants

12    and volunteers are required to fill out.  It's short.  It's

13    four questions.  Question 4 says, among other things, "List any

14    other professional or financial interests," and it goes on to

15    say "including intellectual property rights, that may result in

16    a conflict of interest or the appearance of a conflict of

17    interest."

18           Intellectual property rights, what's that?  That's

19    patents and patent applications.  Well, Dr. Shriver reviewed

20    this form.  He filled it out.  He signed it and he submitted it

21    back to the USP.  What did he say in response to No. 4?

22    Nothing.  Nothing.  It's blank.  He didn't disclose the patent

23    application that led to the '886 patent.  Not only did he not

24    disclose it in February of 2008, he didn't disclose it at any

25    of the four USP meetings that he attended as a participant on

1    that panel considering enoxaparin standards.

2          As Mr. Clark will explain, Momenta went further.  When

3    the USP started discussing whether a different patent, owned by

4    Sanofi-Aventis, might cover the tests they were considering,

5    Momenta didn't disclose its patents to anyone.  And Momenta,

6    similarly, did not disclose its patents to the USP even when

7    Momenta itself wrote a demand email to USP's legal counsel

8    demanding that Sanofi-Aventis be forced to abandon its patent

9    that would cover the standard that the organization was

10   considering setting.

11         Momenta demanded that the Sanofi-Aventis patent be

12   abandoned to "remove the threat of suit on any issued patent

13   that may be relevant to the method," that USP was adopting.

14   Momenta made this demand without disclosing they had their own

15   patent in the works that stood to do exactly what Momenta said

16   the Sanofi patent would do:  threaten the user of the USP

17   method with patent litigation.

18         Momenta said, in the absence of taking action, to make

19   this other company abandon its patent, "Momenta, Sandoz and

20   other parties would continue to be subject to the threat of

21   patent litigation for performing a USP-specified test."  This

22   was 2009, just two years before plaintiffs did exactly what

23   they feared and complained to USP that Sanofi would do.

24   Momenta's employee, a named inventor of the '886 patent, helped

25   set a USP standard, and plaintiffs are now suing Amphastar for

1   performing it.

2          Let's take a look at the patent.  You'll hear that the

3   most important part of the patent is the claims.  They're what

4   define the scope of the invention.  The '886 patent claims

5   analysis of a "structural signature associated with a

6   non-naturally occurring sugar associated with Peak 9 of Figure

7   1."  The claim further requiring comparing to a reference

8   standard.

9          Now, the Court is going to provide you with some

10  instructions on what some of those terms mean, but let me pause

11  for a moment.  Look, you're going to hear from some really

12  smart people in this case, scary smart people.  World-class

13  scientists.  And you know the thing that almost all of them

14  have in common?  They studied under Amphastar's expert,

15  Professor Robert Linhardt.  Professor Linhardt was an author or

16  coauthor on most of the scientific papers and publications that

17  you're going to hear about over the course of this case.  And

18  almost every other scientist that you'll hear from was a

19  graduate student learning from, or a post-doctoral fellow being

20  trained, by the master, the true master, and that's Professor

21  Linhardt.

22         Now, from the claims, you might expect that Peak 9 is

23  an important thing.  We're going to switch to infringement.

24  What does that tell us about what the compound of Peak 9 is?

25  Nothing.  Plaintiffs didn't describe what the compound of Peak

1    9 was, and the evidence is going to show that they didn't even

2    know what it was when they filed their patent application.

3    Momenta contends it has a patent on something it didn't even

4    know what it was.  Professor Linhardt is going to tell you

5    that, without knowing what compound corresponds to Peak 9,

6    Amphastar can't infringe its patent; it doesn't infringe this

7    patent.

8         And now Momenta comes forward and says, look, it's

9    this particular 1,6 anhydro structure.  But because Peak 9

10   wasn't identified or characterized at the time, it's now

11   impossible to know what compound or compounds, if there were

12   any, that constitute Peak 9.  And you'll not see any evidence

13   from the time of the patent application offered to show what

14   Peak 9 was.

15        You'll hear the term in this case "person of ordinary

16   skill in the art," and the Court will instruct you on that

17   term.  And you'll hear from Professor Linhardt that in his

18   opinion that it's a very skilled scientist, with a lot of

19   education and experience in the field of chemistry, sugar

20   chemistry.  It's not the perspective of you or me.

21        You'll hear plaintiffs contend that their claims cover

22   this 1,6 anhydro structure broadly.  That structure isn't

23   listed anywhere in that patent, nowhere.  You'll hear

24   plaintiffs' technical witnesses admit under oath on that stand

25   that they didn't know about this structure when they filed

1    their patent application.  In fact, it took plaintiffs almost

2    three years after they noticed this Peak 9 before they were

3    able to confirm that 1,6 anhydro structure.  That's a little

4    longer than two days.  As you can see from this timeline slot,

5    Momenta wasn't even the entity to figure that 1,6 anhydro rings

6    were in digestive enoxaparin.  That was Sanofi-Aventis.

7    Sanofi-Aventis actually disclosed the 1,6 anhydro ring

8    structure publicly before Momenta figured it out.  And both

9    these dates are still long after the patent was filed.

10          You'll hear from Rong Zhou, who is Amphastar's

11   executive VP and senior VP for scientific affairs.  He's going

12   to explain how Amphastar developed its testing for enoxaparin.

13   And Mr. Zhou will tell you that the FDA required Amphastar to

14   perform the tests that plaintiffs here accuse of infringement.

15   And he'll further explain that he used publications authored by

16   Amphastar's expert, Professor Robert Linhardt, to develop these

17   tests, which include USP 207.

18          Mr. Zhou will also tell you about how he compared

19   Amphastar's 1,6 anhydro 15 to 25 percent test to USP 207.

20   Found they were essentially the same.

21          And Mr. Zhou will also tell you about how Amphastar

22   formally adopted USP 207, that standard, when they started

23   selling products and have been specifically practicing this

24   method ever since.

25          Even if you take Momenta at its unsupported word that

1    Peak 9 corresponds to a single 1,6 anhydro compound, Amphastar

2    still doesn't infringe. As Professor Linhardt will explain,

3    either of the Amphastar tests that are accused in this case

4    compare Peak 9 to a reference standard. For USP 207, the

5    accused referenced standard is that the compound with that 1,6

6    anhydro structure make up 15 to 25 percent of enoxaparin.

7        This is, of course, nowhere in the patent. Why?

8    Because they didn't even know 1,6 anhydro existed. How could

9    they know it was 15 to 25 percent? And plaintiffs' Peak 9,

10   even if it does correspond to a single 1,6 anhydro compound,

11   this test collects four compounds and compares them in a math

12   formula. It never looks specifically at Peak 9 or that single

13   compound.

14       Similarly, Amphastar's disaccharide building block

15   test -- we're going it call it the DBB test -- is also very

16   similar to USP 207. In fact, Amphastar used to do them both in

17   the same test. And for the DBB test, you'll hear from Rong

18   Zhou again. He's going to tell you that the FDA required

19   Amphastar to separate out 23 components. They wanted

20   quantification on a lot of those components. But for the ones

21   that were in small quantities, less than 1 percent, it's fine,

22   Amphastar, if you just tell us that it's detected. We don't

23   need to know the amount. So for ten of these components, they

24   fall in that category. You don't need to quantify them. You

25   just need to check and see if they're there.

1          Professor Linhardt is going to say that plaintiffs'

2    patent is like determining whether an air conditioner is

3    working properly by measuring the temperature of the air coming

4    out of it to see if it falls within a range of values of less

5    than 60 degrees or 65 degrees.  Amphastar doesn't do any of

6    that.  It puts its hand in front of the air conditioner.  Is it

7    cold?  Yeah.  That's the DBB test.  In short, Momenta, Peak 9,

8    good for you.  Peak 9, we don't do.

9          Let me shift gears.  The Court will instruct -- I'm

10   going to talk about invalidity a little bit.  You'll hear from

11   Dr. Linhardt that -- evidence relating to four different bases

12   for invalidity here.  The Court is going to instruct you about

13   the written description requirement.  Professor Linhardt is

14   going to talk about plaintiffs allege that their claims cover a

15   structure that the inventors didn't even know about at the

16   time.  The claims refer to Peak 9 of Figure 1.  There's just no

17   disclosure anywhere in the patent of that 1,6 anhydro compound.

18   And there's no disclosure anywhere that would allow a person to

19   link Peak 9 to 1,6 anhydro compound structures.  That problem

20   alone is fatal to this patent.

21         The Court will also instruct you about enablement.

22   Patent disclosure are required to enable a person of skill in

23   the art to practice the invention without undue

24   experimentation.  If the claim talks about Figure 1, then there

25   must be a Figure 1 in the patent, right?  Well, no.  It's not

1    there.  There's a Figure 1A and a Figure 1B.  There's no Figure

2    1.  Professor Linhardt is going to talk about this.  He's going

3    to show you that in three places where the patent

4    specification, that body of the patent talks about Figure 1,

5    it's talking about UFH, unfractionated heparin.  That's not

6    enoxaparin.  That's the starting material to make enoxaparin.

7    And that figure, Figure 1 of UFH, doesn't appear anywhere in

8    the patent.

9         As Professor Linhardt will explain, this patent

10   contains essentially no instructions on how to perform these

11   claims.  A person trying to practice these claims would need to

12   guess at the conditions to generate an image similar to that in

13   the figures.  And as Professor Linhardt will explain further,

14   these techniques are all very sensitive to the various

15   conditions; and so without express guidance in the patent, a

16   person of skill in the art would have to perform a great number

17   of experiments and take an awful lot of time to figure out how

18   to make something that looks remotely like the figures in the

19   patent.

20        Now, plaintiffs allege that Figure -- that the missing

21   Figure 1 is Figure 1A.  That's shown up on your screen.  Given

22   the lack of guidance in this patent and the extremely poor

23   quality of a figure, a person of skill in the art would be

24   unable to recreate or perform the claims resulting from it.

25   Accordingly, these claims aren't enabled, and the patent is

1    invalid.

2         But that's more.  In order to practice the claims, you

3    actually have to figure out what Peak 9 is because the patent

4    doesn't tell you what it is.  And this would have taken an

5    incredibly long time.  It's -- just think.  The plaintiffs

6    themselves took three years after figuring out -- seeing Peak

7    9, what it was.  So how do plaintiffs' experts address this

8    issue?  They avoid it.  You'll hear that they took shortcuts

9    based not on the patent but on research done well after the

10   patent, but these shortcuts weren't around back then.  They

11   weren't available.  And the claims simply aren't enabled.

12        The Court will instruct you on anticipation, but

13   you'll hear that a prior patent, which we'll call the

14   Sasisekharan reference, contains all the things that the claims

15   of the '886 patent require.  Professor Linhardt will walk you

16   through this and explain how each of the steps required by the

17   claims are explained and demonstrated for heparin.  And we'll

18   show you how Sasisekharan inherently tells those of skill in

19   art to do the same thing for enoxaparin.

20        Here's the analysis, on the left, performed by

21   Sasisekharan for heparin in Figure 1A from the patent on the

22   right.  Look at the comparison.  Professor Linhardt is going to

23   explain that the only difference is that Peak 9 isn't readily

24   apparent in Sasisekharan.  There might be some bumps there, a

25   river, but if you apply that condition, the same analysis, to

1    enoxaparin, it should appear.  And so the Sasisekharan

2    reference came first and discloses everything listed in the

3    patent claims Momenta is asserting against Amphastar.  The '886

4    patent is invalid because it was anticipated.

5          Another reason why the '886 patent is invalid is that

6    it would also have been obvious to a person of skill in the

7    art, not you and me, a person skilled in the art, to perform

8    every step.  Professor Linhardt is going to explain how the

9    asserted patent claims are obvious to those skilled scientists.

10   First, the Sasisekharan reference that I just talked about

11   alone would make it obvious to do it.  It shows it for heparin

12   and tells you you can do this for enoxaparin.

13         Second, there are other references that describe very

14   similar analyses.  Two references in particular, what we'll

15   call the Desai and the Linhardt references, together disclose

16   all the claim limitations of the asserted claims.  In fact,

17   both of those were coauthored or authored by Professor Linhardt

18   himself.  Both references also list him as the corresponding

19   author.  What does that mean?  If you have a question about

20   what these references say or what they mean, you talk to Dr.

21   Linhardt, not anybody else.  He's the last word.

22         In the Desai reference, Dr. Linhardt and his coworkers

23   used the same technique in Figure 1A:  capillary

24   electrophoresis.  That was used to generate that.  Dr. Linhardt

25   will explain that the analysis they performed was essentially

1    the same analysis used in the patent.

2              For the Linhardt reference, Professor Linhardt and his

3    coworkers used a different technique, HPLC, high-performance

4    liquid chromatography, to analyze enoxaparin.  You'll hear from

5    plaintiffs that patent can't be obvious because Desai and the

6    Linhardt references don't disclose Peak 9 of Figure 1A, but

7    these references actually disclose more detail about the

8    components present in enoxaparin, including what would be

9    present in Peak 9 of Figure 1A, than the '886 patent itself

10   does.  Doctor Linhardt will testify why the claims of the '886

11   patent would have been obvious by looking at these Desai and

12   Linhardt references.  For all these reasons, we believe that

13   the evidence will show that the '886 patent is a bad patent;

14   and, moreover, Amphastar just doesn't do it.

15             As a result, I hesitate to talk much about damages,

16   but given the numbers that you'll hear from plaintiffs'

17   witnesses, I feel duty-bound to spend a moment or two on it.

18   Amphastar's expert, Dr. Jesse David, has years of experience

19   valuing assets like patents.  He performed a careful analysis

20   of the evidence in this case.

21             The judge will instruct you on the law, but you'll

22   hear from Dr. Jesse David that assessing damages asks you to

23   think about the following hypothetical negotiation:  If the two

24   sides, Momenta and Amphastar, sat down at a table sometime

25   before Amphastar received its approval and discuss -- they

1    negotiate a license on the '886 patent, what would the parties

2    have agreed to so that Momenta gets something that Amphastar

3    would be willing to pay?

4            Now, you just heard Ms. Wang suggest that Amphastar

5    couldn't have moved its testing overseas and never tried to

6    move its testing overseas.  What Ms. Wang didn't tell you about

7    was a decision in a related case in 2015.  You'll hear that

8    about a year before plaintiffs sued Amphastar, they sued the

9    company that was the second to file a generic drug application,

10   Teva Pharmaceuticals, on the same '886 patent.  And it was

11   determined that Teva didn't infringe the patent because it was

12   conducting its testing in Italy, not in the United States.

13   This eliminated plaintiffs' claim that the patents could cover

14   testing outside the U.S.  But that didn't happen until 2015,

15   and by 2015, you'll hear that there was no point in Amphastar

16   moving its tests because by that point already, plaintiffs were

17   already asking for sky-high damages that were so high it would

18   have put Amphastar out of business.

19           Dr. David will tell you that he evaluated what

20   benefits the patent provides and whether there were

21   alternatives available to Amphastar knowing now that the '886

22   patent can't prevent testing outside the U.S.  Dr. David will

23   testify that he took that data point, that noninfringing

24   alternative, into account in this hypothetical negotiation.

25   Why is that important?  Because Amphastar's regulatory expert,

1    Mr. Clark, will testify that the FDA guidelines would have

2    allowed Amphastar to file what's called a CBE 30, changes being

3    effected 30.  30 refers to the number of days it takes before

4    the change becomes effective.  And they could have filed that

5    the day after it received approval.  So long as the FDA doesn't

6    object to it, that change becomes effective.

7         And Amphastar's executive VP of quality assurance and

8    regulatory affairs, Ms. Diane Gerst, is going to testify there

9    were many labs outside the U.S. that Amphastar could have

10   contracted with to perform that testing.  She'll testify that

11   Amphastar would have been in position or could have been in

12   position to file that CBE 30 the day after it received its

13   approval.

14        The evidence is going to show there was a simple FDA

15   mechanism to move the test, and it was logistically simple to

16   make that change.  And Dr. David will testify that it wouldn't

17   be reasonable for Amphastar, in this hypothetical negotiation,

18   to agree to pay more to Momenta for a license than it would

19   have cost to pay a laboratory outside the United States to do

20   the testing in the first instance.  And based on an estimate of

21   Amphastar's own testing costs, that amount is in the range of a

22   million dollars, a very far cry from the hundreds of millions

23   or billion dollars that you'll hear from plaintiffs.  Anything

24   more than that just makes no sense.

25        It may be as simple as this:  Plaintiffs claim the

1    patent is valuable enough to justify damages in the hundreds of

2    millions of dollars.  But as you'll learn, they don't even use

3    the test.

4         That brings me to the end of my opening.  Before I sit

5    down, I want to ask you to do three things in this case.

6    First, please pay careful attention to the evidence as it comes

7    to you from the documents and the witnesses.  It's the evidence

8    from which you're going to decide the facts.

9         Second, please pay careful attention to the

10   instructions you're going to receive from Judge Gorton on the

11   law because the law is the framework against which you're going

12   to assess those facts.

13        And, third, and just as important, please use your

14   common sense.  You all came into this courtroom with the most

15   important asset that you need to decide this case fairly.  And

16   that's your common sense, your collective life experiences that

17   allow you to assess witnesses and decide if what you're hearing

18   makes any sense.  Please bring that common sense into court

19   every day.  Don't leave it in the hall.  If you do those three

20   things -- carefully evaluate the evidence, follow and listen

21   carefully to Judge Gorton's instructions, and apply your common

22   sense -- all parties here will receive a fair trial and you

23   will have faithfully discharged your duty as jurors for which

24   we're all so thankful.  And that is all any party can ask of

25   you.  Thank you.

1          THE COURT:  All right.  The plaintiff will call their

2     first witness.

3          MR. FRANK:  Yes, your Honor.  As a preliminary matter,

4     I simply want to offer into evidence the exhibits to which the

5     parties have agreed and ask that they be admitted.

6          THE COURT:  Will you give me the numbers, the

7     inclusive numbers that we're talking about, and generally what

8     these exhibits are?

9          MR. FRANK:  These exhibits range from the patent

10    itself to all of the other communications and internal

11    documents of the two parties, which the parties agree are

12    authentic and relevant to this case.

13         THE COURT:  And they are numbered?

14         MR. FRANK:  And they are numbered.  And for the

15    Court's record, there is a specific description of each

16    document in the document that I'm going to hand to the deputy

17    clerk, if I may.

18         THE COURT:  Yes.  But will you tell me orally what the

19    numbers are?

20         MR. FRANK:  There are 1,300 of them, your Honor.

21         THE COURT:  Just the numbers 1 through 1,300 or are

22    they --

23         MR. FRANK:  They are -- some of them are numbered

24    consecutively and some are not.

25         THE COURT:  So that the lowest number is 1.

1          MR. FRANK:  The lowest number is 1.

2          THE COURT:  And the highest number?

3          MR. FRANK:  The highest number is 2617.

4          THE COURT:  1 to 2617, with some numbers missing in

5     the middle.

6          MR. FRANK:  Yes.

7          THE COURT:  Roughly 1,300 exhibits will be admitted.

8          MR. FRANK:  Yes.  Thank you, your Honor.

9     (Exhibit Nos. 1-2617 received into evidence.)

10          MR. FRANK:  The plaintiffs call as their first witness

11    Ganesh Kaundinya.

12          GANESH KAUNDINYA, Sworn

13          THE CLERK:  Thank you.  You may be seated.  Would you

14    please state your name for the record, spelling your last.

15          THE WITNESS:  Ganesh Kaundinya, K-a-u-n-d-i-n-y-a.

16    DIRECT EXAMINATION BY MR. FRANK:

17    Q.   Good morning, sir.  Dr. Kaundinya, where do you live?

18    A.   I live in Bedford, Massachusetts.

19    Q.   What's your relationship to Momenta, the plaintiff in this

20    case?

21    A.   I'm the cofounder of Momenta.  I'm also the chief

22    scientific officer, and I'm one of the inventors of the '886

23    patent.

24    Q.   I want to ask you a little bit about your background.

25    Where are you from originally?

1    A.    I grew up in Southern India, in a little town called

2    Nawari.

3    Q.    Where were you educated?

4    A.    Until the equivalent of the undergraduate degree, I

5    studied in India.  I got my undergraduate degree in chemical

6    engineering, and then I came to the United States to do my

7    graduate studies.

8    Q.    Where did you do your graduate studies?

9    A.    At MIT.

10   Q.    Did you obtain a degree from MIT?

11   A.    Yes.  I got my masters in chemical engineering as well as

12   my Ph.D. degree in chemical engineering.

13   Q.    Who is a man named Ram Sasisekharan?

14   A.    I met Ram in 1987.  He became good friends with me as

15   well.  He was pursuing at that time his Ph.D. in cell biology

16   at Harvard, and he's now a full professor at MIT.

17   Q.    Did there come a time when you collaborated with Mr.

18   Sasisekharan on a scientific project?

19   A.    Yes.

20   Q.    When was that?

21   A.    In 1990, Ram was then working for a very famous professor

22   by the name Robert Langer at MIT.  He, you know, at that time

23   was working on a project that we believed that my background in

24   engineering and his background in biology would really bring

25   that together to help him solve that project.

1    Q.   What was that project?

2    A.   It was on a topic called sugars.

3    Q.   What are sugars?

4    A.   Well, there are two kinds of sugars.  You know, the simple

5    sugars are the kind that you put in your coffee to make it

6    sweet.  Then there are the complex sugars.  Complex sugars are

7    something that coat every cell in your body.

8    Q.   Why were you interested in studying complex sugars?

9    A.   Well, as the name says, they're very complex.  People

10   didn't really understand what they do.  But there was evidence

11   that what's outside a cell really matters for what the cell

12   does, how medicine can interact with a particular cell in your

13   body.  Or sometimes when the cell starts to be abnormal and

14   become a cancer, there is evidence now increasingly -- at that

15   time there was increasingly evidence that what's outside the

16   cell was also very important, and these sugars played a very

17   big role in that process.

18   Q.   Was there an understanding as to why sugars appeared to

19   have the kinds of effects that you just described?

20   A.   No, very little because they're very complex.

21   Q.   Are complex sugars all one thing?

22   A.   No.  Actually, they are -- there are many different kinds

23   of complex sugars, and they also combine in many different

24   ways.

25   Q.   You said that your work at MIT was -- well, was your work

1     at MIT directed to a particular kind of sugar, complex sugar?

2     A.    Yes.  It was towards heparin and heparin-like sugars.

3     Q.    What is heparin?

4     A.    Heparin is actually an anticoagulant.  What that means is

5     it's a blood thinner.  It stops your blood from clotting.  It

6     was in about 1916 that it was discovered that heparin stops

7     blood from clotting.  Today, it's isolated from pig intestines.

8     It stops blood clots, you know.  If there's a blood clot that

9     forms in your body, it stops those blood clots from going and

10    blocking an artery in your lung or in your brain causing a

11    stroke, for example.

12    Q.    Why was heparin in particular something that you thought

13    should be studied?

14    A.    Well, very little was known about heparin.  There was --

15    you know, the fact that it was nature, your body, every cell in

16    your body, also makes these kinds of heparin-like sugars; and

17    clearly, because they made it, they must be important, yet

18    nobody really understood what they were doing in the body.  And

19    it was also found that -- very anecdotally that when patients

20    are treated for blood thinning, if some of these patients had

21    cancer, for example, their cancer really dramatically improved,

22    and yet nobody really understood it.

23          So we thought that if you can understand heparin, then

24    you could really understand why nature makes these complex

25    sugars and thereby make better medicines for cancer and also

1    better anticoagulants.

2    Q.   What are the components of heparin?  What's it made up of?

3    A.   That's a rather complex question.  Maybe I can explain

4    that with some slides?

5         MR. FRANK:  PDX 102, please, Scott.

6    A.   So this slide in front of you shows a schematic picture of

7    what heparin looks like.  It is made up of long chains of

8    sugars connected together in a straight line, almost like beads

9    on a string.  The different color sugars are -- the different

10   colors represent different chemical kinds of sugars.  The

11   length can vary quite dramatically, and, you know, no two

12   chains need to be of the same length or no two chains need to

13   have the same colors of the sugars, or even the arrangement of

14   the sugars within a chain can be very different.  So it's very

15   complex.

16   Q.   This slide is an illustration.  Is it perfectly accurate?

17   A.   No.  This is actually maybe an oversimplification.  Lots

18   more chains than what you see here.  The size is much longer.

19   Typical heparin size range from 40 to 70 sugars long, and the

20   number of different kinds of building blocks, number of

21   different kind of sugars that you have, can be as many as 48.

22   Q.   Is one batch of heparin the same as the next batch of

23   heparin?

24   A.   No.  That's the added complexity.  Remember, this is from

25   pigs.  No two pigs are the same.  So every new batch of heparin

1    could look slightly different.  And the process that you use to

2    make that heparin cleaned up and ready for use also introduces

3    variability.  So different batches can look slightly different.

4    Q.    What did you and the others at MIT do to study heparin?

5    A.    Well, we figured that, if you needed to understand the

6    structure of heparin so that you can then look at why heparin

7    is having the effects in biology, you really need to get to

8    understand the basic structure of heparin.  So we figured that,

9    if you can understand what the individual different sugars are,

10   that will give us a much better understanding of what heparin

11   is.

12   Q.    Let me pause here and ask you to help us to understand

13   some of the words that we're going to see in documents in this

14   case.  First, is there a word that scientists use to describe

15   sugars?

16   A.    Yes.  They're typically called saccharides.  There's a

17   slide that -- it's spelled s-a-c-c-h-a-r-i-d-e-s, saccharides.

18   Q.    What is a polysaccharide?

19   A.    "Poly" means many.  So "polysaccharide" means many sugars

20   that are connected together like beads on a string.

21   Q.    When you cut up heparin, the heparin polysaccharide, the

22   long chains, into the smallest possible subunits, what do you

23   get?

24   A.    You get something called disaccharides.  "Di" means two.

25   So it's two sugars linked together.

1  Q.   Do you only get disaccharides, two sugars?

2  A.   No.  You also get sometimes tetrasaccharides, which

3  "tetra" means four.  So sometimes you get four sugars linked

4  together.

5  Q.   Was there a simple way that you referred to these shortest

6  possible sub-chains of heparin?  Was there a wording that you

7  used?

8  A.   We call them the building blocks.

9  Q.   Now, I want to ask you about how scientists cut up the

10 long sugar chains of heparin into the very short chains, the

11 building blocks.

12       First, what do you call the process of cutting up the

13 long chains into disaccharides and tetrasaccharides?

14 A.   It's called digestion.

15 Q.   And let me -- let's put up a slide and ask you to help us

16 teach how this is done.

17       MR. FRANK:  PDX 104.

18 Q.   First, the chain here, what are the beads?  That's -- what

19 are the beads?

20 A.   Those are the different sugars that are linked together to

21 form the long chain in the heparin.

22 Q.   We see some scissors schematically in the -- what's that?

23 A.   Those are enzymes.  Those are enzymes called heparinases

24 that are used to cut up that long chain at very specific

25 places.

1    Q.    What happens when the heparinases cut the long chains?

2    A.    Well, you get the di- and tetrasaccharide building blocks.

3    Q.    When you started at MIT, were heparinases available for

4    that purpose?

5    A.    Yes, but they were not of sufficiently good quality to do

6    what we wanted to do.

7    Q.    So what did you do?

8    A.    Well, we, Ram and I and others, started to develop better

9    heparinases.  We also started to work on coming up with better

10   conditions that can be used to get these kinds of digestions

11   because we were very interested in something called an

12   exhaustive digestion.

13   Q.    What is exhaustive digestion?

14   A.    It is a process by which you can take that chain or chains

15   of heparin and cut it down to the smallest possible building

16   blocks, the di- and tetrasaccharides, using these heparinases.

17   Q.    You said that you developed more effective heparinases.

18   How did you do that?

19   A.    Well, we engineered living cells to make these heparinases

20   so that you could get really pure forms of these enzymes.

21   Q.    You said that you improved it, that you didn't just

22   improve the heparinases, that you improved the way that

23   heparinases are used.  What do you mean by that?

24   A.    Well, when you have something that is cutting up a long

25   chain, you need to make sure that the conditions, like how much

1    of the enzyme compared to the amount of the sugar or the time,

2    the temperature, or what kinds of salts you need to add, all of

3    those, so that you get full digestion to the basic di- and

4    tetrasaccharide building blocks.

5    Q.   After you cut up the long sugar chains of heparin into the

6    short subunits, into the di- and tetrasaccharide, what do you

7    get?

8    A.   Well, you get a mixture of these di- and tetrasaccharide

9    building blocks.  The next slide -- thank you.  This slide

10   shows that there are -- in a test tube of the dietician, you

11   get all these different building blocks.

12   Q.   Are the -- can you study the heparin building blocks when

13   they're all mixed up in a test tube like that?

14   A.   Not easily.

15   Q.   So what do you do?

16   A.   You have to separate these building blocks.  You know, you

17   have to almost group them together.  You know, you've got to

18   collect all of those orange-colored building blocks together

19   and separate that group from the white-colored building blocks

20   and the green-colored building blocks.  So you go through a

21   process called separation.

22   Q.   What do you do -- can you describe to us what the purpose

23   and goal of separation is?  How do you get separation?

24   A.   Well, you have to -- you can do that -- there are many

25   techniques to do that separation.  There's a technique called

1    capillary electrophoresis, which separates based on size and

2    charge of these building blocks.  There's a technique called

3    HPLC, or high-performance liquid chromatography.  That

4    separates also by size and chart but by a different principle.

5    So the goal of this is you're collecting all of a particular

6    group, like all the orange together and separate them from all

7    of the white, et cetera.

8    Q.    Let me show you another slide.

9          MR. FRANK:  Slide PDX 106.

10   Q.    And tell us, please, what we're going to see here.

11   A.    This is illustrating using an animation what happens when

12   you do separation by capillary electrophoresis.  You're

13   collecting all of the different same-colored building blocks

14   and grouping them together, and that comes separate from the

15   white-colored building blocks.  And these are separated in

16   time, so you can think of it as the X axis would be the time.

17   Q.    Do you get the same result depending upon whether you use

18   capillary electrophoresis or the other separation method that

19   you described called HPLC?

20   A.    Yes and no.  You know, like I said, HPLC is a slightly

21   different way to separate.  So HPLC -- in the next slide, HPLC

22   also separates by grouping, but the order in which the groups

23   appear might be different.  So it might, for example, get the

24   red first and then the blue and the orange comes later, but the

25   amount of the orange and the amount of the different building

1    blocks are the same that are used, HPLC or capillary

2    electrophoresis.  I can put them side by side -- thank you.  By

3    putting them side by side, this illustrates how capillary

4    electrophoresis and HPLC both achieve the separation of these

5    building blocks but by slightly different principles.  So you

6    get the same amount, if you look at the orange, for example, on

7    both techniques, but where they come is different.

8    Q.    Now, did you and your colleagues at MIT have a preference

9    as among separation methods as between capillary

10   electrophoresis and HPLC?

11   A.    Yes.  We preferred capillary electrophoresis because we

12   thought it was a little more sensitive.

13   Q.    Once you get this kind of separation using either

14   capillary electrophoresis or HPLC, if you want to know the

15   specific chemical name of, say, the green building blocks or

16   the white building blocks, what do you do?

17   A.    Well, that's relatively straightforward.  You can isolate

18   that and study it with other techniques like NMR, which is

19   nuclear magnetic resonance, or you can study it with MALDI mass

20   spec, which is a kind of mass spectrometry.

21   Q.    Up to this point, are you describing work that you and Dr.

22   Sasisekharan and others did at MIT, or was this something that

23   was done at Momenta?

24   A.    This was all work that we had done at MIT over a period of

25   about ten years.

1    Q.   Did you make the work that you did at MIT available to

2    others in the scientific community?

3    A.   Yes.  We published quite extensively.  In fact, all of the

4    work on the different heparinases that we engineered into

5    living cells was published.  Our work on different separation

6    techniques were all published.  All of our work on the

7    structure of the characterization of each of these sugars was

8    also published.  We also published on different conditions for

9    digestion, quite extensively.

10   Q.   How many publications describe the scientific findings

11   that you and others at MIT made?

12   A.   I have personally authored over 40 publications during

13   that time.  Ram and the lab together have authored over a

14   hundred publications.

15   Q.   I'm going to switch subjects on you now.

16        Did there come a time when you decided you wanted to

17   take what you were doing at MIT and turn it into a business?

18   A.   Yes.

19   Q.   When was that?

20   A.   You know, we started in 1995.

21   Q.   What was the idea for the business?

22   A.   You know, you remember I said that nature makes heparin,

23   and it's really important biologically.  We wanted to use the

24   tools that we had developed to understand why heparin was being

25   made and how we can then take that understanding to make better

1  drugs, you know, better drugs for oncology or cancer or better

2  drugs in anticoagulation.

3  Q.   Were you successful -- you said you started this in 1995.

4  Were you successful in forming a business at that time?

5  A.   No.  You know, for almost five years, from 1995 to about

6  2000 or 2001, Ram and I talked to practically every investor

7  that would listen to us, but we couldn't convince them.

8  Q.   Why not?

9  A.   Well, to start the business, you need money, and money --

10 you need to convince investors.  And sugars, as I said, was

11 very complex.  People didn't understand them at all.  It was

12 not a proven area of science.  You know, nobody had ventured

13 into sugars to understand it the way that we had tried it.  And

14 genomics, or the understanding of genes, was much more

15 attractive to investors because a lot of tools were available.

16 So they didn't want to take the extra risk.

17 Q.   Were you eventually able to form a business?

18 A.   Yeah.  During that period, the work at MIT kept

19 continuing, and sometime in the late '90s we had several

20 breakthroughs, in 1999 and 2000.  And, finally, in 2001, we

21 managed to convince one investor to give us a really small

22 amount of capital, a really small amount of money to start the

23 company.

24 Q.   It took between five and six years to attract a single

25 investor, is that correct?

1    A.   That's right.

2    Q.   Now, when was Momenta formed?

3    A.   In May of 2001.

4    Q.   In 2001, how many employees did Momenta have?

5    A.   Just one.

6    Q.   Who was that employee?

7    A.   Just me.

8    Q.   And what was that one employee paid during 2001?

9    A.   Nothing.

10   Q.   Were you eventually joined by others?

11   A.   Yes.  You know, there are Zach Shriver, Mallik Sundaram,

12   Evay Chi (ph).  You know, three of the scientists that used to

13   work with us at MIT joined Momenta.  And by end of 2002, we had

14   about maybe eight to ten scientists.

15   Q.   You told us that the goal was to address disease

16   conditions using the techniques that you developed.  Did you do

17   that?

18   A.   Yes.  That was the goal.  We started working towards that,

19   but we had to come up with a plan to raise some money in the

20   short term.

21   Q.   What was that plan?

22   A.   We were going to take the tools that we had developed at

23   MIT and apply it to low-molecular-weight heparins.

24   Q.   You've told us what heparin is.  But I think the word

25   low-molecular-weight heparin is something new.  What's that?

1  A.   Well, remember I said heparin is used as an anticoagulant.

2  Heparin also had some bad effects, right?  It's a very large

3  chain.  Only one small piece of that large chain was actually

4  involved in stopping the blood from clotting.  All this other

5  extra stuff was causing side effects.  So the other issue is,

6  because it's such large chains, giving heparin, administering

7  it to a body is also very complicated.  You have to do it

8  intravenously in a hospital.

9       So scientists around in the 1980s figured that, if you

10  can take these long chains and cut them up into slightly

11  smaller chains, not all the way down to di- and

12  tetrasaccharides like I was showing before but just like

13  smaller fragments, then you could keep the anticlotting effect

14  but get rid of some of the side effects.  Also, because it's

15  smaller, you could now give that as an injection

16  subcutaneously, and it also had more controlled predictable

17  effects.

18  Q.   How are low-molecular-weight heparins made?

19  A.   Well, they're made by taking these long chains and cutting

20  them using chemicals.

21  Q.   The long chains of what?

22  A.   Long chains of heparin and cutting them.  I think I have a

23  slide that can explain that.  So this shows -- this slide shows

24  that you can take a long chain of heparin, just one chain just

25  for illustrative purposes but in reality you have the whole

1    mixture, and cut that up with chemicals at different places.

2    And when you cut that up, you get these fragments. So you're

3    now taking these long 40 to 70 chains and making them about 28

4    to 20 sugars long.

5    Q.    You said cut them up with chemicals. Is that the same

6    thing as the heparinases that you described before?

7    A.    Well, yes and no. The chemicals are usually typically

8    acid or base, and they cut at different places at the chain.

9    Q.    Are all low-molecular-weight heparins the same?

10   A.    No. Depending upon how you cut the long chain, you can

11   get very different kinds of low-molecular-weight heparins. By

12   using one kind of chemistry, you will get something called

13   enoxaparin, or Lovenox; that's a brand name. If you use a

14   different kind of chemistry, you get another

15   low-molecular-weight heparin called dalteparin, or Fragmin.

16   You also have tinzaparin and so on. They're different kinds of

17   low-molecular-weight heparins.

18   Q.    Was the work at MIT focused on heparin or on

19   low-molecular-weight heparins?

20   A.    Almost all of the work at MIT was focused on heparin.

21   Q.    You said that the plan was to study a particular

22   low-molecular-weight heparin. Which one?

23   A.    Lovenox.

24   Q.    Why Lovenox? Actually, tell us what the generic name of

25   Lovenox is?

1    A.    Enoxaparin.   Lovenox is the brand name, and enoxaparin is

2    the generic name.   I might sometimes use them interchangeably.

3    Q.    Why were you going to study that, that is, enoxaparin,

4    brand name Lovenox?

5    A.    Well, enoxaparin was a very successful product, and it was

6    marketed by a company called Aventis back then.   They are now

7    called Sanofi-Aventis.   So I'll keep referring them as

8    Sanofi-Aventis.   It was a very popular low-molecular-weight

9    heparin.   Clinicians really favored it.   It had over 70 percent

10   of all of the low-molecular-weight heparins used.   It generated

11   sales of over $2 billion worldwide at that time.

12   Q.    How was your study of enoxaparin, Lovenox, going to make

13   money for your new company in the short run?

14   A.    Well, we figured that by applying the tools that we had

15   developed at MIT to understand enoxaparin, we could actually

16   learn more about why enoxaparin was so successful, and, you

17   know, we could now take those tools and really understand more

18   about enoxaparin than even what Sanofi-Aventis knows about it.

19   We would then -- we hoped that we could then take that

20   information to Sanofi-Aventis and work with them to make better

21   versions of low-molecular-weight heparins and, hopefully, raise

22   some money for the company in the process.

23   Q.    Bear with me for a moment.   How is it that a company like

24   Sanofi-Aventis can sell a couple billion dollars of a drug and

25   not know what the drug is made up of, what the structure of the

1    drug is?

2    A.    Sanofi-Aventis developed enoxaparin as a new drug.  So

3    there is an agency called the USFDA, the Food and Drug

4    Administration, that regulates who gets to sell drugs and

5    pharmaceuticals in the United States.  So to develop a new

6    drug, a company has to convince the FDA three things:  First,

7    you have to show that the drug you're making is safe, and you

8    show that through a whole host of tests in the lab as well as

9    in human testing.

10         Second, you have to show that the drug has to affect

11   that you're claiming it has, in this case, that it does stop

12   blood from clotting.  You have to show that by, again,

13   extensive testing using human patients over many years.

14         And, third, you have to convince the FDA that you're

15   making the same drug every time, and that's called to make sure

16   that the manufacturing is the same.

17         So you don't need to know a lot about the structure.

18   You just need to convince the FDA that you're doing the same

19   thing every single time.  If you have all those three, the FDA

20   gives you permission to sell that drug.

21   Q.   In lay terms, if it works and if it is made the same way

22   every time, if it is demonstrated to the FDA that it works and

23   if it is demonstrated to the FDA that it is made the same way

24   every time, then you don't actually have to know what all the

25   components of what the drug are?

1    A.    That's correct.

2    Q.    Okay.  Now, you said the plan was to take what you learned

3    and to take it to Sanofi-Aventis.  Did the plan work?

4    A.    Yes and no.  You know, we were -- we were scientists, and

5    maybe we were naive in certain ways from a business

6    perspective.  The plan worked from a scientific perspective,

7    but we were not able to do the business relationship.

8    Q.    So let's take that in the two parts.  First, the

9    scientific relationship.  What do you mean when you say that

10   you were successful from a scientific perspective?

11   A.    Well, we bought Lovenox from the market, and we did what I

12   just explained, you know, cut it up into the disaccharide

13   building blocks and started understanding the structure using

14   the different enzymes and all like I walked you through.  You

15   know, and in the process of doing that, we actually had to

16   avoid some of the mistakes that were done in the past by other

17   people that were trying to understand these molecules.

18   Q.    What kind of mistakes?

19   A.    Well, there's this concept called as mass balance.  That's

20   really important.

21   Q.    What is mass balance?

22   A.    You know, when you're looking at something as complex as

23   enoxaparin, it is really important that you know all of the

24   different building blocks.  It's not enough to know just the

25   major ones, right.  So if you have a hundred different sugars

1    that are being put into an experiment, on the back end of it,

2    you need to make sure that you are accounting for all hundred

3    sugars.  If you're only getting 95 or 98, that's not good

4    enough because you're missing some really -- potentially

5    missing some really important parts of the molecule.

6    Q.   Did you apply the principle of mass balance to the

7    analysis of enoxaparin, brand name Lovenox?

8    A.   Yes, we did.

9    Q.   And what was the result?

10   A.   Well, it was something very surprising.

11   Q.   What was that?

12   A.   What we found was that enoxaparin had some sugars that had

13   never been observed before.  You know, people had thought that

14   these are all just -- all low-molecular-weight heparins are the

15   same as heparins.  But we found in enoxaparin that there are

16   some sugars that have never been observed before.  In fact,

17   those sugars was not there in heparin.

18   Q.   How did you come to make that discovery?

19   A.   I can use some slides to explain that.

20        MR. FRANK:  Can we have PDX 111?

21   A.   This slide shows -- let me start with first heparin, the

22   starting material.  So if you take heparin, that's the longer

23   chains, digested exhaustively like I showed, and separate it

24   with a technique called capillary electrophoresis, that is the

25   kind of picture you get.

1    Q.   As I understand it, this is the output of the machine that

2    actually does the capillary electrophoresis, is that right?

3    A.   That's correct.

4    Q.   What do you call a profile like this?

5    A.   It's called an electropherogram.

6    Q.   What do you call the numbered things, the spikes, that we

7    see on the electropherogram?

8    A.   Each one of those are called peaks.

9    Q.   What is a peak?

10   A.   It is -- this is the scientific version of what I showed,

11   which is basically each peak represents a group of building

12   blocks.  So Peak 1, for example, could be your orange-colored

13   building blocks; Peak 2 could be a different colored building

14   block.

15   Q.   When you -- what do you call the collection of peaks that

16   we see on an electropherogram like this?

17   A.   It's called as a profile.

18   Q.   So this is the profile of what?

19   A.   This is a profile of heparin.

20        MR. FRANK:  Now, could we have PDX 112, please?

21   Q.   What is this, Dr. Kaundinya?

22   A.   This is exactly the same thing done on enoxaparin, the

23   low-molecular-weight heparin.  This is the capillary

24   electropherogram profile of enoxaparin, or Lovenox.  This is a

25   figure from the '886 patent, Figure 1A.

1      MR. FRANK:  If we could, Scott, can we put these two

2   figures in one image so we can compare them?

3   Q.   Are the two images the same or different, Dr. Kaundinya?

4   A.   The first thing I'd point out is that the scales of the

5   two are different.

6   Q.   Stop for a second.

7      MR. FRANK:  Scott, please adjust the scales so the

8   scale is the same.

9   Q.   Now, the -- tell us what we see here, please, Dr.

10  Kaundinya.

11  A.   Well, the first thing is that you see a lot of peaks that

12  are common between heparin and Lovenox.  That's not surprising.

13  You know, those are the ones that are highlighted in yellow.

14  That's not surprising because, like I said, Lovenox is from

15  unfractionated heparin.  You are taking these long chains and

16  cutting up into smaller chains.  So you do see a lot of the

17  building blocks that are there in Lovenox that started from the

18  unfractionated heparin.

19  Q.   Just to stop you there, the bottom panel, where does the

20  bottom panel come from?

21  A.   The bottom panel is from Lovenox, which is the enoxaparin

22  that has been digested and separated.

23  Q.   So many of the peaks in the bottom panel, because the

24  bottom panel, Lovenox, comes from heparin, are also observed in

25  the top panel?

1    A.    That's correct.

2    Q.    So what's to be gotten from this?

3    A.    That most of Lovenox is actually the same as the heparin

4    building blocks.  But the interesting thing that was really

5    surprising to us is those two peaks marked 9 and 10 there.

6    That's highlighted there.  That's there only in Lovenox and not

7    there in heparin.

8    Q.    If you were to run the same process, exactly the same

9    process, on other low-molecular-weight heparins, do you find

10   the sugars that -- actually, I should ask you, each of each

11   peaks, I think you told us, relates to a particular kind of

12   sugar.  When you do the same process on other

13   low-molecular-weight heparins, do you find the sugars that

14   correspond; do you get a peak that looks likes Peak 9 or Peak

15   10?

16   A.    No.  When you do this with other low-molecular-weight

17   heparins, you don't get Peaks 9 and 10.  Peak 9 and 10 only

18   come up with Lovenox.

19   Q.    Why does any of this make a difference?

20   A.    I'll try and explain that using the next slide.  You know,

21   the first thing is that this observation that there are sugars

22   in enoxaparin that have a unique structure that's not present

23   in heparin in nature.  That's why you get them as Peaks 9 and

24   10, and you don't see those Peaks 9 and 10 in heparin.  These

25   are called non-naturally occurring sugars because they don't

1    occur in nature in heparin.

2           Second point, because they happen in Lovenox, they had

3    to have come from somewhere.  We figured that these

4    non-naturally occurring sugars are coming from the way

5    enoxaparin is made.  So it's a unique -- something about the

6    way enoxaparin is made imparts some changes to these sugars so

7    that that starts to show up as Peaks 9 and 10.

8           The third piece is that this structural feature that's

9    associated with this non-naturally occurring sugar causes them

10   to separate from all of the natural sugars.  That's what we

11   call as a structural signature of enoxaparin; in other words,

12   it's somehow being imprinted on the way enoxaparin is made.

13   And think of it like, when I say structural signature or

14   fingerprint, think of it very much like my fingerprint.  It is

15   something unique to me, and we realized that, therefore, the

16   structural signature can be used to say if something is

17   enoxaparin or if something is not enoxaparin.

18          And this is all important because the fourth point --

19   remember I say enoxaparin was widely accepted in the market?

20   It was used by clinicians.  We figured that there was something

21   special about enoxaparin, and it could be that these structural

22   signatures are what made enoxaparin so special.

23   Q.   You've told us that at that point you developed a way --

24   discovered a way to distinguish what is enoxaparin from what is

25   not enoxaparin.  Did you stop at that point to figure out the

1   chemical name of the particular signature that was unique to

2   enoxaparin?

3   A.   No, we did not.

4   Q.   Why not?

5   A.   Well, it did not matter to us what the chemical names

6   were.  You know, we all -- we were calling them Peaks 9 and 10.

7   We could have called them anything.  The way I would think

8   about it is, if you're trying to find me from my fingerprint --

9   let's use the next slide.  You know, if you're trying to match

10  my fingerprint to one of these two, and let's say the

11  fingerprint on the right is mine, to say that these two

12  fingerprints are the same or different, you don't need to know

13  the technical names of the different curves, whether it's an

14  alpha curve or a squiggle or there's very technical names for

15  each one of those patterns.  You don't need to know those

16  technical names to make a judgment when you see a fingerprint

17  as to whether it's the same or whether it's not the same, the

18  same way --

19  Q.   I didn't mean to interrupt you.

20        So if you see the pattern that corresponds to

21  enoxaparin, you know you have enoxaparin; and if you don't see

22  that pattern, you know that you don't have enoxaparin?

23  A.   That's exactly right.

24  Q.   So how would a -- now, let's take that up one level of

25  scientific sophistication.  How would a person like yourself or

1    someone who works in the field, how would they find the

2    fingerprint that you're talking about?

3    A.    Exactly like I described, right?  You would take a sample

4    that you don't know whether it is enoxaparin or not.  You would

5    digest them exhaustively using these heparinases.  You would

6    then separate them using a techniques like capillary

7    electrophoresis.  Then you would look for those characteristic

8    signatures, those Peaks 9 and Peaks 10.  If they are there,

9    then you would say it's enoxaparin.  If they're not there or if

10   they're not there in the relative position in that profile,

11   then you'd say it's not enoxaparin.

12   Q.   When you say if they're not there in the same relative

13   position, what do you mean?

14   A.    The capillary electrophoresis, the way it's run in this

15   picture, it shows that it's run in a way that separates the

16   highly charged building blocks first and the not-so-charged

17   building blocks come later.  Like, for example, Peak 1 is a

18   highly charged building block.  Peaks 5, 6, 7 are not so

19   charged.  So you would look for this characteristic signature

20   Peaks 9 and 10 between these two pattern -- these two extremes

21   of the profile.

22           Now, depending on the exact conditions that you run

23   the experiment under, you might get them to be stretched out a

24   little bit or squished a little bit, but the profile remains

25   the same, and the relative positions remain the same.  You will

1    see two peaks that are not present in unfractionated heparin.

2    Q.   To use the term there, maybe I should ask you to define

3    "unfractionated heparin."   What is that?

4    A.   It is the same as what I've been calling heparin.   You

5    know, that natural heparin is also called as unfractionated

6    heparin.

7    Q.   What did you do with what you had learned about Lovenox?

8    A.   So this was a very important finding.   We first filed a

9    patent application on this information, and then we went out

10   and met with Sanofi-Aventis.

11   Q.   Now, you've said that you filed a patent application.

12        MR. FRANK:   Could we have Exhibit 250, please?

13        250, your Honor, is in evidence.

14   Q.   What is this, Dr. Kaundinya?

15   A.   This is the provisional patent application that we filed

16   for back then when we found this.

17   Q.   Let's look at Figure 1, if we could, in the provisional

18   patent application.

19        MR. FRANK:   It's on Bates Page 839, Scott.

20   Q.   What's that, Dr. Kaundinya?

21   A.   That is the figure from that patent application that shows

22   the capillary electropherogram of Lovenox.

23   Q.   Now, let's look, if we could, at Page 50 of the

24   application and Table 3 on Page 50.   Let me take this in

25   pieces.   In the -- the left-hand column is headed "saccharide."

1    Do you see that?

2    A.    Yes.

3    Q.    What's in that -- what is the information in that column?

4    If you go down the column, what's the information here?

5    A.    Those are the different peaks, the different building

6    blocks, numbered 1, 2, 3, 4, et cetera, different peaks that

7    you see in the capillary electropherogram.

8    Q.    The second column says, "Lovenox percent of total."

9    What's the information in that column?

10   A.    It tells you how much of a particular kind of building

11   block, how much of Peak 1 is there when you look at it as a

12   total of all the different building blocks.  So 63.6 percent of

13   building block of Type 1 is present in Lovenox.

14   Q.    And if we go down the list of peaks, the saccharides, to 9

15   and 10, what do we see there?

16   A.    Those Peaks 9 and 10, remember, those are the unique

17   structural signature we saw in Lovenox.  And this table shows

18   that you see 9 and 10 have some values for Lovenox, but it is

19   zero for the other low-molecular-weight heparin, in this case,

20   Fragmin, which is made by a different process.  It's also zero

21   for unfractionated heparin or the starting material heparin.

22   So Peaks 9 and 10 are present only in Lovenox and are not

23   present in the other low-molecular-weight heparins or in the

24   starting material.

25   Q.    If you look further down on the chart, there are two

1    horizontal lines.  One says anti -- I believe that's Roman Ten

2    A and anti 2A.  What's that telling you?

3    A.   Those are telling you about the biological activity, in

4    this case, the ability to stop the clot from forming and now

5    for the different substances here.

6         MR. FRANK:  Your Honor, I'm switching subjects

7    slightly.

8         THE COURT:  Yes.  We will take the morning recess at

9    this stage, jurors.  We're going to be in recess for 15

10   minutes.  We'll be back at 11:15.

11        THE CLERK:  All rise for the jury.

12   (The jury left the courtroom at 11:00 a.m.)

13        THE COURT:  You may step down for the time being.

14        Please be seated, counsel.  Planning for the next

15   segment, about how much longer on direct examination, Mr.

16   Frank?

17        MR. FRANK:  I'm just about halfway through, your

18   Honor.

19        THE COURT:  Meaning -- I've forgotten what you said

20   you were going to have for direct.

21        MR. FRANK:  Yesterday I said about 90 minutes, and I

22   think I'm roughly on schedule, although I may get told

23   something different shortly.

24        THE COURT:  So roughly 45 minutes to go.

25        MR. FRANK:  I would think that's right.

1          THE COURT:  Remind me what --

2          MR. SOMMER:  We still think about a half an hour,

3     Judge.

4          THE COURT:  Then after this witness?

5          MR. FRANK:  Dr. Shriver.  As I said yesterday, I

6     expect that will be about a half hour or so on direct.

7          THE COURT:  So we're on schedule as planned for

8     yesterday.

9          MR. FRANK:  So far.

10          THE COURT:  Just a few matters to cover.  I have

11     decided that I will not give the jury a paper copy of the

12     initial instruction because the jurors will receive a copy of

13     the Court's full instructions at the end of the trial; and

14     giving them a copy of this short initial instruction could

15     confuse and distract them.  So I'm not going to give it to

16     them.

17          Second, I want to ask counsel, because they informed

18     the Court last week, I believe, that they were considering

19     filing proposed -- joint proposed jury instructions.  And I

20     want to know if they are still planning to do that.  If so,

21     when?

22          MR. FRANK:  Let me see if I can speak for both of us.

23     If I misrepresent it, of course, they'll tell you.  Each side,

24     we have exchanged sets of jury instructions.  We have reached

25     agreement with respect to a relatively small number of them.

1    We will be able to provide to the Court sets of jury

2    instructions that at least meet each other in the sense that

3    our version will be placed in juxtaposition to their version of

4    the same jury instruction.  I wish I could tell you we had made

5    more progress, but that's where we are.

6              THE COURT:  And you expect to get those to me when?

7              MR. FRANK:  When -- actually, we will expect to get

8    them to you when you tell us that you want them, and we'll meet

9    whatever is your --

10             THE COURT:  I want them sooner rather than later.

11   Therefore, this week would be good because we'll be giving the

12   charge next week.

13             MR. FRANK:  Yes.  I believe we can give them to you by

14   tomorrow, for example.  It's just a matter of compiling them.

15             THE COURT:  That's fine.

16             MR. FRANK:  If we make further progress, we can, of

17   course, report that.

18             THE COURT:  That's fine.  Do the defendants agree with

19   that?

20             MR. SOMMER:  I agree with most things.  I think we can

21   endeavor to try to do tomorrow.  I think that might be slightly

22   ambitious.

23             MR. FRANK:  I just got poked and said Thursday would

24   be better.

25             THE COURT:  All right.  Just keep it in mind that the

1    sooner you get it to us, the better the consideration will be

2    on our end.

3          Third, the plaintiffs at one point moved for a

4    statement to be read to the jury as to the preliminary

5    injunction.  It was Docket 1024.  That is still pending.  Have

6    the parties reached a neutral agreed-upon statement or

7    stipulation as to the injunction?

8          MR. FRANK:  No, we haven't, but we're still working on

9    it.  Our plan, on this side at least, is to present it to you

10   -- is to present it to you as we approach the point where it

11   becomes relevant so that you can have a better sense of context

12   and why it's relevant.  And we will get you a proposed -- I'm

13   mindful of the admonition that you gave us last week, and we

14   will try to respond to that admonition.

15         THE COURT:  Good enough.  We will be in recess then

16   for 15 minutes.

17   (Recess taken at 11:05 a.m.)

18   (resumes, 11:25 a.m.)

19          (The jury is present for the following)

20         THE COURT:  And good morning again, Jurors.  We're

21   ready to resume.

22         Dr. Kaundinya, you're reminded that you remain under

23   oath.

24         And you may continue with direct examination,

25   Mr. Frank.

1          MR. FRANK:  Thank you, Your Honor.

2    Q.   Just to remind us of where we were, you described the

3    discovery, you've described a provisional patent application.

4          MR. FRANK:  Scott, could we have the provisional

5    patent application up one more time?

6    Q.   Tell us, please, Dr. Kaundinya, when you filed the -- what

7    is the date on which you filed the provisional patent

8    application?

9    A.   It was on May 28th, 2002.

10   Q.   And you testified before that you took your findings to

11   Sanofi Aventis.  When did you take your findings to Sanofi

12   Aventis?

13   A.   The very next day, on May 29th, 2002.

14         MR. FRANK:  Your Honor, I should tell you what I did

15   during the recess, which is that, by agreement of the parties,

16   we have provided both the witness and the Court a binder with

17   paper documents that are going to be referred to in the course

18   of this examination, and opposing counsel have those as well.

19         THE COURT:  Yes.

20   Q.   Now, what --

21         MR. FRANK:  Could we have Exhibit 1073, please.

22   Q.   What is this, Dr. Kaundinya?

23   A.   This is the slides that we used when we met with Aventis

24   on May 29th, 2002.

25   Q.   Let's go to Slide 35 in the deck.  And tell us what you

1    told Sanofi Aventis in May of 2002 regarding what you had

2    determined about Lovenox, enoxaparin?

3    A.   We told them what I had just described, that you could

4    understand Lovenox by completely digesting it with enzymes and

5    then separating the different building blocks and quantifying

6    them and also this concept of complete mass balance that I just

7    told you about.

8           MR. FRANK:  Let's go now to Slide 42, please.

9    Q.   Tell us what you pointed out to Sanofi Aventis with

10   respect to the -- that's represented on this Slide.

11   A.   We told them that there were unique sugars that we found

12   in Lovenox.  This is -- we highlighted that these sugars were

13   modified sugars that were not there in unfractionated heparin,

14   and we highlighted Peaks 9 and 10, as shown in this picture.

15   Q.   Now, could we go to Slide 37 that you used that day.

16   What's this, Dr. Kaundinya?  And I call your attention to the

17   right of the Slide.

18   A.   This is the same table that we just saw a few minutes ago

19   from the provisional application.  It lists all of the

20   different building blocks from 1 through 11 and the amount of

21   those building blocks in Lovenox, in Fragmin, which is a

22   different low-molecular-weight heparin, and in unfractionated

23   heparin or the heparin itself.

24          MR. FRANK:  Now, Slide 36, please.

25   Q.   What did you tell Sanofi Aventis that's on    Slide 36?

1    A.   Well, we told them that you could use these chemical

2    signatures -- we call these Peaks 9 and 10 as chemical

3    signatures.  We told them that we could use these chemical

4    signatures for rapidly understanding what Lovenox was.

5              MR. FRANK:  One more slide, Slide 43, please.

6    Q.   I want to call your attention to the third box down, the

7    one with the third checkmark against it.

8              Tell us what you told Sanofi Aventis that day about

9    that subject.

10   A.   QC, that represents quality control.  What we told them

11   was that you could use this understanding of something unique

12   to Lovenox to control the quality of their manufacturing

13   process and also control the batch-to-batch variability of

14   Lovenox.

15   Q.   What's batch-to-batch variability?

16   A.   Recall I said that heparin and low-molecular-weight

17   heparins can change from one batch to the next batch, and so we

18   said we could use this way to really control so that your

19   manufacturing is making the same product time and again.

20   Q.   So, now, after this initial meeting with Sanofi Aventis in

21   May of 2002, what happened?

22   A.   Well, Sanofi sent to Momenta a rather large team of

23   scientists.  You know, we had a small facility in Cambridge.

24   We had about ten scientists.  They sent a lot more scientists

25   than the total Momenta team at that time.  They flew in people

1    from all over the world, from France, from Germany.

2    Q.   And what happened at that meeting?

3    A.   The Sanofi scientists went into great depths to understand

4    our technology, and at the end of all of that, they decided to

5    give us a test.

6    Q.   And what was that test?

7    A.   They would give us three samples, and we were to digest

8    them or break them down and show them some of the structures

9    from those samples.

10   Q.   And did -- were you given the samples?  And did you

11   analyze them?

12   A.   Yes.

13   Q.   And did you report your findings to Sanofi?

14   A.   Yes.

15        MR. FRANK:  Could we look at Exhibit 1330, please.

16   Q.   Tell us, Dr. Kaundinya, what Exhibit 1330 is.

17   A.   This is the report that we sent back to Sanofi Aventis on

18   the results of that analysis in 2002.

19   Q.   Now, I think you said that you digested the material that

20   they gave you and looked at individual structures.  I want to

21   ask you about a particular structure, which in that context was

22   called Sample 12.

23        What did you determine about Sample 12?

24        MR. FRANK:  Could we have Page 4 of Exhibit 1330,

25   please.

1    A.    We told them that Structure 12 represents a very unusual

2    sequence not found in unfractionated heparin.

3          MR. FRANK:  And could we now have Page 7 of

4    Exhibit 1330, of the presentation.

5    Q.    What did you tell Sanofi Aventis was the chemical name of

6    Structure 12?

7    A.    We said that it is a 1,6 anhydro ring-containing

8    structure.  That's the picture shown on the right.

9    Q.    Now, you're showing two different things here.  Why was

10   that?

11   A.    Well, recall that Sanofi was testing us, so we were not

12   sure if they were giving us enoxaparin.  If they were giving us

13   enoxaparin, we could have surely told them that the Structure

14   12 was the one on the right-hand side, which is a 1,6 anhydro

15   ring structure.

16         On the other hand, we thought they might be tricking

17   us and they might be giving us low-molecular-weight heparin

18   that was made by the acid way of cutting it up.  That would

19   have given us a   2,5 anhydro ring, which is what we showed at

20   the left.

21         So, at that time, we weren't sure if this was an

22   enoxaparin sample or not, and that's why we said it was either

23   this or that.

24   Q.    And remind us, enoxaparin is made using an acid or -- the

25   cutting-up step is achieved by using an acid or a base?

1    A.    It is done by using a base.

2    Q.    And if you use a base, what are you going to get?

3    A.    You get a 1,6 anhydro ring.  And I can point out, if you

4    can highlight on the top right, that ring that you see there is

5    called a 1,6 anhydro ring.  It's because it's connected to the

6    Atom No. 1, which is this atom over here, and to the sixth atom

7    over there.  And that's why it's called a 1,6 anhydro ring.

8    Q.    So, let me see if we -- if I can get context here.

9          Remind us when you told Sanofi Aventis about Peaks 9

10   and 10 and there being an unusual modified sugar.  When was

11   that?

12         MR. FRANK:  Could we have 1073, Slide 42, please.

13   A.    This was in May 29th of 2002.

14   Q.    And now -- and what did you tell Sanofi Aventis in

15   November of 2002 about Structure 12?

16   A.    That it was a structure that was an unusual structure not

17   found in unfractionated heparin and that it was a 1,6 anhydro

18   if it was from an enoxaparin sample.

19         MR. FRANK:  1330, Page 7, please.

20   Q.    Now, when -- tell us again when you reported

21   these findings to Sanofi Aventis.

22   A.    On November 25th -- on November 25th of 2002.

23   Q.    Did Momenta's discussions with Sanofi Aventis continue?

24   A.    No, they did not.

25   Q.    What happened?

1    A.    Well, they called off all discussions in December.

2    Q.    Did Sanofi give you any reason whatsoever?

3    A.    No, they didn't.

4    Q.    Now, you said before that Momenta may have been a little

5    naive in its business dealings with Sanofi Aventis.  What did

6    you mean?

7    A.    Well, we were scientists, you know, we were going to go

8    work with them to make better low-molecular-weight heparins by

9    explaining to them what the structures in Lovenox and hopefully

10   in the process raise some money to build our company.

11         But I think Sanofi looked at us more as a threat than

12   as an opportunity, and therefore, they did not want anybody to

13   get into their rather large franchise.

14   Q.    You told us that the initial plan to bring in money in the

15   short run was to -- this plan to take things to Sanofi Aventis,

16   as you told us, that by December of 2002, Sanofi had told you

17   that they were no longer interested.

18         What did you do?

19   A.    Well, it was a pretty bleak Christmas that year.  We

20   decided that we would go back and come back in January and

21   regroup and decide what to do.

22   Q.    Did you come back in January?  And if you came back, what

23   did you decide?

24   A.    Yes, we did come back.  We decided that we would take all

25   of that knowledge that they have created and make a generic

1    version of Lovenox and we would sell it at a substantial

2    discount than what Sanofi was charging.

3    Q.   That's the first time we've had mention of what a generic

4    drug is.  Would you help us to understand what that is?

5    A.   Sure.  Recall I told you about how the FDA, the Food and

6    Drug Adminstration, approves a company to sell a drug.  And for

7    a new drug, you have to do clinical trials to show safety and

8    efficacy.

9         For a generic drug, you have to prove to the FDA that

10   you're the same active ingredient as the brand name drug.  So,

11   if you're the same as some drug that's already in the market,

12   then it can be expected that you will also have the same safety

13   and the same efficacy or the same outcome by -- and, therefore,

14   you don't need to do human testing all over again.

15        So, a generic drug has to prove that it's the same as

16   the brand name drug.

17   Q.   What did you and the others at Momenta at that time know

18   about making generic drugs?

19   A.   Nothing at all, but we knew a lot about enoxaparin.

20   Q.   Was the task of making a generic version of enoxaparin

21   similar to the task of making the generic version of other

22   common drugs?

23   A.   No.  It's much more challenging.  Let me use the slide to

24   maybe illustrate the point.  If you can get the next slide.

25            MR. FRANK:  PDX-128.

1     A.   So, if you think about a drug like Advil, it's made of a

2     very simple small what is called as a chemical structure.

3     Because it's a small-molecule chemical, it's shown here

4     pictorially, making a generic of Advil, you have to synthesize

5     that same chemical structure, and -- you know, the generic name

6     is like ibuprofen.  And synthesizing that kind of a chemical

7     structure is a relatively straightforward thing.  You know, us

8     chemists can do that in a matter of a few weeks.

9          But Lovenox is much more complex.

10    Q.   Why so?

11    A.   Well, if you go to the picture on the right, this is a

12    schematic of what Lovenox looks like.  Firstly, it's not a

13    simple chemical structure.  It is made of long complex chains,

14    anywhere from eight to 20 sugars connected together, different

15    kinds of sugars.  No two chains are of the same length, and no

16    two sugars are -- no two chains have the same sequence of those

17    sugars in them either.

18         So, understanding what's Lovenox is really much more

19    challenging than understanding what something like Advil or

20    ibuprofen is.

21    Q.   So, I take it the challenge is to make something that's

22    the same as what's on the right.

23         How did you do that?

24    A.   Well, that requires two things.  When you're trying to

25    make a generic, you first need to know what the brand drug is.

1    You need to understand what is Lovenox.  Remember that we had

2    done at lot of work, just as I described, in understanding what

3    is Lovenox.  So, we thought we could do that clearly.

4          But the second part of it is now you need to develop a

5    manufacturing process to make the same as what is Lovenox.  And

6    together, then, you can now show the FDA that you have made the

7    same thing.

8    Q.   So, if you know the structure of Lovenox, how do you

9    develop a manufacturing process, a way of making an enoxaparin?

10   A.   Well, remember that enoxaparin is made from unfractionated

11   heparin or heparin and cut up in different ways.  So, you need

12   to buy heparin and cut it up in a way that makes it the same as

13   Lovenox.

14   Q.   Okay.  So, you buy the heparin.  Then what do you do?

15   A.   Well, you have to develop a process to then cut it up so

16   that you get the same as Lovenox, get all of the different

17   attributes of Lovenox.

18   Q.   At that point, what was known about the way Lovenox is

19   made?

20   A.   Well, Sanofi Aventis had publicly disclosed that Lovenox

21   is made by a three-step process that involved a base.  That's

22   all they had disclosed.  But the details of any of those three

23   steps was not published.

24   Q.   So, what did Momenta do?

25   A.   Well, for a period of over nine months after that, we

1    systematically looked at all of the different steps, all the

2    three steps, and each time evaluated whether, by taking the

3    heparin and cutting it up and making a low-molecular-weight

4    heparin, if you made Lovenox or not.

5    Q.   When you say you systematically varied the process steps,

6    tell us what that means.

7    A.   Well, in every step, it's really important to -- remember

8    I said that there are certain attributes that are made because

9    of the way Lovenox is made.  So, it was really important to get

10   the conditions of depolymerization correctly.

11   Q.   Depolymerization, what does that mean?

12   A.   Well, it's a technical word for cutting up these long

13   chains of sugar, and it's -- you know, polymer --

14   depolymerization is the technical word for cutting up these

15   long chains of sugar.

16   Q.   So -- I'm sorry.  I interrupted you.  You were describing

17   adjusting the process conditions.

18   A.   Right.  So, you have to make sure that things like the

19   time, the temperature that you use, the amount of the chemical

20   that you use are all exactly right so that you get Lovenox and

21   you don't get just any low-molecular-weight heparin.

22   Q.   Were the sugars that correspond to Peaks 9 and 10 and the

23   structural signature that makes those sugars unique used in the

24   process of developing a generic enoxaparin?

25   A.   Yes, they were critical.

1    Q.    Why?

2    A.    Recall that I said that these sugars corresponding to

3    Peaks 9 and 10 are something unique to the way Lovenox is made.

4    So, we used those sugars that corresponds to Peak 9 and 10 as a

5    way to optimize the different conditions so that you get

6    something that's Lovenox and not just any low-molecular-weight

7    heparin.

8    Q.    And were you looking just to get those   signature --

9    those -- the sugars that had the structural signature or to get

10   them in the right amounts?

11   A.    We had to get those structural signatures in the right

12   amounts.

13   Q.    Right amounts, what does that mean?  Right amounts as

14   compared to what?

15   A.    It has to be the same as what's there in the referenced

16   product.  In this particular case, it has the same amount as in

17   Lovenox.

18   Q.    Now, was Momenta successful?

19   A.    Yes.  In -- sometime in September, 2003, two    of our

20   scientists, you know, Zack Shriver and     Malik Sundaram,

21   actually walked into a conference room that I distinctly

22   remember with a really tiny little vile where they had

23   successfully made enoxaparin.

24   Q.    Now -- so, now you have what you think is a generic

25   version of enoxaparin in a tiny vile.  Is that the end of the

1    process?

2    A.    Oh, no.  That was just the beginning.  There are at least

3    five different hurdles that we had to come -- cross.

4    Q.    So, now, I'd like to talk about those hurdles.  Let's take

5    them one at a time.

6              What was the first of the hurdles?

7              MR. FRANK:  PDX-127, please.

8    A.    We had to find a partner.

9    Q.    Why?

10   A.    Well, we were -- Momenta was not a drug manufacturer.  You

11   know, we were a small biotech company based on science.  And we

12   needed somebody that had expertise and capabilities in making

13   and selling and distributing and commercializing drugs.  And of

14   course we needed money too.

15   Q.    So, did you find a partner?

16   A.    Yes, we did.

17   Q.    Who was that partner?

18   A.    Sandoz.

19   Q.    What is Sandoz?

20   A.    Sandoz is the largest generic company in the -- one of the

21   largest generic companies in the world.

22   Q.    What did you and others at Momenta do in an effort to

23   persuade Sandoz to partner with little Momenta?

24   A.    We gave them several technical presentations, we had many

25   business discussions with them, and Sandoz also decided to put

1    us to a test.

2    Q.   And what was that test?

3    A.   Sandoz gave us three samples, three blinded samples, they

4    marked it, you know, "Sample 1, Sample 2" and "Sample 3," and

5    asked us to identify which one was Lovenox.

6    Q.   Is that the same kind of test that you had gotten from

7    Sanofi Aventis nine months earlier?

8    A.   Yes and no.  It was slightly different.  Sanofi gave us

9    samples and asked us to identify structures.

10        Sandoz was testing us to see if we can convince the

11   FDA that we can prove something is or is not Lovenox.  So, they

12   gave us three samples, they knew which ones were Lovenox and

13   which ones were not, and they asked us to pick that out.

14   Q.   So, what did you do?

15   A.   Exactly like I described, we put those samples through

16   exhaustive digestion, separated out all of the different blocks

17   and looked for the signatures of  Peak 9 and 10 and called out

18   which was enoxaparin.

19   Q.   And what was your conclusion?

20   A.   That one of those three samples was an enoxaparin.

21   Q.   Did you report that conclusion to Sandoz?

22   A.   Yes, we did.

23   Q.   What was Sandoz's reaction?

24   A.   They said they were very impressed, and they did a deal

25   with us.  They invested about $12.5 million, and they also did

1    a partnership where we would -- Momenta would get 45 percent of

2    the profits if we were the first one to launch the generic, as

3    long as there was nobody else, and 10 to 12 percent royalties

4    subsequently.

5    Q.   So, that's the first hurdle, finding a partner.

6         What was the second hurdle?

7    A.   Well, we had to scale up the process.  Remember, we had

8    made enoxaparin in a vile this big.  Commercially that's not

9    viable.  We have to make a large scale of the process.

10   Q.   So, let's see if we can illustrate that.

11        MR. FRANK:  Could we have PDX-131.

12   Q.   What's shown here, Dr. Kaundinya?

13   A.   So, shown on the left is the one-ML vile that our

14   scientists in the lab made enoxaparin.

15   Q.   I think you said a one ML, milliliter?

16   A.   One-milliliter vile that the scientists had made

17   enoxaparin in.

18        Typically, commercial reactors are thousands of

19   gallons.  You know, shown on the right is our commercial scale

20   at 2,000 gallons.  You know, that reactor typically spans many

21   floors of a building.  And so, going from something this small

22   to something that large is not a trivial task.

23   Q.   So, why can't you just take something that's this small

24   and multiply it by a very big number and do the same thing in a

25   chemical reactor like what's shown on the slide?

1    A.    I wish it was that simple.  You know, you can do a lot of

2    things when something is this small.  For example, you can stop

3    a reaction by just taking that and putting it into something

4    very cold, like dry ice, and the reaction will immediately

5    stop.

6          But when you have something like a 2,000-gallon

7    reactor that's at 150 or 200 degrees and you have to cool it

8    down to stop the reaction, that could take hours.  And remember

9    I said that where you make enoxaparin really matters, and so

10   you couldn't just take everything and multiply it and do the

11   same thing.

12   Q.    So, what did you do?

13   A.    We systematically -- you know, much like we had explained

14   to Sanofi Aventis, we optimized the conditions of the

15   manufacturing so that we can make enoxaparin the same way every

16   time.

17   Q.    Did the non-naturally occurring sugars that have the

18   structural signature of enoxaparin play a part in that process?

19   A.    Yes, it did.

20   Q.    What was that?

21   A.    Well, similar to what we had told Sanofi, you know, using

22   these non-naturally occurring sugars as a signature of looking

23   for whether you made Lovenox, we systematically looked at

24   conditions during that depolymerization step, for example, the

25   step where these kinds of signatures were formed, so that we

1  varied time, we varied temperature, and we optimized the

2  process so that those structures are in the right amounts.

3  Q.   And if you were to get those structures in the right

4  amounts, what does that -- what's the significance of that?

5  A.   We realized that you also get all of the other attributes

6  within the right amounts for Lovenox.  Those were unique that

7  way.

8  Q.   Okay.  So, first hurdle is finding a partner.  Second

9  hurdle is scaling up the process.

10      What was the third hurdle?

11  A.   Getting approval from the FDA.

12  Q.   Now, I want to go back a step for a moment.  Remind us

13  again, when -- I think we may have a timeline on this -- when

14  was it that you told Sanofi Aventis about Peaks 9 and 10?

15  A.   In May, 2002.

16  Q.   And when was it that you told Sanofi Aventis that

17  Structure 12 was an unusual structure not found in heparin and

18  identified it as either a 1,6 anhydro ring structure or a 2,5

19  anhydro ring structure?  When was that?

20  A.   In November of 2002.

21  Q.   When did Sanofi Aventis cut off all contacts with Momenta?

22  A.   In December of 2002.

23      MR. FRANK:  Let's put up Exhibit 240.

24  Q.   And tell us what this is, sir.

25  A.   This is a citizen's petition that was filed on behalf of

1    Sanofi Aventis to the FDA.

2    Q.    When was it submitted to the FDA?

3    A.    On February 19th, 2003.

4    Q.    What is a citizen petition?

5    A.    A citizen's petition is a public document that any citizen

6    or a company or a law firm can file to the FDA asking them to

7    either do or not to do something.

8    Q.    And tell us, please, what Sanofi Aventis asked the FDA to

9    do.

10        MR. FRANK:  And let's put up the first page under the

11   heading "Actions Requested."

12   A.    Sanofi told the FDA that enoxaparin has not been fully

13   characterized, and until such time that it is characterized,

14   Sanofi said the FDA should not approve a generic unless the

15   generic was using the same process as Sanofi Aventis or it had

16   to do clinical trials.

17   Q.    And did Sanofi Aventis -- let me draw your attention to

18   Paragraph 2 of the actions requested.  Tell us what Sanofi

19   Aventis said in February of 2003, a couple of months after they

20   had met with you.

21   A.    They also said to the FDA that the generic product should

22   contain 1,6 anhydro ring structure at the reducing ends of 15

23   to 25 percent of the chains.

24   Q.    So, let's put that timeline back.

25        MR. FRANK:  I think it's PDX-133.

1    Q.   And you've told us about the dates when you were

2    interacting with Sanofi Aventis.

3         Tell us exactly what's the date of the citizen

4    petition.

5    A.   February 19th, 2003.

6    Q.   Now, let's see if we can unpack the various things that

7    Sanofi asked.

8         MR. FRANK:  Go back to Exhibit 240, Page 1, requested

9    actions.  And I want to just take that piece by piece.

10   Q.   What exactly did Sanofi say about what was known to it and

11   what was not known to it about the structures in enoxaparin?

12   A.   They said that enoxaparin was not fully characterized.

13   They said over 30 percent of -- or about a third of the

14   enoxaparin, they did not know what it was or they did not have

15   any characterization on.

16   Q.   And what did Sanofi Aventis say was the significance of

17   the fact that it did not understand what 30 percent of its

18   product was?

19   A.   They said it's -- you know, because it was not known, you

20   cannot have a generic; and, therefore, the only way to have a

21   generic was to do exactly what they did in their plant.

22   Q.   So, let me see if I understand.  Sanofi was saying that

23   you had to do exactly what Sanofi did in their plant.  Didn't

24   you tell us before that Sanofi hadn't made public, was keeping

25   secret exactly what they were doing in their plant?

1    A.    That's exactly right.  They said, You have to do what we

2    are doing, and we are not going tell you what we are doing.

3    Q.    Did Sanofi Aventis say that there was an alternative?

4    A.    They said you could do clinical trials.

5    Q.    So, give us a practical sense of what that means.  How

6    long and how much?

7    A.    It's hard to say that upfront, but there -- you know,

8    clinical trials are extremely challenging.  You know, it can

9    take anywhere from six to ten years and tens maybe even

10   sometimes over $100 million because you have to do a large

11   number of human patient testing with these kinds of molecules.

12   Q.    Did you have an understanding in 2003 as to why Sanofi

13   Aventis was taking the positions that it took in the citizen

14   petition?

15   A.    This was a very large product for Sanofi Aventis, several

16   billion dollars of sales, and they were trying to make sure

17   that generics were not coming to compete with them.

18   Q.    And you said that Sanofi Aventis told the FDA that it

19   should not approve the sale of a generic version of enoxaparin

20   unless it included a 1,6 anhydro ring structure at one end of

21   15 to 25 percent of the sugar chains that made up enoxaparin.

22         MR. FRANK:  Let's look, if we could, Scott, at

23   Exhibit 240, Page 13, first paragraph, around the fifth line.

24   240, Page 13, first full paragraph, five lines down.  Could we

25   go to the fifth line where I think you'll see it says,

1    "Formation of the 1,6 anhydro ring occurs during the

2    B-eliminative depolymerization process"?  Can we find that?  I

3    may not be on the right page.  I'm not on the right page.

4    A.    Exhibit 230 you said?

5    Q.    I said 240.

6    A.    It's --

7    Q.    I want to be on Page 13, please.

8    A.    It's on Page 13.

9    Q.    Five lines down, "Formation of the 1,6 anhydro ring

10   structure" --

11   A.    -- "occurs during" --

12   Q.    -- "occurs during the beta-eliminative depolymerization

13   process."

14         What in heaven's name does that mean?

15   A.    Well, that's a technical description of the way enoxaparin

16   is made.  So, what Sanofi Aventis is telling is that the 1,6

17   anhydro ring occurs during the way enoxaparin is made.

18         MR. FRANK:  Now, on the same page, can we drop down to

19   the topic heading that's immediately below, Topic No. 3, blow

20   that up for us.

21   Q.    And that says -- and tell us how Sanofi Aventis referred

22   to this feature of enoxaparin; that is, the 1,6 anhydro ring

23   structure.

24   A.    They call them as structural fingerprints.

25   Q.    And how had you described the same thing to Sanofi Aventis

1    when you had met with them?

2    A.    We called them chemical signatures.

3    Q.    Now, you've told us before that, at the time of your

4    meeting with Sanofi Aventis, you had not determined the

5    chemical name of Peak 9 and the Peak 10 sugars or the name of

6    the structural signature that made those sugars unique.

7         Did you in fact determine the name of the structures

8    that correspond to -- that are the structural signature

9    associated with Peak 9 and    Peak 10?

10   A.    Yes, we did.

11   Q.    When did you make that determination?

12   A.    Sometime before our meeting with the FDA in May.  Sometime

13   in April of 2003.

14        MR. FRANK:  Could we go, please, to -- could we go to

15   the FDA briefing book, which is Exhibit 226, and let's --

16   Q.    First, tell us what that is, sir.

17   A.    This is the briefing book that we submitted to the FDA in

18   May of 2003 to meet with them about our ANDA, or the generic

19   drug.

20   Q.    So, this is the briefing book?

21   A.    That's correct.

22        MR. FRANK:  Let's go to Page 15, please.

23   Q.    And what do we find in the chart on the middle of Page 15?

24   A.    It shows the 1,6 anhydro ring structures in Lovenox, and

25   it lists them in this table.

1    Q.   Now, you said that your first meeting with the FDA was in

2    May of 2003.  Why did you meet with the FDA?

3    A.   We wanted to tell them about the analytical technology

4    that we had developed for characterization of molecules like

5    Lovenox, and we also wanted to learn from the FDA what the

6    requirements will be for making some generic of Lovenox.

7    Q.   What was Momenta's strategy in dealing with the FDA?

8    A.   We -- in some sense, we agreed with Sanofi Aventis that

9    this is a very complex product, and it is also a very critical

10   product because it's a blood-thinner, so you have to be

11   extremely careful in making sure that you have the same thing

12   because too much of having a blood-thinner, you could have

13   severe consequences, you could bleed.

14          Too little of anti-clotting could also be bad because

15   you then form clots, and you could have stroke or pulmonary

16   embolism, which is the way that the arteries get blocked.

17          So, getting the right amount of anti-coagulation,

18   getting the right molecule is really important.

19          Where we disagreed with Sanofi was that we said we

20   could characterize those molecules, we could show that we can

21   make the same thing as Lovenox using analytical techniques.

22   Q.   When did you file a formal application with the FDA for

23   permission to sell enoxaparin?

24   A.   In August of 2005.

25   Q.   And while the application was pending, did something

1    happen that diverted resources from your efforts to obtain FDA

2    approval?

3    A.    Yes.

4    Q.    What was that?

5    A.    In November of 2007, there was suddenly events where

6    people were dying when they were given heparin in the clinic.

7    Q.    Why?

8    A.    Nobody knew at that time what was happening.

9    Q.    What did that situation come to be called?

10   A.    It was called the heparin crisis.

11   Q.    So, this involved heparin, not enoxaparin?

12   A.    Yes, the actual deaths involved heparin.  These were

13   people that were treated with heparin.  However, remember I

14   said that enoxaparin is made from heparin, so it also affected

15   some of the enoxaparins.

16   Q.    Did it affect Momenta's enoxaparin?

17   A.    No, it did not.

18   Q.    Did you and others at Momenta participate in efforts to

19   address the heparin crisis?

20   A.    Yes, we did.

21   Q.    In what way?

22   A.    The FDA and the Center for Disease Control actually

23   immediately called a task force to address this problem, and

24   myself and my colleagues at MIT,   Ram Sasisekharan as well as

25   Zachary Shriver,       Ishan Capila and about 20 other

1   scientists were part of this task force to address this crisis.

2   Q.   How long did it take you to figure out what the problem

3   was?

4   A.   About a month.

5   Q.   And what was the problem?

6   A.   It turned out that there was a contaminant or, more

7   specifically, an adulterant that was added to the heparin

8   supply that was coming from China that was causing allergic

9   reaction in people that were getting heparin.

10  Q.   And what was done to fix the problem?

11  A.   That adulterant was called OSCS, or over-sulfated

12  chondroitin suflate, so a specific method was developed to

13  actually screen for that contaminant and make sure that the

14  heparin is safe.

15  Q.   So, back now to the FDA's consideration of Momenta's

16  application to sell the Momenta enoxaparin, was the FDA

17  eventually persuaded that the techniques that had been

18  developed at Momenta were sufficient to determine that the

19  Momenta enoxaparin was the same as Lovenox?

20  A.   Yes, they were.

21  Q.   How long did that take?

22  A.   We initially met with the FDA in 2003, we filed our

23  application in 2005, and, you know, in July of 2010 is when the

24  approval came.  So, it took about five years, a little over

25  five years from the time we filed the application, and during

1    that time, there was a lot of additional amendments that we

2    did.

3    Q.   So, can you give us examples of the kind of information

4    that the FDA required of Momenta?

5    A.   They asked us for lots of information on chemical analysis

6    to show that we are the same, you know, chemical analysis that

7    -- just in limit with the disaccharides that I showed of the

8    disaccharide building blocks but tetrasaccharadies and hexa and

9    octasaccharaides, you know, longer and longer chains.

10        And then, on the biological side, they wanted us to

11   make sure that our product was giving the same biological

12   activities, both in terms of the efficacy in the anti-clotting

13   way, as well as the safety and the immunogenicity of these

14   molecules.

15        So, that's -- all of that was the subject of many

16   amendments that was filed in that time period.

17   Q.   Now, I gather something happened in 2010.  What happened?

18   A.   The FDA -- two things happened on the same day.  The FDA

19   approved our enoxaparin, and the FDA also responded to Sanofi

20   Aventis's petition that I talked about earlier.

21   Q.   So, let's go first to Exhibit 189.  What is this, sir?

22   A.   This is the approval letter from the FDA that approves the

23   sale of our enoxaparin.

24        MR. FRANK:  And could we go to Page 4, please, and to

25   the paragraph that's -- first Page 4.  Now, there's a fat

1    paragraph sort of in the middle of the page.  Blow that up,

2    please.

3    Q.   Tell us what the FDA is saying here.

4    A.   They reference all of the different amendments over that

5    five-year time period that we talked about where we showed them

6    several reports on chemical as well as biological equivalence.

7         MR. FRANK:  I think we may have a slide on that.

8    Could we have PDX-134.

9    Q.   What does this show, Dr. Kaundinya?

10   A.   This shows the timeline where we met with the FDA first in

11   2003, we submitted our application for the generic approval in

12   2005, and then we got approved in July, 2010.  All those little

13   rectangles that you see are the many, you know, almost hundred

14   amendments that we did that provided data to the FDA, some of

15   them several hundred pages long that talk about the

16   characterization of enoxaparin.

17        MR. FRANK:  Now, let's look at Exhibit 239.

18   Q.   Please tell us what that is.

19   A.   This is the response from the FDA rejecting Sanofi

20   Aventis's citizen's petition.

21   Q.   And what was the conclusion that the FDA drew?

22   A.   Among other things, they said that enoxaparin can be

23   characterized and that analytical methods can be used to get a

24   generic approved.

25   Q.   And who had developed those analytical methods?

1    A.    We had developed those analytical methods.

2    Q.    July 23rd, 2010, a good day?

3    A.    Well, it was a great day.  We were vindicated because a

4    company about a thousand times our size, Sanofi Aventis, was

5    proven wrong.  Not just that, you know, it also set a

6    precedence for the FDA to take analytical technology and

7    approve other complex drugs to make them more affordable.

8    Q.    Okay.  Five hurdles:  Finding a partner, scaling up the

9    process, getting FDA approval.

10         What was the fourth hurdle?

11   A.    Well, around the same time that we were working on getting

12   our product approved with the FDA, there was a hurdle at the

13   USP.

14   Q.    What is the USP?

15   A.    It's called the United States Pharmacopeia.  It is a

16   non-profit agency that sets standards for the structure and

17   quality of drugs.

18   Q.    A Government agency or a private agency?

19   A.    It's not a Government agency.

20   Q.    What is an USP monograph?

21   A.    A monograph is a publication that the USP puts out that

22   sets -- that describes the quality attributes of a particular

23   drug.

24   Q.    Who ordinarily proposes the contents of the monograph for

25   a specific drug?

1    A.    Typically it's the brand name company.

2    Q.    When was the monograph for enoxaparin proposed?

3    A.    I believe sometime -- that the problem started sometime in

4    the 2006-2007 timeframe.

5    Q.    Was an advisory panel assembled to address the proposed

6    enoxaparin monograph?

7    A.    Yes, in early 2008.

8    Q.    Tell us, actually, what is an advisory panel?

9    A.    The USP -- when a monograph is proposed, the USP assembles

10   together experts from academia, from industry that are

11   volunteers.  They also ask for public comments about those

12   monographs, and the advisory panel then advises the

13   decision-makers at the USP on whether something should be a

14   monograph or not.

15   Q.    Okay.  Is an advisory panel a decision-making body?

16   A.    No.  They just advise the USP.

17   Q.    Were people at Momenta invited to join the advisory panel?

18   A.    Yes, myself and a scientist, Zack Shriver, were invited.

19   Q.    And did the two of you participate?

20   A.    I did not participate.  Zack Shriver did.

21   Q.    Okay.  What was the proposal?  What had been proposed with

22   respect to the enoxaparin monograph?

23   A.    The proposal talked about structure of enoxaparin,

24   structural elements of enoxaparin, including the     1,6

25   anhydro ring structure.  There was also a description of a

1    method that needs to be used to measure that some -- the 1,6

2    anhydro structure, which came to be known as Method 207.

3    Q.   Did Momenta, as a company, take a position regarding

4    Method 207?

5    A.   Yes, we did.  We opposed --

6    Q.   And --

7    A.   We opposed --

8    Q.   Sorry.  Go ahead.

9    A.   We opposed that option of Method 207.

10   Q.   Why did Momenta oppose Method 207?

11   A.   There were four reasons.  The first, there were some

12   technical issues with how Method 207 was being proposed.  There

13   were some technical flaws in the way that method had been

14   proposed.

15   Q.   At a high level, can you give us a sense of what those

16   technical flaws were?

17   A.   That method involved calculations which assumed that all

18   of those building blocks, those different colored sugars that I

19   talked about, were the same.  In fact that assumption we know

20   is not right because those building blocks have different

21   properties.

22   Q.   You said there were technical flaws in the process.  Were

23   there other reasons why Momenta opposed it?

24   A.   Yes.  The second reason was that, you know, we agreed that

25   certifying that 1,6 anhydro is presented in enoxaparin is

1   really important. However, we did not agree that there was

2   only one way to do that. In fact, you know, science moves on,

3   and this was in 2008, and Momenta had already developed a

4   different way to look for that 1,6 anhydro ring and quantify

5   it. It was more sensitive and more accurate.

6          We did not want USP to adopt and make it mandatory to

7   practice science that was old and cumbersome. You know, we

8   needed USP to allow different companies to come up with

9   innovative ways and push the frontiers of science, rather than

10  be stuck to an old way of doing things. So, that's why we

11  opposed that option of 207.

12  Q.  And I think you told us there were a total of four

13  reasons. What were the other reasons?

14  A.  Well, the third one, since we had already developed a

15  better and more sensitive method, we had actually discussed

16  that with the FDA and gotten that validated with the FDA saying

17  that was a better way to measure the 1,6 anhydro rings in

18  Lovenox.

19         If USP had made Method 207 as a mandatory method or a

20  required way to do it, then we will have to go back to the FDA

21  and re-do and go back to an older version of the science, which

22  would have delayed our approval significantly.

23  Q.  And I think you said four reasons. I think we're up to

24  three. What's the fourth?

25  A.  We also learned that Sanofi Aventis had a patent

1    application on Method 207, and we figured that this was -- it

2    was like they were trying to set a trap.  They were trying to

3    make -- USP was trying to make Method 207 as a mandatory method

4    or a required way to do it, but Sanofi would have a patent on

5    that.

6    Q.   So, what did Momenta do?

7    A.   Well, we had a three-part strategy.  The first was that we

8    discussed with USP and communicated to them all the technical

9    issues with Method 207.  We made scientific presentations to

10   them.

11          Second, we asked that USP not adopt Method 207 or, at

12   the very least, make it an optional method so that it gives

13   industry, companies like us and others, to come up with better

14   ways to measure the 1,6 anhydro.  That way you could promote

15   the innovation and promote the science and not be stuck in only

16   one way to do it.  So, we said, Make that as an optional

17   method.  If not, remove that method completely and just let

18   companies certify to the 1,6 in any way.

19          And, third, we asked USP to request Sanofi Aventis to

20   withdraw their patent application because, if these first two

21   things didn't work, that would have been a trap for us.

22   Q.   And what did the USP actually do?

23   A.   Well, unfortunately, they did not remove     Method 207

24   completely, they decided to adopt it, but they did agree with

25   us and adopted it only as an optional method.  So, it's not a

1   required method.

2   Q.   And what was the result of all of this?

3   A.   Since Method 207 is now an optional method, every company

4   that's making a generic enoxaparin can certify to the amount of

5   1,6 anhydro by whatever way they choose to certify.  Of course

6   they have to convince the FDA that they are making it -- they

7   are measuring it correctly, but every company can innovate, and

8   every company can come up with their own way to measure and get

9   their product approved.

10  Q.   Okay.  Five hurdles:  First one is finding a partner;

11  second, scaling up; third, FDA; fourth, USP.

12       What was the fifth?

13  A.   To get patent protection for all of our innovations.

14       MR. FRANK:  Let's look, if we could, at Exhibit 1687.

15  Q.   What is this, sir?

16       MR. FRANK:  Scott, blow up the upper part, please.

17  A.   This is the patent application that we filed.

18  Q.   And the -- let's look at the upper right-hand corner where

19  it says, "Pub. Date."

20       What does that tell us?

21  A.   It's a date that this patent was published by the United

22  States Patent Office so that it's publicly available to

23  anybody.

24  Q.   And once a patent is published, are the -- is not only the

25  content of the patent but the back-and-forth between the patent

1    office on the one hand, the        US Government, and whoever

2    it is that's trying to get a patent, is that also fully open to

3    the public?

4    A.   Yes, all of that is public information and can be

5    available -- can be downloaded from the internet.

6    Q.   Do people in your field pay attention to the patent

7    applications filed by others in the field?

8    A.   Of course, all the time.  We monitor what our competition

9    is doing, what kinds of patents they are filing, so that we

10   know where they're innovating, and we also know where they

11   could potentially block us.

12   Q.   Now, let's look at the other side of the top where it

13   says, "Inventors."  There are five people listed there.  The

14   first is Ganesh Venkataraman.  Who is he?

15   A.   That's me.  That used to be my name.  My name now is

16   Ganesh Venkataraman Kaundinya.  I took on a last name that

17   makes it consistent with the rest of my family.

18   Q.   Who are the other inventors?

19   A.   Zachary Shriver, Malik Sundaram and Yi-Wei Qi  are the

20   three scientists that I talked about that joined Momenta in the

21   very early days from MIT, and   Ram Sasisekharan.  He is a

22   full professor and the co-founder of Momenta.  He's now a

23   professor at MIT.

24   Q.   Now, let's look at Exhibit 1, please.

25           What is this document?

1   A.   This is the patent that was awarded to us in 2009 that

2   describes -- that covers the method that I just described to

3   you.

4   Q.   So, when you say the method that you've described, what do

5   you mean?

6   A.   If I can have the next slide, it --

7        MR. FRANK:   I think it's PDX-137, please.

8   A.   It's a four-step method.  Step one, like I have been

9   talking about, is to cut up these long chains using enzymes so

10  that you can break them down completely or exhaustively.

11       Step two is, once you have broken them down, separate

12  out the different building blocks, and this separation, like I

13  showed you, you know, from the orange ones, from the green

14  ones, et cetera, and then look for the presence of a structural

15  signature.

16       Step three is to compare the results of that

17  structure -- of that presented structural signature to what is

18  there in enoxaparin.

19       And step four is then make a pass-or-fail, you know,

20  select or reject a manufacturing batch based on that

21  comparison.

22  Q.   When was that patent issued?

23  A.   In 2009.

24  Q.   I think August of 2009.

25       And when did Momenta's sales of -- you've told us that

1    the FDA approval was in -- tell us again when the FDA approval

2    was.   July --

3    A.   July 23rd, 2010.

4    Q.   And when did you start selling enoxaparin?

5    A.   The very next day.

6    Q.   And what was the market reaction to Momenta's enoxaparin?

7    A.   Very successful.  I believe it was one of the largest

8    generic launches in the United States.

9    Q.   Was Momenta's enoxaparin sold at the same price that

10   Sanofi Aventis had been selling its enoxaparin or at some

11   different price?

12   A.   No.  It was at a price that was about one-third lower than

13   Sanofi Aventis's price.

14   Q.   Did Momenta estimate the savings to patients, doctors,

15   hospitals and others in the healthcare system from just the

16   first year of sales of Momenta's product?

17   A.   Yes.  Just that first year, we -- I believe we saved about

18   $400 million.

19   Q.   For the consumers?

20   A.   For the system, yes.

21   Q.   And what did Momenta do with its share of the profits from

22   the sale of its enoxaparin?

23   A.   The plan from the very beginning was to use the money from

24   enoxaparin to do research and development.  So, we invested

25   that money to do research and development and develop more new

1   products for diseases like cancer and also to make more less

2   expensive medicines or more affordable medicines, and we hired

3   about -- over 50 people as a result of that approval.

4   Q.   Were the -- the medicines that you developed, are they

5   generic drugs or new drugs or some mixture?

6   A.   Both.  In fact we recently got approval for a second very

7   complex product that we made a generic version of and have

8   launched it, and it's in the market now.

9        We have about six products that are novel, new drugs

10  that are being developed for different diseases, and we have

11  about seven products that are in the generics.

12  Q.   Now, Dr. Kaundinya, Mr. Carsten said in his opening that

13  Momenta does not use the method -- that today Momenta does not

14  use the method that is protected by the '886 patent; is that

15  correct?

16  A.   That's correct.

17  Q.   Does that make it all right for someone like Amphastar to

18  use Momenta's patented invention?

19  A.   No, it does not.  You know, '886 patent was the result of

20  a lot of hard work for a lot of years.  You know, it was a

21  fundamental discovery to look for a signature to say if

22  something is or is not Lovenox.  You know, that's precisely why

23  we filed that as a patent before going and talking to Aventis,

24  because we did not want other companies to use that invention.

25       Our competition should innovate and come up with ways

1    to do this, and they should get patent protection, but they

2    shouldn't be using our patents.  I believe that's how, I

3    believe, competition should work.

4              MR. FRANK:  Thank you, sir.  No further questions.

5              THE COURT:  Cross-examination.

6              MR. MACK:  Thank you, Your Honor.  I will be

7    cross-examining the witness.

8              THE COURT:  All right.

9              MR. MACK:  And we have some binders that we'd like to

10   hand out to the witness and to the Court.

11             THE COURT:  All right.  Yes.

12             Mr. Mack, you may proceed.

13             MR. MACK:  Thank you.

14             **CROSS-EXAMINATION BY MR. MACK**

15   Q.   Good afternoon, Dr. Kaundinya.

16   A.   Good afternoon.

17   Q.   It's afternoon now.

18             My name is Joshua Mack, and I will be asking you a few

19   questions today.

20             Do you have the binder in front you that we handed

21   out?

22   A.   Yes, I do.

23   Q.   Okay.  There will be some documents in there that we'll

24   discuss during the cross-examination.

25             Momenta did not invent Lovenox, did it?

1    A.   No, it did not.

2    Q.   And Momenta did not invent enoxaparin, did it?

3    A.   No, we didn't.

4    Q.   And Momenta did not invent the enzymes used to digest

5    enoxaparin; right?

6    A.   We invented -- we invented three combinant versions of

7    those enzymes.

8    Q.   You invented heparanase 1, 2 and 3; is that what you're

9    saying?

10   A.   There is naturally occurring versions of heparanase 1, 2

11   and 3, like I described in my testimony.  Those were not good

12   enough for the purposes of studying our product.  We had to

13   come up with recombinant versions of those enzymes.

14   Q.   But you're not claiming recombinant versions of heparanase

15   1, 2 and 3 in your patent, are you?

16   A.   No, we are not.

17   Q.   And that was -- those were known before you filed your

18   patent application; right?

19   A.   That's correct.

20   Q.   And you're an inventor of the '886 patent; right?

21   A.   Yes, I am.

22   Q.   But you didn't know the structure of Peak 9 when you filed

23   your patent application; right?

24   A.   That's correct.

25   Q.   And 1,6 anhydro is not mentioned anywhere in the '886

1  patent; right?

2  A.   That's right.

3  Q.   And the structure of the '886 patent is not shown anywhere

4  in the -- in -- I'm sorry.  The structure -- let me start

5  again.

6       And the structure of 1,6 anhydro compound is not shown

7  anywhere in the '886 patent; is that right?

8  A.   That's correct.

9  Q.   And when you filed the patent application leading to the

10  '886 patent, you were not aware that the      1,6 anhydro

11  structure existed in enoxaparin; is that right?

12  A.   We knew that there was a modified structure in enoxaparin.

13  Q.   You knew there was a structure.  You didn't know that the

14  1,6 anhydro structure existed in enoxaparin; right?

15  A.   At the time of filing, that's right.

16  Q.   No one knew that the 1,6 anhydro structure existed in

17  enoxaparin when you filed your patent application; isn't that

18  right?

19  A.   I can't speak for what others knew.

20  Q.   Did you -- are you aware of anybody that knew that the 1,6

21  anhydro structure existed in enoxaparin when you filed your

22  patent application?

23  A.   No, I'm not.

24  Q.   But now, this 1,6 anhydro ring structure, it's vital to

25  your case of infringement against Amphastar; isn't that right?

1    A.    No.  What we are talking about is looking for a structural

2    signature, looking for a modified sugar.  That's what we are

3    talking about.  It could be called 1,6 anhydro.  It could be

4    called anything.  Looking -- as I described, the patent that we

5    are talking about is looking for that structural signature

6    that's unique to Lovenox.

7    Q.   But when you filed this lawsuit, the reason we're all here

8    today, you based it on the fact that the FDA required Amphastar

9    to perform 1,6 anhydro tests on enoxaparin to sell it to the

10   public; isn't that correct?

11        MR. FRANK:  Objection.  There's a premise in that

12   question that is --

13        THE COURT:  Overruled.

14   A.   Could you -- I don't know what the FDA has asked

15   Amphastar.  I'm not aware of that.

16        MR. MACK:  Okay.  Could we bring up his deposition

17   transcript?  Does he have a copy of that in his notebook?

18        Okay.  May I approach the witness?

19        THE COURT:  Yes.

20        THE WITNESS:  Thank you.

21   Q.   So, I want you to turn to Page 169 of your deposition

22   transcript, Line 14.

23        Are you there?

24   A.   Yes.

25   Q.   Okay.  And it says, "Question:  So, the complaint alleges

1    -- the complaint alleges infringement of the '886 patent;

2    correct?"

3           "Answer:  I believe so, yes.

4           "Question:  And what's the factual basis for that

5    allegation?

6           "Answer:  In my opinion, the FDA has required us, when

7    they approved us, to use tetrasaccharide as well as to show 1,6

8    anhydro and other disaccharide building blocks for approval, so

9    we believe that anybody else that the FDA has approved would

10   also be required to do that.  And the '466 and '886 patents

11   describe methods to do that.  So, the basis is:  You got

12   approved, I believe the FDA has approved you based on the fact

13   that you have done that."

14          Do you see that?

15   A.   Yes.

16   Q.   And so you filed this lawsuit, the reason we're all here

17   today, because Amphastar was required by the FDA to perform 1,6

18   anhydro tests; right?

19   A.   Again, we are all here because Amphastar is -- my

20   understanding is Amphastar is using a Momenta's patented test

21   to satisfy that requirement.  If Amphastar had innovated and

22   come up with a different test, like we also have innovated and

23   come up with different tests, none of us will be here.  FDA's

24   requirement is to show that you have 1,6 anhydro.  FDA doesn't

25   tell you that you have to do it by this method.

1    Q.   But you said in your deposition just there that you based

2    the infringement complaint against Amphastar on the fact that

3    they had to perform a 1,6 anhydro test; isn't that right?

4    A.   I believe that the FDA has required everybody to perform

5    and certify that you have the right amount of 1,6 anhydro.

6    Q.   And that's why you filed your lawsuit; right?

7    A.   Again, we filed the lawsuit because you are -- as I

8    understand it, you are performing that 1,6 anhydro using the

9    Momenta's invention.  That's Momenta's properties.

10   Q.   Well, let's keep reading.  So, Line 5, it says, "Question:

11   So, the only facts that Momenta was aware of at the time they

12   filed the lawsuit in this case  was that the FDA required

13   Momenta to test for the   1,6 anhydro ring structures and to

14   do the tetrasaccharide sequencing; is that your answer?

15        "Answer:  The facts for us were that Momenta was

16   required to do the 1,6 anhydro test and many other tests to get

17   approval.  The citizen's petition response from the FDA also

18   talks about the requirements, and two taken together is what's

19   the basis for us."

20        So, the basis for you was the fact that Amphastar was

21   performing this 1,6 -- a 1,6 anhydro test, as required by the

22   FDA; isn't that correct?

23   A.   That's what it says, yes.

24   Q.   So, if you could turn to your -- the notebook that your

25   counsel provided to you, Exhibit 2 in your large notebook

1    there.  That's the '886 patent.

2    A.    Sorry.  I don't see Exhibit 2.

3    Q.    In the other -- the large notebook next to you on your

4    left.

5    A.    Oh.

6    Q.    We'll come back to that one in a little bit, don't worry.

7          Okay.  If you could turn to -- and this is the '886

8    patent, the patent you're an inventor of; right?

9    A.    Yes.

10   Q.    Okay.  And could you turn to Column 4, Line 40.

11         You see where it says -- are you there?

12   A.    Yes.

13   Q.    You see where it says, "SACS HPLC, is that" -- sorry.  Let

14   me take -- HPLC, that's high-performance liquid chromatography;

15   is that right?

16   A.    That's correct.

17   Q.    Okay.  And earlier in your testimony today, you said that

18   capillary electrophoresis and HPLC are essentially the same;

19   right?  The little things on the graph are re-arranged in a

20   different way; right?

21   A.    That's right.

22   Q.    Okay.  And so -- but here is says, "SACS HPLC, which

23   relies on detection by ultraviolet absorbance, is often

24   insufficiently sensitive for detecting small amounts of

25   structurally important heparin-derived oligosaccharides.  As

1    current technologies for analyzing heparins and other

2    glycosaminoglycans are insufficient, it has been heretofore

3    impossible to create LMWH preparations with any degree of

4    batch-to-batch consistency or to predict the potency of a given

5    batch."

6           Do you see that?

7    A.    Yes, I do.

8    Q.    Okay.  And so, you're saying here that it's impossible to

9    determine the components of an enoxaparin, a

10   low-molecular-weight heparin, using HPLC; isn't that correct?

11   A.    No, that's not what it's saying.  It's saying --

12   Q.    It says "impossible" here; right?

13   A.    Yes, it does use the word "impossible," but --

14   Q.    What do you mean by that?

15   A.    So, SACS HPLC is not useful unless it's done in the right

16   way to look for really small structural components.  But once

17   you know what you're looking for, then SACS HPLC can be

18   absolutely tuned, and there are other parts in the application

19   that say you can use SACS HPLC or any other way to practice

20   this invention.  But to look for those unique signatures, you

21   needed something with more resolving power.

22   Q.    So, that's what you mean by impossible?

23   A.    No, no, no.  It says that current technologies at that

24   time when we filed the patent are not sensitive enough to get

25   low-molecular-weight heparin preparations that are consistent

1    and batch to batch.

2    Q.   So, HPLC wasn't sensitive enough to detect things like

3    Peak 9; is that correct?

4    A.   That's not what it says.

5    Q.   It doesn't say that?  It doesn't say it's impossible?

6    A.   It uses the word "impossible."  "Current technologies for

7    analyzing heparins and other glycosaminoglycans are

8    insufficient because it's impossible to create

9    low-molecular-weight preparations with batch-to-batch

10   consistency."

11        So, the impossibleness, making low-molecular-weight

12   heparin preparations that don't have variability.  That's what

13   the impossible is.  The impossible is not using HPLC.  The

14   impossible is people have not -- until that time, everybody

15   thought heparin, low-molecular-weight heparin, it's all the

16   same, you don't need to know, and that's why finding a very

17   small needle in that haystack, now you can use that needle to

18   control the batch to batch.  That's what I take that statement

19   to mean.

20   Q.   It seems like you're reading a lot into "impossible," but

21   --

22   A.   I am -- sorry.

23   Q.   Okay.  You didn't say anything -- you didn't show anything

24   about HPLC, any figure with HPLC in your patent, though, did

25   you?

1   A.   No, we did not.

2   Q.   It was just capillary electrophoresis?

3   A.   Yes.  But we also discussed in different parts of the

4   patent that one could use -- capillary electrophoresis was the

5   illustrative picture, that one could use other methods of

6   separation too.

7   Q.   But you didn't show how to do that, though, in the patent;

8   right?

9   A.   No, we did not show it.

10  Q.   And could you turn back to my notebook, Exhibit -- and

11  turn to Exhibit 107.  It's the first exhibit in the notebook.

12  A.   Could you repeat that number again, please?

13  Q.   Exhibit 107.

14  A.   Yeah.

15  Q.   And so these are slides from a September 8th, 2003,

16  meeting between Plaintiffs here, Momenta and Sandoz; is that

17  correct?

18  A.   Let me just make sure.  It doesn't say Sandoz anywhere

19  here, so --

20          I believe -- it doesn't say Sandoz anywhere here, but

21  I'll assume it's --

22  Q.   Look at Slide 15.

23  A.   Slide 15?

24          Thank you.  Yes.

25  Q.   Sandoz-Momenta diligence meeting; right?

1    A.    Yes.

2    Q.    Okay.  And this was a meeting about enoxaparin, right?

3    A.    That's correct.

4    Q.    Okay.  And this was about the collaboration between

5    Momenta and Sandoz for enoxaparin that you described in your

6    direct; is that correct?

7    A.    This was the diligence or the test that Sandoz had given

8    to set up that collaboration.

9    Q.    And why don't you turn to Slide 18.

10   A.    Yes.

11   Q.    And do you see where it says, the third bullet down,

12   "Momenta technology has characterized enoxaparin to enable

13   approval (establishing FDA standards to demonstrate

14   equivalence)"?  Do you see that?

15   A.    Yes.

16   Q.    And what does it mean where it states, "Establishing FDA

17   standards to demonstrate equivalence?"

18   A.    I'm not sure what was meant by that presentation.  I don't

19   recall if I prepared this, but -- this was a long time ago, but

20   I take it that it refers to the fact that we are convincing the

21   FDA that analytical technology can be used to show something as

22   complex as Lovenox is the same -- something as complex as

23   Lovenox can be made as a generic.

24   Q.    Doesn't this sentence mean that you're proposing to create

25   FDA-sanctioned high barriers to prevent other generics like

1    Amphastar from entering the market?

2    A.   No, I don't read that into that.  I don't see where it

3    says that.

4    Q.   Okay.  Well, why don't you turn to another meeting between

5    Momenta and Sandoz at -- it's Exhibit 2150 in that same binder.

6    And you see it says, "Momenta and Sandoz" --

7    A.   Yes.

8    Q.   -- M-enox project overview, January, 2004," at the front;

9    right?

10   A.   Yes.

11   Q.   Okay.  And if you could turn to Page 72 of this

12   presentation, it's Bates number -- the little number in the

13   right-hand corner MOM-00195280?

14   A.   19 -- sorry.  5280?

15   Q.   5280, yeah, Page 72 of the presentation.

16   A.   Yes.

17   Q.   Okay.  And this is describing a meeting with the FDA on

18   May 20th, 2003; is that correct?

19   A.   That's right.

20   Q.   Okay.  And if you look at the next page, at Page 73, you

21   were there as a participant; right?

22   A.   That's correct.

23   Q.   And so, let's turn a couple more pages to    Slide 79.

24   A.   Yes.

25   Q.   And do you see on the left-hand side, it says, "Outcome,"

1    and on the right-hand side it says, "Implications"?

2    A.   Yes.

3    Q.   Okay.  If you go three rows down on the outcome side, it

4    says, "Multiple complementary analytical approaches are

5    required," and then the implications of that, "higher barrier

6    to entry to others, consistent with our strategy and plan."

7    A.   Yes.

8    Q.   Do you see that?

9    A.   Yes.

10   Q.   And so, your strategy was to create higher barriers of

11   entry for others to establish a generic monopoly; isn't that

12   correct?

13   A.   No.  Our strategy, like I explained in my direct, was to

14   make sure that patients receiving this drug are getting the

15   same as Lovenox.

16        The fact that the science to show that I still believe

17   is a very high bar, to be able to show something as complex as

18   enoxaparin is the same, and that's what I meant by high

19   barrier.

20   Q.   I think at your deposition you said you didn't know what

21   you meant by that.

22   A.   Okay.

23   Q.   Has your answered changed since then?

24   A.   No.  This is -- again, what I'm saying here is that what

25   we are talking to the FDA about is to show that the analytical

1    techniques can be used to show something is the same as

2    Lovenox.

3    Q.   And you want -- but you want to create high barriers of

4    entry, though; right?  That's your strategy and plan here?

5    A.   No.  Anybody that can innovate should be in the

6    marketplace.  That's our strategy and plan.  Anybody can --

7    this is fair competition.  If you innovate, you should be in

8    the marketplace.

9    Q.   And so, let's turn to your exhibit, one of your

10   demonstratives, PDX-133.

11          And it says, "On May 20" -- sorry -- "On

12   November 25th, 2002, the 1,6 anhydro ring structure was

13   identified;" right?

14   A.   Yes.

15   Q.   But you didn't actually identify it at that point

16   definitively; right?

17   A.   We identified -- my direct shows that we identified and

18   put it into Sanofi Aventis's petition as one of two structures.

19   Q.   But you knew it was one of two structures.  You weren't

20   sure which one it was; right?

21   A.   We weren't sure which one it was because we didn't know if

22   Sanofi was trying to trick us.

23   Q.   But then you didn't actually identify the      1,6

24   anhydro ring structure until April 2003; isn't that right?

25   A.   That's correct.

1   Q.   And so, this is not necessarily accurate.  There should be

2   an April of 2003 for 1,6 anhydro ring structure identified.

3   A.   No.  For definitively identified is April.

4   Q.   Well, you didn't definitively identify it until May of

5   2003; isn't that correct?

6   A.   So, it should be definitively identified in May of 2003.

7   Q.   You determined which one it actually was of the two in

8   April of 2003; right?

9   A.   I don't recall exactly when we did that.

10  Q.   And in fact, on November 25th, 2002, Momenta did not know

11  the structure of Peak 9 or 10; isn't that correct?

12  A.   That's correct.

13  Q.   And Momenta did not determine -- I'm sorry.  Let me start

14  again.

15          And Momenta did not confirm that the 1,6 anhydro

16  structure existed, you know, in enoxaparin until May, 2003,

17  when you got the structural results back from the Ronzoni

18  Institute; isn't that correct?

19  A.   I don't recall all the details of when the data came, but

20  we -- again, we knew Peaks 9 and 10 existed, we knew they were

21  modified sugars.  The names of those structural signatures came

22  sometime in the April-to-May timeframe in 2003.  That -- my

23  memory doesn't have that level of resolution of a month when

24  you're talking about 15 years ago.

25  Q.   The names -- it wasn't just the names of them; it was the

1    structures, what they actually were; right?

2    A.    No.   We knew -- excuse me.   We knew the fact that there

3    was a modified sugar.

4    Q.    Okay.   But as of the priority date, when you filed this

5    application, you know, all these dates you have are well after

6    the filing of the application; right?   You filed that in May

7    and then -- of 2002 you said on your direct?

8    A.    That's correct.

9    Q.    And so, a person of ordinary skill in the art who's

10   looking at your application as of 2002 would have no idea that

11   there was a 1,6 anhydro structure in enoxaparin; right?

12   A.    I would say a person of ordinary skill in the art will

13   know that there's modified structures in enoxaparin that are

14   unique signatures.

15   Q.    Well, they wouldn't know what it was; right?

16   A.    They wouldn't know what to call it, yes.

17   Q.    And when you filed your patent application, no one would

18   have thought that it covered a 1,6 anhydro compound because

19   even Momenta didn't even didn't know that -- didn't know that,

20   that structure was in there; isn't that correct?

21   A.    I can't speak to what others would have thought, but --

22   your question is no one would have thought.   I can't say that.

23   Q.    Anybody looking at this patent, if they didn't know that

24   the 1,6 anhydro structure was in there, they wouldn't know that

25   Peak 9 would correspond to a        1,6 anhydro structure; right?

1    A.   The patent describes modified structure in Lovenox.  It

2    doesn't use the word "1,6 anhydro."

3    Q.   And it doesn't identify what that structure is; right?

4    A.   It doesn't identify what that structure is.

5         MR. MACK:  No further questions.

6         THE COURT:  Any redirect?  Mr. Frank.

7              **REDIRECT EXAMINATION BY MR. FRANK**

8    Q.   Just two or three things, Dr. Kaundinya.

9         First, does the patent provide a roadmap that tells

10   people how to get the Figure 1 of the '886 patent?

11   A.   Yes, it does.

12   Q.   Can anyone in the field follow that roadmap and get an

13   electropherogram that looks exactly like Figure 1?

14   A.   Yes, they can.

15   Q.   And once you have Figure 1, what remains to be done if you

16   are interested in knowing the specific name of the chemical

17   structure, as distinguished from having the fingerprint

18   already?

19   A.   Once you have Figure 1, you know that you have modified

20   structures.  You can collect those modified -- like I said, you

21   can collect those peaks and characterize them further if so

22   desired.

23   Q.   Hard to do or easy to do in 2002?

24   A.   Very straightforward to do.

25   Q.   Next question:  You were asked a question about getting

1    FDA approval and using the patented method with respect to

2    getting FDA approval.

3            Are we talking here about the process of getting to

4    FDA approval or the regular everyday process of testing

5    production batches of enoxaparin, every single batch every

6    single day?

7    A.    We are talking about the second of what you said, which is

8    the regular production batch of every single batch every single

9    day.  Getting FDA approval, as I understand it, is outside of

10   the purview of -- I'm sure there's some safe harbor, I believe.

11   Q.    Now, does the FDA require anyone, anyone to use the

12   patented method to determine whether -- to determine whether

13   the level of 1,6 anhydro ring structure is 15 to 25 percent?

14   A.    No, the FDA does not require anyone to do that.

15   Q.    Is there some -- can you give me a piece of evidence that

16   demonstrates that the FDA doesn't require it?

17   A.    Well, we ourselves have developed a completely different

18   method that does not practice what is described in the patent.

19   It's a very different method.  We have innovated, like I said

20   in my direct, an alternate method that's more sensitive and

21   accurate and got that approved by the FDA as a different way

22   that is not what's described in the '886 patent.

23   Q.    One more question, Dr. Kaundinya.

24            MR. FRANK:  May we have Exhibit 2, please, which is

25   the patent.  And can we go to Column 7, beginning at Line 55.

1    And would you blow up the rest of that paragraph, please.

2    Q.   Now, you were asked questions about whether the patent

3    said that you couldn't use HPLC -- you shouldn't use HPLC, it

4    wasn't precise enough.

5         Would you tell us what is said at Column 7 beginning

6    at Line 55 with respect to the preferred uses -- the techniques

7    that are -- the patent says are preferred to be used?  It says

8    -- does it not?

9    A.   I think it's Column 7.

10   Q.   Column 7, Line 55.

11   A.   Yes.  So, he had Column 8.  Sorry.  He's got Column 7.

12   Thank you.

13   Q.   Column 7, Line 55.  Do you see the words, "In a preferred

14   embodiment"?

15   A.   Yes, it says, "The structural signature is determined by

16   one or more methods chosen from a group consisting of MALDI-MS,

17   ESI-MS, CE, HPLC" --

18   Q.   Okay, stop there.  What is CE?

19   A.   Capillary electrophoresis.

20   Q.   And what is HPLC?

21   A.   High-performance liquid chromatography.

22        MR. FRANK:  Thank you.  No further questions.

23        THE COURT:  Any recross, Mr. Mack?

24        MR. MACK:  None, Your Honor.

25        THE COURT:  Thank you, Dr. Daundinya.  You may step

1    down.

2            THE WITNESS:  Thank you.

3            THE COURT:  And I think, rather than start a new

4    witness now, we're going to break ten minutes early.  I'll ask

5    you to come back ten minutes early at ten minutes of 2:00, and

6    we will resume the testimony at that time until about 3:30

7    today.  I'll see you back here at ten minutes before 2:00.

8            (The jury is not present for the following)

9            THE COURT:  You may step down, Dr. Kaundinya.

10           Anything that needs to come to my attention outside

11   the hearing of the jury before we recess for lunch?

12           MR. FRANK:  I don't think so, Your Honor.

13           THE COURT:  All right.  We're in recess, then, till

14   ten minutes before 2:00.

15           (Recess, 12:50 p.m.)

16           (Resumes, 1:55 p.m.)

17           (The jury is present for the following)

18           THE COURT:  And good afternoon again, Jurors.  We're

19   ready to resume, and the Plaintiffs will call their next

20   witness.

21           MR. FRANK:  Your Honor, Plaintiffs call  Zachary

22   Shriver.

23           And I've provided to the Court, to opposing counsel

24   and to the witness a binder with documents in it.

25           THE COURT:  Fine.  Thank you.

1          (The Witness Was Sworn)

2          THE CLERK:  Thank you.  You may be seated.

3          And would you please state your name for the record,

4     spelling your last.

5          THE WITNESS:  Yes.  My name is Zachary Shriver.  The

6     last name is S-h-r-i-v -- as in Victor -- e-r.

7               **DIRECT EXAMINATION BY MR. FRANK**

8     Q.   Good afternoon, Dr. Shriver.  Tell us, please, where you

9     live.

10    A.   I currently live in Winchester, Massachusetts.

11    Q.   Are you presently employed?

12    A.   I am.  I am currently the -- employed at Visterra, a small

13    biotech company in the Cambridge, Massachusetts, area.  I'm

14    currently the Vice-President of Research.

15    Q.   What's the business of Visterra?

16    A.   Visterra is focused on discovering and developing

17    anti-infective medicines for diseases like Influenza and

18    tropical diseases like Dengue Fever.

19    Q.   Was there a time when you worked for Momenta?

20    A.   There was.

21    Q.   When was that?

22    A.   So, I joined Momenta early in 2002 and left at the end of

23    2008 to join Visterra.

24          MR. FRANK:  Could we put up a copy of Exhibit 2 on the

25    screen.  This is the patent.  Could we look at the

1    identification of the inventors.

2    Q.   One of those inventors is Zachary Shriver.  Is that you,

3    sir?

4    A.   It is.

5    Q.   A little bit about your background.  Where did you go to

6    college?

7    A.   I went to Amherst College out in western Massachusetts.

8    Q.   Did you go to graduate school?

9    A.   I did, at MIT.

10   Q.   When you were at MIT, did you come to know  Ganesh

11   Kaundinya?

12   A.   I did.  So, I joined MIT in the lab of        Ram

13   Sasisekharan, who was a new faculty member.  Ganesh was a

14   research fellow in the lab.  He and I worked together on

15   certain projects.

16   Q.   What was the work that you did in that lab?

17   A.   So, the lab was heavily focused on a group of molecules

18   called heparin and heparan sulfate, and the goal of the lab was

19   really to do two things.  One is understand the biology of

20   those molecules and really try to understand how the particular

21   structures present in heparin and heparan sulfate affected the

22   biology, in particular things like clotting ability or

23   anti-cancer properties.  And so, part of the work really

24   involved developing new and improving upon techniques to look

25   at heparin structure.

1    Q.   What do you mean when you say you worked on new and

2    improved techniques to work on heparin structures?

3    A.   So, we looked at a variety of things.  One thing in

4    particular was this concept of taking a heparin or heparan

5    sulfate and basically digesting it down to its individual

6    building blocks and then analyzing those building blocks for

7    their structure and the quantities of those building blocks.

8         So, that really involved two sets of activities.  One

9    was improved -- improvements to enzyme technologies to be able

10   to cleave the heparin and heparan sulfates, as well as

11   improvements in the analytical techniques, that once you had

12   those building blocks, how would you separate and look at them.

13   Q.   Was all of the work in the lab focused on heparin?

14   A.   So, in the lab, as I mentioned, there was work focused on

15   heparin and a related set of molecules, heparan sulfate, which

16   basically surrounds all the cells in our bodies and really is

17   one of the key things that modulates how your cells see various

18   signaling molecules.

19        There was also a small amount of work done on

20   low-molecular-weight heparins.

21        MR. FRANK:  Could we put up Exhibit 2, which is the

22   '886 patent, and Figure 1 of that patent.

23   Q.   Tell us what this is, please, Doctor.

24   A.   So, broadly, this is what's called an electropherogram.

25   It's what's obtained by running a technique called capillary

1    electrophoresis.  Basically in this case, it's of Lovenox,

2    which is enoxaparin sodium, made by Sanofi Aventis.  It's a

3    digest where the individual building blocks of Lovenox are

4    separated and quantified in the electropherogram.

5          MR. FRANK:  Now, let's look at Exhibit 225, please.

6    Q.   This is not easy to see, but tell us, please, what this is

7    and -- please tell us what this is.

8    A.   So, this is also an electropherogram.  From Exhibit --

9    from the Exhibit, I can tell that this was run in 2000 at MIT

10   and basically is a similar profile of a digest of enoxaparin.

11   Q.   I'm sorry.  Is this the capillary electrophoresis profile

12   that's in the '886 patent?

13   A.   It's not.  It's similar, but it's not the identical

14   electropherogram.

15   Q.   Now, if you look along the bottom axis, about where it

16   says -- about at 13.5, there are two small peaks there.

17         MR. FRANK:  Could we zoom in on them?

18   Q.   What do they tell you?

19   A.   So, from an analytical standpoint, those peaks basically

20   migrate through the capillary and are detected at those

21   migration times, so 13.489 and 13.724.

22         From our analyses at that time, we knew that the

23   individual building blocks of heparin, and certainly in this

24   case enoxaparin, migrate through the capillary based on their

25   size and charge.  And so, these peaks have unique structural

1    properties that are present in the other building blocks.

2            At this point in time, I should point out that what

3    MIT was highly focused on was a different set of peaks, really

4    what we were using as a surrogate for the anti-coagulant

5    activity.  And MIT was focused on developing improved heparins

6    and low-molecular-weight heparins for clotting.

7    Q.   Was your work at MIT on heparins and the techniques that

8    were developed to analyze heparins published in scientific

9    journals?

10   A.   They were.  I believe I have between 35 to 40 publications

11   on heparin and heparin-related work from my MIT work.

12   Q.   And was your work at MIT the subject of patents or patent

13   applications?

14   A.   It was.  I believe there are something like 23 MIT patent

15   and patent applications.

16   Q.   And did there come a time when you joined Momenta?

17   A.   There was.  So, I was in the lab as a graduate student,

18   and I came to understand that Ram, Ganesh and Dr. Robert Langer

19   had started Momenta in 2001.  And in early 2002, they had

20   procured enough funding to start a laboratory, and so I was

21   quite excited to join that laboratory as a scientist.

22   Q.   Did there come a time when the unique structural feature

23   of enoxaparin, those two little peaks that you showed before,

24   when that structural signature was put to practical use?

25   A.   Yes.  Early in the Momenta -- early at Momenta, we

1     undertook a more systematic effort to really look at existing

2     low-molecular-weight heparins, including enoxaparin, and there

3     we really determined two things.  One was that those structural

4     signatures were -- appeared to be unique to enoxaparin and

5     could be used as a fingerprint really to tell something was

6     enoxaparin versus whether it was not.

7           And in addition, there was an indication that it was

8     sensitive to process conditions, and so that it could

9     potentially even be a read-out for a process to make

10    enoxaparin.

11    Q.    I'm sorry.  I didn't get the last --

12    A.    A read-out of the process, so really to understand how the

13    process -- how process changes could lead to enoxaparin or not

14    lead to it.

15    Q.    Thank you.

16          Now, did you participate in the development of a

17    generic version of enoxaparin or in the development of the

18    manufacturing process for producing a commercial product at

19    commercial -- manufacturing at a commercial scale?

20    A.    Yes.  So, I was really involved in both those activities

21    because at that point in time, Momenta was a small company, and

22    we really wore many different technical hats.  So, I was

23    focused on really dissecting enoxaparin in a variety of

24    different ways to understand the different structures that were

25    present in the molecule as well as looking at how the different

1   steps in moving from heparin to enoxaparin influenced those

2   structures.  And that really involved both laboratory-scale

3   experiments and then ultimately moving that in to a

4   manufacturing process that could be used to produce medicines.

5   Q.   And you've told us that you're an inventor of the '886

6   patent.  Are you an inventor of other patents owned by Momenta?

7   A.   Yes, I am, at least 14.

8   Q.   Did you have any role in Momenta's efforts to patent its

9   inventions?

10   A.   Yes, I did.

11   Q.   Was it your job to do the actual prosecution of the

12   patents?

13   A.   No, it was not.

14   Q.   Was it your job to oversee the prosecution of the patents?

15   A.   No, it wasn't.

16   Q.   What was your role?

17   A.   So, I am a scientist; I'm not a business guy.  So, patents

18   in many ways are on the business side.  So, as a scientist,

19   what I was really focused on was getting materials into the

20   business guys' hands in terms of technically accurate

21   scientific information that we believed was novel and then, in

22   the context of the patent application, reviewing that technical

23   information to make sure it was accurate and then, if other

24   technical questions came up, really making sure that those were

25   answered accurately.

1          MR. FRANK:  Scott, could we have Exhibit 3 at Pages 32

2     -- starting at Pages 323.

3     Q.    Dr. Shriver, what is that?

4     A.    This is a declaration that I signed with regards to

5     certain questions that the United States Patent Office had

6     raised about literature and how what we had disclosed was

7     scientifically different than what was disclosed previously.

8     Q.    So, what patent application are we talking about?

9     A.    I now know that this is the '886.

10    Q.    And so, what had happened?  The US Patent Office had --

11    what had the US Patent Office done, and what was this done in

12    response?

13    A.    Yes.  So, what the Patent Office had done is cited two

14    pieces of literature and asked the question basically of how

15    what we had done was different from what was done previously.

16    So, I was given those references, I read them very carefully

17    and then looked at what we had put in technically in the patent

18    application and then spoke with lawyers about how I perceived

19    there to be some very important differences between what we had

20    done and what had been done in the prior art.  A declaration

21    was written, I reviewed it for scientific accuracy, and I

22    signed it.

23    Q.    Did you have any other participation in the prosecution of

24    the '886 patent at any time from the time it was filed in 2002

25    to the time it was issued in 2009?

1    A.   So, really that was it.  So, I was involved in the early

2    stages in terms of making sure information was as

3    scientifically accurate as possible, signing particular

4    documents when the application was filed and then, five or six

5    years later, doing this declaration.

6    Q.   A change of subjects.  I want to ask you about the USP.

7    Remind us, please, what the USP is.

8    A.   The USP stands for an organization, a non-profit

9    organization, called the United States Pharmacopeia.  It's

10   basically an organization in DC -- in the DC area that's

11   focused on developing quality standards for medicines.  And

12   they have a group of staff scientists as well as they rely on

13   volunteers.

14   Q.   And did there come a time when you participated in a USP

15   activity?

16   A.   Yes, I was invited to join the heparin and later the

17   low-molecular-weight heparin advisory panels.

18   Q.   How did you come to be involved?

19   A.   So, I had published quite extensively in the structure and

20   function of heparin and heparan sulfate and also been part of

21   the FDA task force that had identified the particular

22   contaminant or adulterant in heparin that had led to really

23   some very unfortunate side effects.  That work -- I became --

24   USP became aware of that work.  They asked whether I would be

25   interested in joining the panel.  I submitted my resume and

1    fortunately was selected to join the panel.

2    Q.   Did you get paid for your participation in the USP panel?

3    A.   I did not.

4    Q.   Was the advisory panel that you were on and similar

5    advisory panels, were they decision-making bodies?

6    A.   Not at all.  So, the advisory panels are meant to be

7    advisory only.  They produce recommendations to a -- what is

8    called an expert committee, which is a voting body, and

9    ultimately, if things pass the expert committee, it goes up to

10   another voting body, which is the USP Council of Experts.  So,

11   I was not a decision-maker at all.

12   Q.   Now, when you were participating in the USP activity, did

13   you serve as a representative of Momenta?

14   A.   I did not.  It was a -- it was made clear to me that I was

15   selected and I was operating as -- with my -- as a scientist

16   using my own individual expertise in this area.

17   Q.   Were you asked by the USP to disclose conflicts of

18   interest?

19   A.   I was.

20        MR. FRANK:  May we have Exhibit 1557.

21   Q.   Tell us, please -- I'll ask you more questions about this,

22   but at a high level, what we are looking at?

23   A.   So, this is a conflict of interest statement that I signed

24   in February of 2008.

25        MR. FRANK:  Scott, could we zoom in, please, on the

1    italicized language near the top.

2    Q.   Now, that says, "No person who, during his or her service

3    on an expert committee, has a financial interest that may

4    conflict or may appear to conflict with his or her duties and

5    responsibilities shall vote on a matter in which he or she has

6    such financial interest.  An employee's interest shall be

7    presumed to coincide with that of his or her employer."

8         What was your understanding of the USP's rule against

9    conflicts of interest?

10   A.   That I was not supposed to vote in a matter that involved

11   Momenta or in which I had a conflict of interest.

12   Q.   Did you believe that you had a conflict of interest?

13   A.   Yes.

14   Q.   Did you disclose that conflict of interest?

15   A.   Yes, I disclosed that I was an employee of Momenta

16   Pharmaceuticals and that decisions made by USP could have

17   ramifications on Momenta who had an active application in front

18   of the US FDA for enoxaparin.

19        MR. FRANK:  Scott, could we have first   Question 2

20   and the answer to that.  Question 2.  I'm sorry.  I've asked

21   for the wrong thing.  Question 1.

22   Q.   Tell us what that is, please, Dr. Shriver.

23   A.   So, that requests listing who my employer is, and I had

24   listed that I was the Director of Analytical Research,

25   currently employed at Momenta Pharmaceuticals.

1         MR. FRANK:  Now, Question 3, please, Scott.

2    Q.   Tell us what that is, please.

3    A.   So, that was listing where any decision by USP could

4    potentially have an impact on a potential company that I was

5    involved with.  And since, again, Momenta Pharmaceuticals had

6    an active application in front of the US FDA, I wanted to make

7    clear that there was a conflict there.

8    Q.   Now, let's look, if we could, at Question 4.  That asks

9    you to list other professional or financial interests, and then

10   there's a parenthetical there that calls out a number of

11   things, including intellectual property rights.

12        You didn't write anything there.  Why not?

13   A.   I had disclosed all the conflicts I had; namely, that I

14   was an employee of Momenta Pharmaceuticals, and so I understood

15   that, that was basically disclosing, and the fact Momenta had

16   an active application, I had disclosed my conflict.

17   Q.   Weren't you named as an inventor on some of Momenta

18   patents and patent applications?

19   A.   Yes, I was.  I was named on Momenta applications, but

20   those applications were owned by Momenta, not by me.

21        Similarly, I was named on MIT applications.  Those

22   were owned by MIT and not by me.  So, I -- in the context of my

23   disclosure, I had disclosed my conflicts.

24   Q.   At the time -- at that time; that is, when -- this is I

25   believe early in 2008, how many MIT and Momenta patents and

1     patent applications were you listed on?

2     A.    So, at that time, probably somewhere greater than 30.

3     Q.    Was the fact that you were listed as an inventor on MIT

4     and Momenta patents and patent applications something that was

5     not publicly known?

6     A.    Not at all.  So, the -- it was publicly known.  All of the

7     applications are made public through the US PTO website.  It's

8     basically on the internet.  A search for my name would come up

9     with all of the patents and patent applications.

10    Q.    Now, did there come a time when you learned about

11    something called proposed Method 207?

12    A.    Yes.

13    Q.    What is or was Method 207?

14    A.    So, Method 207 is a method to determine the amount of 1,6

15    anydro-containing chains are in an enoxaparin sample.  It

16    basically involves digestion of enoxaparin, separation of the

17    individual building blocks, and then performing a calculation

18    to determine the percent of 1,6 anydro.

19    Q.    Did Momenta, as a company, take a position regarding

20    Method 207?

21    A.    Yes, we did.

22    Q.    And what was that position?

23    A.    We were opposed to the adoption of Method 207.

24          MR. FRANK:  Please put up Exhibit 1262.

25    Q.    Dr. Shriver, what is Exhibit 1262?

1   A.   So, this is a letter that Dr. Jim Anderson and myself sent

2   to USP in April outlining our opposition to Method 207

3   adoption.

4   Q.   Who is Jim Anderson?

5   A.   So, at Momenta, I was responsible for discovery different

6   analytical techniques, and Jim was a colleague and counterpart

7   who was responsible for taking some of those and really making

8   sure the material we were producing was of high quality.

9   Q.   And can you explain why Momenta was opposed to the

10  adoption of Method 207?

11  A.   So, there were a number of fundamental inaccuracies in the

12  Method that led to substantial bias.  It wasn't that an

13  HPLC-based method inherently couldn't be used; it was that 207

14  had some fundamental limitations associated with it.

15  Q.   By the time of this letter, was Momenta using a method

16  like Method 207 in its own manufacturing process?

17  A.   No.  We were using different methods.

18  Q.   And why were you using different methods?

19  A.   So, we had, again -- Sanofi had established this as a

20  percent of chains, and so we had discovered advanced techniques

21  using something called nuclear magnetic resonance, or NMR, that

22  we believed could accurately get to 1,6 anydro in the context

23  of the chains.

24  Q.   Did you tell the USP that Momenta had developed what it

25  thought was a better way to determine the presence and amount

1    of 1,6 anydro ring structures in a sample of enoxaparin?

2    A.   We did.

3         MR. FRANK:  Let's go to Page 2 of Exhibit 1262 and to

4    the first -- that first full -- yeah, there you go.

5    Q.   Tell us what is said there, Dr. Shriver.

6    A.   So, this is basically a disclosure of the fact that

7    Momenta was performing a validated NMR method, an advanced NMR

8    method to determine percent of chains that ended in 1,6 anydro

9    and how that accurate method fundamentally couldn't be

10   replicated with Method 207.

11   Q.   And you used the word NMR.  Remind us again what that

12   means.

13   A.   That stands for nuclear magnetic resonance.

14   Q.   Now, I want to ask you to help us understand what you

15   believe was the scientific error in the way  Method 207 was

16   implemented.  Can you explain that error?  And we have an

17   animation that goes with that.

18   A.   Yes.  I first would like to kind of walk through HPLC.

19   Q.   Okay.  Actually, why don't you start by telling us what's

20   on the screen.

21   A.   So, this is an animation in terms of how, kind of in a

22   cartoon way, one would inject a sample, building blocks of

23   enoxaparin, and what kind of fundamentally happens in terms of

24   HPLC separation and detection.

25   Q.   Okay.  So, what's the first step?

1    A.   So, basically the first step is you have an HPLC column,

2    which contains beads.  So, those are the blue blobs in the HPLC

3    column.  You introduce a sample, which in this case would be a

4    set of building blocks of enoxaparin, onto the column.  The

5    individual building blocks then have different ability to

6    basically bind to the beads in the column, and so they move

7    through the column at different rates.  And what that kind of

8    lends itself to is the fact that you ultimately get separation

9    of the building blocks as they move through the column, and

10   then --

11   Q.   And then what happens?

12   A.   -- and then one by one, those building blocks will pass by

13   a detector, in this case a detector that measures ultraviolet

14   light, and those peaks will then form blips or peaks on the

15   chromatogram that can be integrated or you can determine the

16   area under them to give you an identity and an amount.

17   Q.   So, what was wrong with that method?

18   A.   Well, inherently there is nothing wrong with the

19   HPLC-based separation, the digestion and separation.  Where the

20   issue came was ultimately what you did with that information.

21        So, in the case of Method 207, the idea was you

22   separated the building blocks, then integrated them or

23   determined the amount of them and then used a calculation that

24   had introduced a fundamental bias to get to 1,6 anydro.

25   Q.   What was the bias?

1    A.   So, the bias was fundamentally that the method assumes

2    that each of the building blocks absorbs UV light to the same

3    extent, and we know that is not the case.

4         So, an example I can give is that, in the case of a

5    window that's letting light in, if one pulls down a white shade

6    that's translucent and lets light in, but if one pulls down a

7    room-darkening shade, basically all the light is blocked.  So,

8    one couldn't say that those two shades basically are equivalent

9    at blocking light.

10        Similarly, Method 207 assumes that all of the

11   individual building blocks, even though they have different

12   structures, block or absorb UV light to the same extent, and we

13   know that's not true.

14   Q.   Now, was there a meeting of the heparin advisory panel at

15   which Method 207 was discussed?

16   A.   Yes, there was.

17   Q.   Were you present at that meeting?

18   A.   So, it was a telephone meeting, so I was on the phone.

19        MR. FRANK:  Could we have Exhibit 1029, please.

20   Q.   What is this, Dr. Shriver?

21   A.   So, this appears to be the meeting minutes of that meeting

22   on November 14th, 2008.

23        MR. FRANK:  Scott, could we go to the part that says

24   "Legal Update," just the first couple of lines.

25   Q.   It says there that Mr. van Hook gave a presentation

1    updating members on the rules of conflict of interest and

2    confidentiality.

3          Do you see that?

4    A.   I do.

5    Q.   Who was Mr. -- or who is Mr. van Hook?

6    A.   I believe Mr. van Hook is a lawyer at USP.

7          MR. FRANK:  Turn, please, to Exhibit 1030.  And just

8    blow that up for us, please, Scott.

9    Q.   And Dr. Shriver, tell us what that is, please.

10   A.   I believe that is the presentation that     Mr. van Hook

11   made at the meeting.

12         MR. FRANK:  Could we go to Slide No. --

13   Q.   And what did Mr. van Hook -- I'm going to ask you what

14   Mr. van Hook said by reference of these slides.

15         MR. FRANK:  Let's go to Slide No. 2, please.  Blow it

16   up.

17   Q.   If you count down under the heading, "Conflict of

18   Interest," would you tell us what it says under that heading --

19   explain what it says under that heading.

20   A.   So, that what it says is that, to maintain independence

21   and impartiality, employee -- or, in this case, volunteers must

22   remain free of actual or perceived conflicts of interest.

23         MR. FRANK:  And could we go now to Slide No. 5.  Blow

24   it up.

25   Q.   And now, let's look at the bottom bullet point there.

1    Tell us what that says.

2    A.    So, it says that a member with a perceived or actual

3    conflict can participate in the scientific discussion but must

4    disclose the conflict and then recuse themselves from a vote.

5    Q.    Was there any reference to patents in      Mr. van Hook's

6    presentation that day?

7    A.    Not to my knowledge, no.

8    Q.    Was there any reference to patents at all at the November,

9    2008, meeting?

10   A.    There was.

11   Q.    And what was that?

12   A.    There was -- USP informed the panel that Sanofi Aventis

13   had agreed to let lapse its patent that covered Method 207.

14   Q.    Now, did you believe that you had a conflict      of

15   interest with respect to the consideration of    Method 207?

16   A.    Yes.

17   Q.    Why?

18   A.    So, for several reasons.  One of course is that any

19   decision on 207 could impact the filing that USP had in front

20   of the FDA as well as the fact that Momenta on several

21   occasions had made very clear its opposition to adoption of

22   Method 207.

23   Q.    Well, that was -- you had written a letter back in April.

24   This is in November.

25            Do you expect everyone to remember that letter?

1    A.   So, it wasn't just in April.  There was also a

2    presentation by Momenta at this meeting.

3             MR. FRANK:  Turn, please to -- or could we have

4    Exhibit 1031.

5    Q.   Please tell us what that is, Dr. Shriver.

6    A.   So, that was a presentation made by        Dr. Jim

7    Anderson of Momenta on Method 207.

8             MR. FRANK:  Can we go to Slide 2, please.

9    Q.   And when was that presentation made?  I should have asked

10   you that.

11   A.   So, that presentation was made during the November 14th

12   telephonic meeting.

13            MR. FRANK:  Slide 2, please.  Can you blow it up?

14   Q.   Tell us, please, what -- first, did Mr. Anderson refer

15   back to the submission that had been made the prior April?

16   A.   Yes.

17   Q.   Second, Mr. Anderson says -- he describes "Several" --

18   actually, before I get to that, in the first -- under the first

19   heading, it says, "1,6 anydro method was successfully used by

20   Momenta to characterize lots of enoxaparin sodium."

21            What is that referring to?

22   A.   So, that refers to the fact that, again, fundamentally an

23   HPLC-based method, so enzymatic digestion and separation by

24   HPLC can characterize enoxaparin and calculate a 1,6 anydro.

25            However, this Slide goes on to say, in the context of

1    Method 207, there are a number of major issues that prevent the

2    data from being accurate, in other words, the data is biased.

3    Q.   Now, if you go down into the sub-points on the bottom,

4    there's one that says, "Formula for calculation of percentage

5    1,6 anydro content was not correct."

6         What is that talking about?

7    A.   That there were errors basically in the calcula -- in the

8    mathematical calculation that was used to take the raw data

9    from the chromatogram, the peaks, and use that to convert to a

10   percent 1,6 anydro.

11        This also, by the way, includes the issue that we had

12   spoken about in terms of the lamp shade issue.

13        MR. FRANK:  Turn, please to -- or let's have Slide 6,

14   please.

15   Q.   Directing your attention to Slide 6 -- Slide 6.  Oh, we're

16   on Slide 6.  I'm sorry.

17        It says at the bottom -- can we call your attention to

18   the language that begins with the word "because" toward the

19   bottom.  Would you explain what is being said there?  The whole

20   bottom, please.

21   A.   So, what was said -- what basically this is saying is

22   that, so the output of the 207 is a particular range of chains;

23   namely, 15 to 25 percent.  Because of the bias introduced into

24   this 15 to 25 percent, one can't -- if the 207 test was

25   mandatory, one would have to do that test, there wouldn't be

1    available alternative methods because it's very hard to match a

2    method that gives inaccurate data.

3            And so, in the presentation, Jim goes on to provide

4    really two potential solutions, including avoiding the assumed

5    response factors or, as I mentioned before, relying on

6    alternative techniques like NMR, or nuclear magnetic resonance,

7    that don't rely on response factors.

8            MR. FRANK:  Now, Slide 7, please.

9    Q.   Did Mr. Anderson make recommendations on behalf of

10   Momenta?

11   A.   Yes, he did.

12   Q.   And tell us, please, what those recommendations were.

13   A.   He recommended either fixing 207, which would have been a

14   major exercise, or really allowing alternative methods to be

15   used, so allow the flexibility in the monograph for alternative

16   methods to calculate       1,6 anydro be used.

17   Q.   Was a vote taken that day?

18   A.   Yes, there was.

19   Q.   Did you vote?

20   A.   I did not.

21   Q.   Why not?

22   A.   Because, as I've mentioned previously, I have a conflict.

23   A decision by the -- by USP on Method 207 would have an impact

24   on Momenta, particularly in the context of the FDA filing.

25   Q.   What was the USP's eventual decision?

1  A.   So, the eventual decision was to adopt Method 207 but,

2  importantly, not to make it mandatory.  In our view -- in my

3  view, that allows alternative methods to be used to determine

4  1,6 anydro content.

5  Q.   Now, did you tell the USP about the existence of what was

6  then Momenta's application that led eventually to the issuance

7  of the '886 patent?

8  A.   I did not.

9  Q.   Why not?

10  A.   You know, I thought about this in retrospect, but it just

11  didn't -- at the time, it did not occur to me.

12  Q.   Do you have a view now as to why the existence of the

13  application didn't occur to you then?

14  A.   So, my view is I think the meat or what the panel was

15  trying to do was scientifically assess a variety of issues

16  associated with enoxaparin and in particular the issues around

17  Method 207.  And so, I was focused on those scientific issues,

18  as opposed to patent-related issues.

19  Q.   Were you trying to force people to use a method that

20  Momenta might some day get a patent on?

21  A.   No.  In my belief, I was trying to do something quite the

22  opposite, which is really allow for flexibility in terms of

23  different methods to detect  1,6 anydro and quantify its amount

24  in enoxaparin.

25  Q.   And what was the final result?

1    A.   The final result was that Method 207 is not mandatory, and

2    people have the ability to practice whatever method they would

3    like.

4         MR. FRANK:  Thank you, sir.

5         THE COURT:  Cross-examination?

6         MR. SOMMER:  Yes, Your Honor.  I just want to grab the

7    binders and --

8         THE COURT:  Yes, Mr. Sommer.

9         MR. SOMMER:  Thank you.

10                **CROSS-EXAMINATION BY MR. SOMMER**

11   Q.   Dr. Shriver, my name is Michael Sommer.  Nice to meet you.

12   A.   Nice to meet you as well.

13   Q.   You told the jury that you were a paid employee at Momenta

14   through the end of 2008; correct?

15   A.   I was a paid employee through the end of 2008, yes.

16   Q.   But even after that, you remained a paid consultant;

17   correct?

18   A.   Yes.

19   Q.   Through at least when?

20   A.   2012 or so.

21   Q.   Okay.  Now, you told the jury here about your work on the

22   USP panel; correct?

23   A.   Yes, I did.

24   Q.   And as a member of that panel, you would have been aware

25   that USP's standards were intended to be public standards

1    available for the use and benefit of all parties; correct?

2    A.    Yes.

3    Q.    I'm going to show you a portion of Exhibit 2037.  This is

4    a USPA guideline document that says, "USPA standards are

5    intended to be public standards available for the use and

6    benefit of all parties."

7          Do you have an understanding of what that means, sir?

8    A.    I do.

9    Q.    Okay.  And what that means is that any party could use --

10   should be able to use a USPA method free of any threat, for

11   example, of a patent infringement claim; correct?

12   A.    So, I believe this language responds to standards.  Method

13   207 is not a standard.

14   Q.    Is it your view that the USPA -- USP guidelines don't

15   apply to methods?  Is that your view?

16   A.    So, Method 207 is non-mandatory, so people are free to do

17   the method if they want to or to practice an alternative

18   method.

19   Q.    You didn't answer my question.  My question, sir, is

20   whether you understood that the USPA methods were supposed to

21   be free for all to use.

22   A.    So, my understanding, again, is that standards need to be

23   free to be used.  So, standards are things that are required.

24   Q.    So, was it your understanding that methods were not free

25   to be used by all?

1    A.    No, that didn't enter my -- that actually didn't enter my

2    calculation.

3    Q.    Okay.  Let's read a little further.  "USP requests that

4    sponsors disclose in their requests for revision whether any

5    portion of the methods or procedures" --  there's the word

6    "methods" right there.

7          Doesn't this apply to methods, sir?

8    A.    So, this statement corresponds to sponsors, and I would

9    just remind that the sponsor of the enoxaparin monograph was

10   Sanofi Aventis.

11   Q.    So, let me just make sure I got it straight.

12         Is it your view that USP-adopted methods were not

13   intended to be free for all to use?

14   A.    No, not at all.

15   Q.    That's not your view?

16   A.    That's not my view.

17   Q.    Is it your view that they were intended to be free for all

18   to use?

19   A.    Again, if they're required, certainly they need to be free

20   to be used.

21   Q.    But what if it's just an option?  Should they be free to

22   use?

23   A.    You know, I guess my thing on that is that, that could be

24   USP's position, sure.

25   Q.    Okay, thank you.

1       Now, you were shown a moment ago some minutes from a

2  meeting you attended on November 14th, 2008.  You were shown

3  that by counsel; do you remember that?

4  A.   I do.

5  Q.   Okay.  And in advance -- excuse me.

6       As part of that meeting, we also saw a presentation by

7  an attorney named by Mr. van Hook relating to conflicts of

8  interest and other matters; correct?

9  A.   Yes.

10 Q.   Okay.  And you were shown a couple of them during your

11 direct examination.  I just want to take you through you a

12 couple of other aspects of that very briefly.  This is

13 Exhibit 2047.

14      MR. SOMMER:  Let me just grab my highlighter.

15 Q.   Okay.  On Page 2 of that Exhibit, it talks about remaining

16 free of actual or perceived conflicts of interest; do you see

17 that?

18 A.   I do.

19 Q.   And by perceived conflicts of interest, what you

20 understood that to mean was that somebody from the outside

21 looking in might have a question, Hey, maybe this guy does have

22 a conflict of interest even if in your mind you don't think you

23 do; correct?

24 A.   Yes.

25 Q.   Okay.  And turning to Page 3 of the Exhibit, there's a

1    section that says, "Members shall not use membership in any way

2    that is or appears to be motivated by private gain or outside

3    interests;" correct?

4    A.   Yes.

5    Q.   So, that means that you should not do anything that either

6    does or appears to do something positive for your employer;

7    correct?

8    A.   That's correct, yeah.

9    Q.   Okay.  All right.  Let's go to Page 4.  One of the things

10   you're required to do is not only to submit your conflict of

11   interest statement but to update it; correct?

12   A.   Yes.

13   Q.   And here's another one.  Your interests are presumed to be

14   the same of your -- as your employer; correct?

15   A.   Yes.

16   Q.   So, that means if Momenta has an interest, that's your

17   interest; correct?

18   A.   Yes, and I'm required to disclose it.

19   Q.   And, finally -- let's just look at Page 5 -- who has

20   primary responsibility for disclosing potential conflicts of

21   interest, sir?

22   A.   So, this reads as the primary responsibility rests with

23   the member.

24   Q.   And that would be you?

25   A.   Yes.

1    Q.    Thank you.

2          Now, sir, that presentation on November 14th, 2008,

3    you were asked some questions -- I think you were asked the

4    question by your lawyer, "Did the word 'patents' come up?"  Do

5    you remember that?

6    A.    That's right.

7    Q.    Okay.  At the meeting itself, the word "patents" came up,

8    didn't it?

9    A.    Yes.  And I said so, yes.

10   Q.    I know you said so.  And I want to show you Exhibit 2046.

11   This is the minutes from that meeting.  Okay.  It says, "The

12   1,6 anydro patent issue."

13         You, in your testimony on direct, described to the

14   jury, the top part of this entry, that there had been some

15   discussion with Sanofi Aventis; correct?

16   A.    Yes.

17   Q.    Okay.  What you didn't describe during your direct was the

18   second one where the USP told you, told you that it was not

19   aware of any patent issues that may cover the test.

20         Now, the one they were aware of was Sanofi; correct?

21   A.    Yes.

22   Q.    They were not aware of '886; correct?

23   A.    As the statement says, they weren't aware of any other

24   issues.

25   Q.    Okay.  And that would include the '886.  They were not

1    aware of that; right?

2    A.    Yes.

3    Q.    So, you're sitting there, and you know about '886 because

4    you're an inventor on it; right?

5    A.    I am.

6    Q.    You know that's been filed as a patent application with

7    the Patent and Trademark Office; correct?

8    A.    Yes.

9    Q.    You know that, that, as you've already told us, presents a

10   conflict of interest for you; correct?

11   A.    No.  My conflict of interest, as I disclosed, was the fact

12   that I was an employee of Momenta Pharmaceuticals, and as you

13   pointed out, my interests were assumed to be consistent with my

14   employer.

15   Q.    You had a conflict of interest with respect to the '886;

16   correct?

17   A.    I had a conflict of interest with regards to enoxaparin in

18   general, yes.

19   Q.    I'll ask it again.  You had a conflict of interest because

20   of the pending patent application now known as '886; correct?

21   A.    Including other issues, yes.

22   Q.    So, the answer to my question is yes?

23   A.    Yes.

24   Q.    Thank you.

25              So, you're sitting there at this meeting, you hear the

1   USPA announce, The only patent issue we're aware of is Sanofi

2   Aventis, and what you do is you remain silent; correct?

3   A.   Yes, I did.

4   Q.   And that silence, you appreciate, sir, that, that silence

5   on your part confirmed to the USP that the only patent

6   application out there that stood to impact the 1,6 anydro issue

7   was the Sanofi one; right?

8   A.   And, as I testified, I honestly had not -- was not

9   thinking about patent-related issues at all at that point.

10  Q.   Could you answer my question now?

11  A.   Could you repeat it?

12  Q.   Sure.  By remaining silent, you confirmed to the USP that

13  the only patent issue out there was the Sanofi patent issue and

14  not a Momenta patent issue; correct?

15  A.   I'm not sure I confirmed to USP anything.

16  Q.   By remaining silent, you don't think you communicated

17  anything?

18  A.   Again, I wasn't aware of any issues at that point, and I

19  didn't speak up.

20  Q.   You weren't aware of -- I just want to understand what --

21  you weren't aware of any issues.  You knew the '886 had been

22  filed for a patent; correct?

23  A.   So, that application was filed in 2002, and I had really

24  not spent much time thinking about it since that point.

25  Q.   Is it your testimony, sir, that, as you sit at that

1    meeting, you had completely forgotten that you, an inventor on

2    the '886 patent, and your employer, Momenta, had submitted that

3    application which was pending?

4    A.    It's not something that came -- that I considered.

5    Q.    That wasn't an answer to my question.

6    A.    I'm saying I didn't consider it.  It didn't arise in my

7    memory.

8    Q.    Let's talk about the Sanofi issue that did come up.  The

9    issue that came up with Sanofi -- I want to make sure we're

10   clear on this -- Sanofi had a patent application out there that

11   stood to impact 207 that the panel was talking about; correct?

12   A.    Yes, especially as the sponsor of 207 became mandatory.

13              MR. SOMMER:  Okay.  I'm dropping things left and

14   right.

15   Q.    Let's look at Exhibit 2070.  I'm just going to put that up

16   on the screen.

17              This is an e-mail from November 19th, 2008.  This is

18   five days after the meeting we were just talking about;

19   correct?

20   A.    Yes.

21   Q.    Okay.  And we see someone in this chain is named Steve

22   Brugger from Momenta.  You know him; right?

23   A.    Steve Brugger, yes.

24   Q.    Thank you for the correction.

25              And the e-mail Steve gets from someone,    Gordon

1    Johnston, is talking about the Sanofi issue; correct?

2        You've seen this before; right?

3    A.    I have not.

4    Q.    You've not seen this before?

5    A.    No.

6    Q.    Well, let me just highlight one thing -- two things.

7        Okay.  On Line 4 -- 5, it says, "The innovator" -- and

8    can we agree that's Sanofi; right?

9    A.    Yes.

10   Q.    -- "The innovator may be allowing its method to be

11   published, but the patented method has not been voided.  Need

12   better term.  Hence, the innovator could decide to enforce its

13   IP rights to the method at any time.  Express worries that the

14   innovator may be gaming the system."

15       Do you see that?

16   A.    I do.

17   Q.    Do you know what gaming the system means?

18   A.    In this context?

19   Q.    Well, I'll make it easier for you.  Have you ever heard

20   the term before, "gaming the system"?

21   A.    Yes, I have, of course.

22   Q.    Okay.  It means, like, stacking the deck or cheating;

23   right?

24   A.    Yes.

25   Q.    So, the concern here is that it, Sanofi, has not voided

1    its patent, and it could game the system if other companies

2    start using 207, and then Sanofi could strike with a patent

3    infringement lawsuit, that's the concern; correct?

4    A.   Yes, especially as the innovator of 207 becomes mandatory.

5    Q.   Okay.  And if they did that, if they lulled other

6    companies into believing that they could use a USP method,

7    since they're supposed to be free for all to use, that would be

8    gaming the system because, when you then spring and sue them,

9    they would have no idea that lawsuit's coming; correct?

10   A.   Yes.

11   Q.   Okay.  So, there's discussion at the USP where you're

12   there talking about the fear of Sanofi and maybe Sanofi

13   changing its position and suing some company; right?  That's

14   discussed?

15   A.   At the USP meeting?

16   Q.   Yes.

17   A.   No, that was --

18   Q.   That was within Momenta?

19   A.   So, again, I haven't seen that -- I've only just seen that

20   e-mail today.  I wasn't a part of that discussion.

21   Q.   Okay.  Let's show you something that you were part of.

22   That's Exhibit 2184.

23        Here's 2184.  And you're on this e-mail, we see, I

24   highlighted it; right?

25   A.   Yes.

1    Q.   This is November 21st.  This is two days after the one we

2    just looked at; correct?

3    A.   Yes.

4    Q.   Okay.  Let's go down to the bottom.

5         With regards to the patent -- now, this is Sanofi's

6    patent; right?

7    A.   Yes.

8    Q.   -- "USP informed that" -- SA is Sanofi Aventis, can we

9    agree on that?

10   A.   Yes.

11   Q.   Okay.  "USP informed that SA has confirmed in writing that

12   they would let the patent lapse."  Now, let's stop there for a

13   moment.

14        Letting a patent lapse means you agree not to enforce

15   it, I won't sue you; right?

16   A.   I don't know what that means in --

17   Q.   Okay.  If you don't know what it means, I'll move on.

18        "Steve Auten and Leda made the point that USP should

19   actually request that the innovator affirmatively 'expressly

20   abandon' any patent application."

21        Do you see that?

22   A.   I do.

23   Q.   USPA -- USP thanked for the input and said they would take

24   that into consideration; you see that?

25   A.   I do.

1    Q.    Does that refresh your memory that, that was discussed

2    with the USP?

3    A.    So, I thought you meant in the context of the

4    November 14th meeting.

5    Q.    I'm sorry if we miscommunicated.

6          You know this issue was discussed with USP; right?

7    A.    From Momenta, yes.

8    Q.    All right.  And expressly abandon, if Sanofi agrees to

9    expressly abandon its patent, what that means is they can't

10   then change their mind and sue someone for patent infringement;

11   correct?

12   A.    I don't know what the --

13   Q.    You don't know?

14   A.    --- phrase means.  Sorry.

15   A.    Did you ask anybody any questions when you got this

16   e-mail, like, What does this mean?  I don't get it?

17   A.    So, again, what I was focused on was the fact that 207 was

18   an inaccurate method, and if it were made mandatory, that would

19   be hugely problematic.

20          And in the context of this e-mail, again, if 207 were

21   mandatory and it was covered by a patent, that there would be

22   issues associated with it.

23   Q.    Okay.  Let me show you another e-mail.  This is

24   Exhibit 2013.

25          Have you ever heard the name Susan de Mars?

1    A.   Yes.

2    Q.   She's head legal counsel at the USP; correct?

3    A.   Yes.

4    Q.   And how about the name Leda Travinos?  Do you know that

5    name?

6    A.   So, I'm sorry, on my screen, I'm not getting the -- yes,

7    okay.  Yes.

8    Q.   Sorry.  That was probably my fault.  Can you see it now?

9    A.   I can.  Thank you.

10   Q.   Do you know who Leda Travinos is?

11   A.   Yes.

12   Q.   She is someone at Momenta, the head lawyer there?

13   A.   Yes.

14   Q.   Okay.  So, this is a lawyer-to-lawyer communication.

15        Okay.  Let's just look at a little bit of this.  "We

16   understand" -- I'll try to zoom in a little so you can read it

17   better.

18        "We understand that Sanofi Aventis has provided USP a

19   written statement that Sanofi Aventis would allow its patent

20   application for the proposed Chapter 207 method to lapse.  We

21   would appreciate a copy."

22        Okay.  Now, it goes on to say, "In addition, in

23   addition, in order to provide certainty and public notice of

24   legal access to perform the method" -- let me stop there for a

25   minute.

1          You understand that to mean you have the right to use

2     this method; right?

3     A.   Yes.

4     Q.   Okay.  -- "we respectfully request that USP require Sanofi

5     Aventis to take affirmative steps to abandon any pending patent

6     applications and remove the threat of suit on any issued

7     patents that may be relevant to the method or to re-agents

8     required to perform the method."

9          Do you see that?

10    A.   I do.

11    Q.   And if you go to the very end of this paragraph, it says,

12    "In the absence of these actions, Momenta, Sandoz and other

13    parties would continue to be subject to the threat of patent

14    litigation for performing a USP-specified test."

15         Do you see that?

16    A.   I do.

17    Q.   Let's see if we can agree on what this means.

18         Momenta and Sandoz -- because we can see lots of

19    Sandoz people here also; you see that?

20    A.   Sure.

21    Q.   Okay.

22    A.   A lot of yellow, but yeah.

23    Q.   A lot of yellow.

24         Momenta and Sandoz are saying to the USP, Look, if you

25    don't get Sanofi to abandon its patent, then if that -- excuse

1    me -- their patent application, then if that patent gets

2    granted, they could -- we would be subject to being sued for

3    patent infringement, and that's inconsistent with USP policy of

4    legal access; right?

5    A.   So, the statement is that there would be a -- they would

6    be -- Momenta and Sandoz could potentially be subject to patent

7    litigation.

8    Q.   Right.  They would be under threat unless there was an

9    abandonment; correct?

10   A.   I would add that, even for any USP test, people can run an

11   equivalent method to deliver equivalent results.

12   Q.   Sir, I didn't write this.  This was written by Momenta and

13   Sandoz, and it says, If Sanofi doesn't abandon its patent

14   application or patent, we're going to be subject to the threat

15   of patent infringement litigation, and that's not fair.

16        That's basically what it's saying; right?

17   A.   For performing that exact test, yes.

18   Q.   And you knew at this time that Momenta had its own patent

19   application pending before the Patent and Trademark Office;

20   right?

21   A.   As I've testified, it's not something that I thought very

22   much about at all.

23   Q.   Would the answer be yes?

24   A.   Again, it's not something that came up.

25   Q.   During your direct examination, your counsel showed you

2-173

1   something called the certificate of correction; do you remember

2   that document?

3   A.   The --

4   Q.   You signed a declaration, "I read it, I thought it was

5   scientifically accurate, and I signed it."  Do  you remember

6   that?

7   A.   So, I'm not sure what document you're referring to.

8        MR. SOMMER:  Sure.  May I approach the    witness --

9   Q.   Oh, on your binder, the smaller one, it's Exhibit 3.

10       Remember that, being asked about that document?

11  A.   Yes.

12  Q.   Okay.  And you told the jury how you read it, you made

13  sure it was scientifically accurate, and you signed it.

14  A.   No.

15  Q.   Do you remember that?

16  A.   So, the declaration, yes.

17  Q.   Okay.  Let's just look at the date on that declaration.

18  A.   Yes.

19  Q.   Hold on.  Let me get there so everyone can see.

20       The 27th of June, 2008.

21  A.   Yeah.

22  Q.   So, you clearly weren't thinking about this patent in

23  June of 2008; right?

24  A.   So, yes, and as I testified, I was focused on the prior

25  art that -- or the literature that was cited by PTO.

1    Q.   So, when it came to Momenta's '886 patent and how it might

2    generate a threat to other people using  Method 207, then the

3    '886 just went out of your mind?

4    A.   So, my focus was on making sure either 207 was corrected

5    or that companies were free to use any method to determine 1,6

6    anydro.

7    Q.   Remember the term we saw a moment ago, "gaming the

8    system"?

9    A.   Yes.

10   Q.   Okay.  The concern of your employer, Momenta, and its

11   partner Sandoz was that there was a threat here that Sanofi

12   would game the system by letting others practice the USP method

13   and then getting sued for patent infringement; correct?

14   A.   If 207 were mandatory, yes.

15   Q.   I don't understand the "if 207 were mandatory."

16   A.   So, in the context --

17   Q.   No.  Hold on a second.

18            MR. FRANK:  Excuse me.  May he finish his answer?

19            THE COURT:  Let him finish his answer.

20            MR. SOMMER:  Sure.

21   A.   So, in the context of the monograph, Sanofi Aventis was

22   the sponsor, and the sponsor has significant authority to

23   basically recommend revisions or recommend inclusions into the

24   monograph, and that's what they were attempting to do with 207

25   and to make it mandatory.

1    Q.    Thank you.

2          In Exhibit 2013 that we just looked at, there's

3    nothing said there at all, when Momenta and Sandoz were talking

4    to the USP, about the threat of litigation only existing if the

5    method was mandatory, is there?

6    A.    Can you repeat your question one more time, please?

7    Sorry.

8    Q.    Yeah.  Exhibit 2013 that we looked at a moment ago from

9    Leda Travinos to Susan de Mars copying all those people at

10   Sandoz and Momenta, there's nothing mentioned about, Oh, this

11   concern only exists if the method is mandatory; correct?

12   A.    Well, again, the sponsor-related things are almost

13   understood to be mandatory.

14   Q.    Isn't it true, sir, that the very gaming of the system

15   that Momenta and Sandoz were scared of from Sanofi is exactly,

16   exactly what Momenta and Sandoz did when they and you did not

17   disclose the '886 patent application to the USP?

18   A.    No.  We were focused on making sure companies could use

19   whatever method they wanted to.

20   Q.    Didn't you game the system by not disclosing to the USP

21   that Momenta had a patent application pending that would be

22   implicated by Method 207?

23   A.    And, again, it's not something that really occurred to me

24   at all.

25   Q.    Last couple of questions on this point.  Momenta went to

1    the USP and said, Hey, we are worried that Sanofi is going to

2    game the system, and any USP method should be free to all, make

3    them abandon their patent; right?

4    A.    Because, as a sponsor, 207 could be mandatory.

5    Q.    And when the USP said, We're not aware of any other patent

6    issue, you sat there silent and let a method get adopted that

7    Momenta now uses to game the system and sue my client for

8    patent infringement just by using the 207 method; isn't that

9    right?

10   A.    No.  I recused myself from that vote, so I did not vote in

11   that matter to --

12   Q.    Do you think by abstaining, sir, that relieved you of your

13   duty to make disclosure to the USP?

14   A.    Absolutely not.

15   Q.    Let's see if the plan succeeded, sir.  Let's look at 2147.

16   A.    I missed that first part.

17   Q.    Let's just look at 2 -- I'll withdraw the first part.

18            Let's look at 2147 together.  This is a letter from

19   Sanofi Aventis dated January 29th, 2007.  It's regarding the

20   test for the 1,6 anydro and the monograph.

21            THE COURT:  Would you give us the date of that letter

22   again?

23            MR. SOMMER:  Yes, sir.  January 29th, 2009.

24   Q.    This was about a month and a half later after those

25   e-mails we saw; correct?  Maybe two months.

1   A.   Again, I'd have to go back and look at those letters.  I

2   wasn't familiar with those letters until you presented them.

3   Q.   Okay.  But let's just see if we can agree on something.

4   This was the letter where Sanofi agreed to abandon its patent

5   application so it wouldn't be a threat to anyone who wanted to

6   practice the method; correct?

7   A.   It appears so.  I haven't read this letter before, but

8   that appears to be the case.

9   Q.   Okay.  Don't you think, when the USP announced that it was

10  -- the only patent issue it was aware of was the Sanofi one on

11  November 14th, 2008, that it might want to know that Momenta

12  had a patent pending?

13  A.   I think USP would want to be aware of any issues

14  associated with patents.

15  Q.   At any time prior to the Plaintiffs bringing this lawsuit

16  against Amphastar, did you disclose the '886 patent to the USP?

17  A.   I did not.

18  Q.   And are you aware of anyone else from Momenta or Sandoz

19  disclosing the '886 patent to the USP?

20  A.   Not to my knowledge.

21  Q.   I want to read to you a short portion from a declaration

22  of Susan de Mars, the head lawyer at the USP, and I'm going to

23  ask you a question about it.

24       Here it is.  This is Exhibit 2051.  It's the

25  declaration of Susan de Mars that was executed on the 13th day

1    of July, 2012, and I'm going to read to you from Paragraph B on

2    the second page.

3              "At no time during the development of     Chapter 207

4    or subsequently did Momenta, its employees or agents ever

5    suggest to USP staff, advisory panels, including ad hoc

6    advisory panels and expert panels involved in developing

7    Chapter 207 or the expert committee that considered input from

8    the advisory panels and approved Chapter 207; namely, biologics

9    and and biotechnology, that any of Momenta's intellectual

10   property, including patents, might pertain to or in any way

11   constrain the public use of USP compendial standards for

12   Chapter 207."  Do you see that?

13   A.    I do.

14   Q.    So, can we agree based on that -- do you have any reason

15   -- first of all, do you have any reason to dispute what Ms. de

16   Mars wrote in her sworn declaration?

17   A.    I do not.

18   Q.    So, can we agree that Momenta and none of its employees,

19   including you, or any of its agents, maybe that's Sandoz, none

20   of you disclosed to USP that the '886 patent application was

21   out there that might constrain public use, did you?

22   A.    Not to my knowledge.

23   Q.    Dr. Shriver, throughout this period of non-disclosure, you

24   were aware that there were actually rules and procedures at the

25   USP for disclosing conflicts; correct?

1    A.    Yes.

2    Q.    Let's go to Exhibit 2043.  We're just going to look at a

3    couple of them.  Exhibit -- I'm sorry -- 2043.  There it is.

4          Okay.  These are the rules and procedures governing

5    Council of Experts effective January 1, 2008.  And I'm going to

6    take you first to Rule 206, "Conflict of interest statements."

7    That one's right here.  Okay.

8          And your counsel on your direct showed you a form you

9    signed; do you remember that?

10   A.    Yes, I do.

11   Q.    That was your conflict of interest statement; right?

12   A.    Yes.

13   Q.    Okay.  And it's designed -- "You shall submit a statement

14   of all employment, professional research, organizational

15   memberships and financial interests that relate, either

16   directly or indirectly, to his or her duties and

17   responsibilities."

18         Do you see that?

19   A.    I do.

20   Q.    And then it goes on to say it needs to be updated.

21         And then we go to 205, which is called "Conflicts of

22   Interest;" do you see that?

23   A.    Yes.

24   Q.    Okay.  And it says, "It is the responsibility of each

25   member to make those disclosures;" correct?

1    A.    Yes.

2    Q.    Now, let's go to that form that you signed, 2073. Here's

3    the form.  Just give me one second.

4          Okay.  So, Question 1 asks your organizational

5    affiliation or your employer; correct?

6    A.    Yes.

7    Q.    And you listed Momenta Pharmaceuticals as your employer;

8    is that right?

9    A.    Yes.

10   Q.    Okay.  And Question 3 you told us asked about any

11   companies known to you that might have an equity or financial

12   interest in excess of $15,000 in connection with the work

13   you're doing; correct?

14   A.    Yes.

15   Q.    Okay.  Now, let me just ask you one question for a moment.

16         You were listed as an inventor in the '886 patent;

17   correct?

18   A.    Yes.

19   Q.    So, you had a professional interest in that patent;

20   correct?

21   A.    What do you mean by a professional interest?

22   Q.    Do you not understand that term, "professional interest"?

23   A.    Well, I guess not in this context, so what do you mean by

24   that?

25   Q.    Okay.  Well, if I said to you -- if were at a cocktail

1    party and I said, Dr. Shriver, I heard about something called

2    the '886 patent, do you have a professional interest in that,

3    how would you respond to me?

4    A.    I would ask you what you meant.

5    Q.    Fair point.

6    A.    Okay.

7    Q.    Okay.  If you don't understand -- you don't understand

8    professional interest?

9    A.    I don't -- in this context, I guess I just don't quite

10   understand.

11   Q.    Okay.  Let's look at Question 4, then.  "List all

12   companies known to you, all companies."

13   A.    You're on Question 3.

14   Q.    Oh, yeah.  Thanks.

15          "List any" -- right.  Thanks.

16          "List any other professional or financial

17   interests" -- let me stop there for a moment.

18          Okay.  "Professional or financial interests."  Let's

19   take it one at a time.

20          In the context of the conflict of interest form that

21   you signed, do you have an understanding of what a professional

22   interest is?

23   A.    This would be -- I understood this to be other interests

24   outside of Momenta Pharmaceuticals.

25   Q.    You're not answering my question again.

1    A.    So, professional to me means employer, so other -- like,

2    if you're a consultant or if you run your own business or

3    something like that.

4    Q.    So, I'll go back to my first question.  In your view,

5    sir -- I can only ask you -- do you believe that being an

6    inventor on the '886 patent gave you a professional interest in

7    that patent?

8    A.    So, in the context of my invention disclosure, I had

9    disclosed that I was an employee of Momenta Pharmaceuticals and

10   that anything I did, as you pointed out in your documents, that

11   regarded USP, I had to disclose those conflicts.

12   Q.    Let's dispel something right now.

13         In your direct testimony -- I remember I scribbled

14   down exactly what you said.  Of course I can't find it this

15   second.  Your testimony on direct was that you disclosed the

16   pending '886 application to the USP; correct?

17   A.    My -- I did not disclose '886.  It really is not something

18   that came into my --

19   Q.    Here it is, okay.  I found it.  "You disclosed that

20   Momenta had an active application."

21   A.    Active FDA application, that's what I meant.

22   Q.    No.  Well, I --

23   A.    That's what I meant is that -- because what I thought is

24   that, again, any USP-based decisions could impact the FDA

25   application we had.

1    Q.   So, let's just make something really clear from this form.

2    When you wrote that your employer was Momenta in response to

3    Question 1, that did not disclose the '886 patent; correct?

4    A.   You mean specifically?

5    Q.   Yes.

6    A.   There's no mention of '886.

7    Q.   No mention of it.  And when you wrote "Momenta

8    Pharmaceuticals" in response to Question 3, it didn't disclose

9    the '886 patent, did it?

10   A.   Again, there is no specific mention of it, yes.

11   Q.   And when you were asked if there was any other, any other

12   professional or financial interests that may result in a

13   conflict of interest or the appearance of a conflict of

14   interest under the rules we just looked at, what did you write?

15   A.   I didn't write anything.

16   Q.   You wrote zero, you wrote nothing; isn't that true?

17   A.   That's right.

18   Q.   So, USP gets your form, and they look at it, and they go,

19   Oh, well, Dr. Shriver has no conflict of interest.  We don't

20   know anything about the '886 patent because they announced that

21   to you in the conference.  How are they supposed to know that

22   you have a conflict of interest specifically on the '886

23   patent?

24   A.   So, first of all, the USP knew very much that I was --

25   had -- because I was Momenta's -- a Momenta employee, that --

1    the interests of Momenta, and I did fully recuse myself with

2    any voting regarding enoxaparin.

3    Q.   Okay.  We looked at the rules a moment ago, sir.  Can we

4    agree there is no rule, no rule that says you don't have to

5    answer these questions accurately if you recuse yourself?

6    A.   So, I believe I did answer these questions accurately.  I

7    believe I filled out my conflict of interest to the best of my

8    ability --

9    Q.   Without --

10   A.   -- and I was completely honest.

11   Q.   Sorry.  I don't mean to interrupt you.  Without disclosing

12   '886; correct?

13   A.   Without the specific mention of '886.

14   Q.   Okay.  This makes specific reference, Question 4, to rule

15   -- the rules we just looked at, Section 2 -- I don't know if it

16   says 206 or 205, but we looked at both of them.  You see that

17   there?

18   A.   I do.

19   Q.   Okay.  Now, can we agree that Momenta certainly had a

20   financial interest in the '886 patent?

21   A.   So, Momenta -- if you mean by financial interest

22   protecting its intellectual property, yes, I would say yes,

23   there is an interest there.

24   Q.   Do you know what financial interest means in the context

25   of this form that you filled out and signed?

1    A.   So, do I understand what my financial interest was?

2    Q.   You're presumed to be the same as your employer, remember?

3    We already looked at that rule.

4    A.   And that's what I disclosed, was that I was an employee of

5    Momenta Pharmaceuticals.

6    Q.   Now try to answer my question, please.  Do you believe

7    that Momenta had a financial interest in the '886 patent?  Yes

8    or no.

9    A.   In terms of protecting its intellectual property,

10   absolutely, yes.

11   Q.   And yet you didn't disclose that, did you?

12   A.   There was no specific mention of '886.

13   Q.   Okay.  Do you believe that by telling USP that you worked

14   for Momenta, that that allowed you -- that relieved you from

15   truthfully answering Question No. 4?

16   A.   So, I believe I truthfully answered all of the questions.

17   Q.   Is it your position, sir, that the USP was obligated to go

18   out there -- and I think the jury saw a video yesterday, they

19   heard about hundreds of thousands of patents being filed each

20   year.

21        Is it your view that the USP was obligated to go

22   search through patents to see if you had a conflict of interest

23   that you did not disclose?

24   A.   No.  No, they would not have to do that.

25   Q.   And we saw a few moments ago that the primary

1    responsibility is on you for making that disclosure?

2    A.    Yes.

3    Q.    Did your employer, Momenta, tell you not to disclose to

4    the USP the pending '866 application?

5    A.    We never had a conversation of the '886 in the context of

6    USP or anything like that.

7    Q.    That November meeting in 2008 where you sat silent, that

8    was not the only meeting you went to of this panel where you

9    failed to make disclosure; isn't that right?

10   A.    I believe I've made disclosures all the time.

11   Q.    Let's just go through a few of them quickly, then.

12         Exhibit 2041 are minutes from the meeting of the panel

13   on April 24th and 25th, 2008; you see that at the top?

14   A.    I do.

15   Q.    Okay.  And we see down at the bottom, right here,  Susan

16   de Mars discussed the confidentiality and conflict of interest

17   policies; you see that?

18   A.    I do.

19   Q.    Did you disclose the '886 patent that day?

20   A.    So, this is the heparin panel.  This has nothing to do

21   with low-molecular-weight heparins at this point, I believe.

22   Q.    Okay.  The '886 was pending -- correct? -- at this time?

23   A.    I guess so, yeah.

24   Q.    Okay.  Let's look at the next one.  This is Exhibit -- I'm

25   sorry.  2191 is next.

1          This is a meeting on May 27, 2008.  This is, again,

2     that heparin ad hoc advisory panel?

3     A.   Yes.  And at this point, again, it's referring only to

4     heparin.

5     Q.   Okay.  So, you believe you had no disclosure obligation

6     with respect to '886?

7     A.   No.  I'm just saying I had full disclosure obligations to

8     USP, and I made those disclosures.

9     Q.   Now, did you make any disclosure about '886 at the May

10    27th meeting?

11    A.   No.

12    Q.   Okay.  Let's look, finally, at 2192.  This is, again, the

13    heparin ad hoc advisory panel.  And this time we're in

14    August of 2008; do you see that?

15    A.   Again, this refers specifically to heparin sodium, not the

16    low-molecular-weight heparin advisory panel.

17    Q.   And that means you don't have to update the USP on any

18    conflict of interest; right?

19    A.   No.  Absolutely.  But it means that the subject pointing

20    these out as evidence of something, these meetings had nothing

21    to do with low-molecular-weight heparin at all.  The topic

22    would never have come up in the context of these discussions.

23    Q.   Okay.  And you made no disclosure about '886 at that

24    meeting either; correct?

25    A.   I did not.

1  Q.   Let's talk about your opposition.  You've told us about

2  your opposition to 207.

3        Let me ask you this:  If 207 was adopted as the

4  exclusive method, Momenta would have had to have changed their

5  testing; correct?

6  A.   They would have had to have done a lot more than that --

7  Q.   Okay.

8  A.   -- because it goes to the issue of sameness, for example,

9  as well.

10  Q.   Okay.  And that would have delayed any FDA approval of

11  Momenta's generic enoxaparin; correct?

12  A.   I don't know if it would have delayed it.  It would have

13  confused the scientific discussion.

14  Q.   Well, the jury heard from your colleague, Mr. Kaundinya,

15  just a few moments ago that it would have delayed.

16  A.   Sure.  Then --

17  Q.   Do you have a different view?

18  A.   No, not at all.

19  Q.   Okay.  And that would have cost Momenta money; right?

20  A.   Yes, presumably.

21  Q.   Now, are you familiar with the generic market at all?

22  A.   Not entirely, no.

23  Q.   Well, let me ask you a simple one, then.  If you don't

24  know, just tell me.  Are you aware that, when the first generic

25  comes in and it's just the brand and the generic, the price

1    goes down some?  Are you aware of that?

2    A.    In general, yes.

3    Q.    Okay.  And are you aware that, when more generics come in

4    after the first one, the price goes down dramatically?

5    A.    I'm aware in general, again, of that, that's the case.

6    Q.    Okay.  2192 I want to show you if I can find it.  I got

7    it.  It's 2150.

8          Exhibit 2150, this is an exhibit that was shown to

9    your colleague, Mr. Kaundinya, during his examination.  If my

10   recollection is right, he told the jury -- well, withdrawn.

11         Let's put it up in front of you.  This is from a

12   strategy meeting with Momenta and Sandoz that was described

13   earlier.  Okay.  "Multiple complementary analytical approaches

14   are required, higher barrier to entry for others, consistent

15   with our strategy and plan."

16         Do you see that?

17   A.    I do.

18   Q.    Okay.  Just give me one second.

19         Now, when Mr. Kaundinya was questioned earlier

20   today -- let me just find it.

21         THE COURT:  What Exhibit are we looking at here?

22         MR. SOMMER:  Yes, Judge.  2150 at Page 79.

23         THE COURT:  I don't seem to have 2150.

24         MR. SOMMER:  This is the first page of 2150.  If I can

25   pull back a little.  Oops.  That's going forward.

1          Is that sufficient, Your Honor?

2          THE COURT:  I just don't have a paper copy.

3          MR. SOMMER:  Oh, I'm sorry.

4          THE COURT:  Is that in yours or in the Plaintiffs'?

5          MR. SOMMER:  Let me hand it up.  If I may approach the

6    bench?

7          THE COURT:  Yes.

8          MR. SOMMER:  Sorry about that.

9    Q.   My question to you, sir:  Were you familiar with the

10   strategy of erecting barriers to keep others out?

11   A.   So, I was -- I don't think that was the strategy.  The

12   strategy, in my view, was a high-science application that would

13   show sameness for a very complex product, and the challenge to

14   the industry would be to do the same.

15   Q.   Look, I didn't write this.  This is a Momenta document.

16   A.   I didn't write it either.

17   Q.   I'm asking you, sir, if you were --

18          MR. FRANK:  Objection.

19          THE COURT:  Sustained.

20   Q.   I'm asking you, sir, if you are aware of the strategy at

21   Momenta to erect barriers to other companies entering.

22   A.   Again, I wouldn't classify it as erecting barriers.

23   Q.   Let's see if we can agree on this:  If Momenta has its

24   generic enoxaparin in the marketplace and it can erect barriers

25   to stop other generics from coming in, that allows it to

1    maintain a higher price; correct?

2    A.   If other generics weren't allowed in, yes, that would --

3    Q.   Okay.  And that means that Momenta can charge consumers

4    more than they would otherwise be able to charge them if other

5    generics such as Amphastar were able to come into the market;

6    correct?

7    A.   Presumably.

8    Q.   Can we agree, sir, that there was strong economic motive

9    for Momenta not to disclose its '886 patent to USP?

10   A.   I don't agree with that.

11   Q.   Well, if some unsuspecting company came along and

12   practiced that method and Momenta took the position that it had

13   a patent that was implicated by it, Momenta could then sue that

14   company for hundreds of millions of dollars; correct?

15   A.   So -- but in the context of USP, people are free to

16   practice any 1,6 method that they deem fit and appropriate.

17   Q.   Let me just show you a couple of last exhibits on this,

18   and then I'm going to do one last brief point and you'll be

19   free of me.

20        I want to show you Exhibit 163.  This is a letter from

21   the FDA approving Amphastar's generic enoxaparin.  It's

22   Exhibit 163.  And I'm going to start with the date of this,

23   September 19th, 2011.

24        And if you look at Page 2 -- I'll pull back a little.

25   A.   Thank you.

1   Q.   You're welcome.  -- where you see that, "Accordingly, the

2   ANDA is approved effective on the date of this letter;" do you

3   see that?

4   A.   I do.

5   Q.   Okay.  I don't -- I will admit to you I don't remember

6   whether it was your testimony or your colleague, Mr. Kaundinya,

7   where we saw a similar letter that listed all the interactions

8   over the years with the FDA, all the hard work to get the

9   generic approved.  Do you see that there?

10   A.   Yes.

11   Q.   Okay.  Are you aware of how many days after the FDA

12   approved Amphastar's generic that Momenta and Sandoz sued?

13   A.   I am not.

14   Q.   Let me show you the first page of Exhibit 368, which is

15   the complaint here.

16         September 21st, 2011, two days later; do you see that?

17   A.   I see September 21st, 2011, yes.

18   Q.   Now, we can agree that Momenta would have known for years

19   that Amphastar had an ANDA application with the FDA; correct?

20   A.   Momenta did know that there was an application from

21   Amphastar.

22   Q.   And at any time over those years did Momenta pick up the

23   phone or write a letter to Amphastar and say, Hey, by the way,

24   we've got this thing out there called the '886 patent that

25   could cause a problem for you if you use USP 207?

1    A.   I don't know if Momenta did that or not.

2    Q.   You didn't do it?

3    A.   I did not do it, no.

4    Q.   You're unaware of anyone at Momenta doing it; right?

5    A.   I am not aware of anyone doing it.

6    Q.   You're unaware of Sandoz doing it; right?

7    A.   I'm not generally aware of what Sandoz does.

8    Q.   Okay.  Now, I'm going to get to that last point.  I'll put

9    this mess aside.  Never trust a lawyer when he says he has just

10   one more thing.  I have two last things.

11   A.   Sure thing.

12   Q.   Okay.  As of the filing date of the patent, March 11th,

13   2002, you did not know that a 1,6 anydro structure was in

14   enoxaparin; correct?

15   A.   Correct.

16   Q.   And that is why we can search the patent, and we will find

17   no reference to a 1,6 anydro; correct?

18   A.   Correct.

19   Q.   And so, a person of ordinary skill in the art looking at

20   the patent as of the filing date would have had no idea at all

21   that it covered a 1,6 anydro structure; correct?

22   A.   So, it certainly would have been a modified structure that

23   existed in enoxaparin but not a      1,6 anydro.

24   Q.   Okay.  Thank you.  And you didn't know; right?

25   A.   At that point?  No.

1   Q.   And Momenta didn't know?

2   A.   Not to my knowledge.

3   Q.   All right.  And I think the jury's heard this a couple of

4   times -- I don't mean to overdo it -- but Momenta didn't invent

5   enoxaparin; correct?

6   A.   No.

7   Q.   Okay.  Ganesh Kaundinya did not invent it?

8   A.   He did not.

9   Q.   Momenta didn't, Sandoz didn't; correct?

10  A.   No.

11  Q.   And there is no patent or other exclusive right that

12  Momenta or Sandoz have to sell enoxaparin; correct?

13  A.   Again, I -- patent -- not to my knowledge, but I haven't

14  done a --

15  Q.   Okay.  All right.

16       Now, in the binder up there that your counsel gave you

17  was Exhibit 2, which was the patent.

18  A.   Yes.

19  Q.   Now, I'm not the science guy on my team, but let me ask if

20  we can agree on something.  As you understand the infringement

21  claim here -- well, let's just go to it.

22       Go to Claim 1.

23  A.   Where is Claim 1?

24  Q.   Yeah, I'm going to direct you there.  Fair enough.  I

25  think it's Column 47 maybe?

1          MR. SOMMER:  I'm waiting for one of my team to help me

2     out here.  Got it, got it, got it.  Thank you, Josh.

3     Q.    Okay.  Column 63 begins with, "We claim."  Those are the

4     claims; right?  That's where the claims begin, I should say?

5     A.    Yes.

6     Q.    Okay.  And the first thing we read is, "A method for

7     analyzing an enoxaparin sample for the presence of an amount of

8     a non-naturally occurring sugar associated with Peak 9 of

9     Figure 1;" do you see that?

10    A.    I do.

11    Q.    Okay.  So, let me make sure I understand it.  As you

12    understand the infringement claim here on this, the claim is

13    that Amphastar is doing something that the Plaintiffs say

14    infringes on something that you guys say you discovered that's

15    set forth in Figure 1; is that correct?

16          MR. FRANK:  Objection.  Claim 1 is not an asserted

17    claim.

18          THE COURT:  Sustained.

19          MR. SOMMER:  Okay.  Withdrawn.  I'm sorry.

20    Q.    Let's go to Claim 6, and I'll ask you the same question.

21    This is 6 here.  Here it is.  Okay, my bad.

22          Now, we're on Claim 6.  I'm not going to read the

23    whole thing, but again, it talks about a non-naturally

24    occurring sugar associated with Peak 9 of Figure 1; correct?

25    A.    That's what it says, yes.

1    Q.   Okay.  Now, I want you to take the patent, sir, and I'd

2    like you to turn to Figure 1.

3              THE COURT:  Well, before you do that, we're going to

4    break for the day.  You may step down for the time being, and

5    we will adjourn for the day and return tomorrow.  You may step

6    down.

7              Jurors, we will be in recess until 9:00 a.m. tomorrow

8    morning.  Please leave your notebooks in the jury room, and

9    we'll see you back here at 9:00 a.m.

10             THE CLERK:  All rise for the jury.

11             (The jury is not present for the following)

12             THE COURT:  Please be seated, Counsel.

13             THE WITNESS:  Do you want me still up here or --

14             THE COURT:  No.  Please step down.

15             How much longer on cross-examination?

16             MR. SOMMER:  Less than five minutes, Judge.

17             THE COURT:  All right.  Just a point of order, I don't

18   want you using the jury box as a table anymore.  You've got two

19   big tables --

20             MR. SOMMER:  I apologize.

21             THE COURT:  -- for the Defendants.  You don't need to

22   use the floor, and you don't need to use the jury box.

23             MR. SOMMER:  Understood, Judge, loud and clear.

24             THE COURT:  I would like -- I don't mind when Counsel

25   change seats, but whenever I have new lawyers at --

1    representing one or the other of the parties, I want to have a

2    chart of who is in the Courtroom and who is sitting at Counsel

3    table.  I notice that you have changed, both sides, from time

4    to time the order of chairs, but I don't want that to happen

5    without notifying the Court.  So, every session that starts, I

6    want to know who's sitting where on behalf of both of the

7    clients --

8              MR. FRANK:  Yes --

9              THE COURT:  -- both of the parties.

10             MR. FRANK:  -- it will be done.

11             MR. SOMMER:  We're going to stay put where we are.

12             THE COURT:  All right.  Is there anything else that

13   needs to come to -- well, let me say, after the finish of

14   cross-examination, approximately how much redirect?

15             MR. FRANK:  Oh, five minutes, ten minutes, something

16   like that.

17             THE COURT:  All right.  And who is the first new

18   witness tomorrow?

19             MR. FRANK:  Dr. Capila followed by Dr. Liu.

20             THE COURT:  And how long will Dr. -- remind me of

21   Dr. Capila's direct.

22             MR. FRANK:  I think I said 30 minutes yesterday.  It's

23   still that.

24             THE COURT:  All right.  And then Dr. Liu?

25             MR. FRANK:  Is approximately I think an hour and a

1    quarter.

2              THE COURT:  All right.  And cross-examination of

3    Dr. Liu?

4              MR. SOMMER:  About 30 minutes?

5              MR. CARSTEN:  Yeah.

6              THE COURT:  And then after Dr. Liu?

7              MR. FRANK:  David Picard.

8              THE COURT:  Picard?

9              MR. FRANK:  Picard.

10             THE COURT:  And the length of his direct?

11             MR. FRANK:  Approximately a half hour.

12             THE COURT:  And the cross?

13             MR. SOMMER:  Less.

14             THE COURT:  And after him?

15             MR. FRANK:  After him is Rao, is Mohan Rao who is our

16   damages expert, yes.

17             THE COURT:  And his direct would be -- approximately.

18             MR. FRANK:  Approximately 45 minutes.

19             THE COURT:  All right.  So, we certainly won't get

20   through that part of the testimony, but I want to have a

21   preliminary on the possibility of who's going to testify

22   tomorrow.

23             MR. FRANK:  Could we get estimates of the cross as

24   well?

25             MR. SOMMER:  On Capila, half an hour; on Liu, half an

1   hour to three quarters of an hour; Picard, less than a half an

2   hour; Rao, I hope less than a half an hour.  Those are our best

3   estimates, having not heard --

4          THE COURT:  All right.  Anything else that needs to

5   come to my attention before we ajourn for the day?

6          MR. FRANK:  No, thank you, Your Honor.

7          MR. SOMMER:  Thank you, Judge.

8          THE COURT:  We're adjourned.

9          (Adjourned, 3:35 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4

5

6

7

8

9            We, Debra D. Lajoie, RMR, FCR, CRI, and Cheryl

10   Dahlstrom, RMR, CRR, do hereby certify that the foregoing pages

11   are a true and accurate transcription of our stenographic notes

12   in the above-entitled case.

13

14

15

16

17

18            /s/ Debra D. Lajoie

19            /s/ Cheryl Dahlstrom

20

21

22            7/13/17

23

24

25